IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAUREN KESTERSON<br>6311 Third Avenue<br>Kent, OH 44240<br><br>            Plaintiff,<br><br>vs.<br><br>KENT STATE UNIVERSITY<br>800 East Summit Street<br>Kent, OH 44240<br><br>and<br><br>KAREN LINDER (individually)<br>514 Karen Trail<br>Tallmadge, OH 44278<br><br>            Defendants. | CASE NO.<br><br>JUDGE<br><br>MAGISTRATE JUDGE |

**Plaintiff's Complaint with Jury Demand**

### NATURE OF ACTION

1.      This is a civil-rights action brought under Title IX of the Education Amendments of 1972, as amended, 42 U.S.C. § 1983 for violations of equal protection under the Fourteenth Amendment, and for violations of state law. In this complaint, former Kent State softball player Lauren Kesterson alleges that—when she reported to her coach that a Kent State baseball star had raped her—the coach pressured Ms. Kesterson to cover up the rape. When Ms. Kesterson reported what her coach had done, other Kent State officials retaliated against her, making Ms. Kesterson's life so miserable that she had no choice but to stop playing softball (even after Kent State allowed the coach to resign in

the wake of her grievous failures). Title IX guarantees that no student-athlete should ever have to choose between playing the sport she loves and reporting a sexual assault.

## PARTIES

2.      Plaintiff Lauren Kesterson is a current Kent State University student and former student-athlete.

3.      Defendant Kent State University is a public university located in Portage County, Ohio.

4.      Defendant Karen Linder is the former head coach of the Kent State women's varsity softball team. She resides in Summit County, Ohio, and is sued personally.

## JURISDICTION AND VENUE

5.      Jurisdiction over federal claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 and under 42 U.S.C. §§ 1983 and 1988, which provide for attorney and expert fees for vindication of civil-rights claims, is asserted under 28 U.S.C. §§ 1331 and 1343.

6.      Jurisdiction over state-law claims is asserted under 28 U.S.C. § 1367, which grants supplemental jurisdiction over claims that are part of the same case or controversy as claims over which the Court has original jurisdiction.

7.      The Court has personal jurisdiction over defendants and venue is proper here under 28 U.S.C. § 1391 because the relevant events took place with this Court's jurisdiction.

### FACTUAL BACKGROUND

### In Division I athletics programs, coaches wield
### enormous authority over athletes.

8.      In NCAA Division I varsity athletic programs, coaches have substantial authority. They are often the first university personnel with whom prospective student-athletes interact. Coaches recruit student-athletes to come to their universities and be part of their programs. Coaches have the power to offer student-athletes scholarships including the cost of tuition, room, and board.

9.      Once on campus, NCAA Division I varsity coaches control most aspects of a student-athlete's existence. Coaches decide such matters as how much, if any, playing time an athlete will receive and in what position(s). But beyond that, coaches wield considerable authority over other aspects of an athlete's life such as where and with whom they live; where, when, and what they eat or drink; when they lift weights or have conditioning sessions; when they must attend study tables; when they can schedule classes (based on when practices, individual workouts, conditioning sessions, and weight lifting are held); when they can go home for Christmas break, spring break, or summer break; when they must participate in camps or booster activities or hosting prospective student-athletes; and whether they may have a job and, if so, what kind.

10.      NCAA Division I varsity coaches have the power to implement team rules about any number of subjects such as team attire, curfews, social-media use, and use of drugs and alcohol.

11.      Violations of team rules are punishable even if they take place in the off-season, off campus, and have nothing to do with an athlete's sport.

12.     At Kent State, Coach Linder wielded all of the authority described above. She chose her student-athlete's living arrangements. She specifically had team rules for the softball players including a prohibition on them sticking out their tongues in pictures. They were not allowed to spit or drink soda on the road. She prohibited them from employing curse words on their social-media accounts including retweeting any messages with curse words on Twitter. She also instructed them on what type of attire they were permitted to wear when going out socially.

13.     Financial scholarships based on athletic skill are granted for one year only.

14.     A Division I head coach has the power to non-renew a student-athlete's scholarship.

15.     As Kent State's head softball coach, Linder had the power to non-renew her players' scholarships.

16.     Because coaches can non-renew an athlete's scholarship, and control an athlete's opportunity to play the sport to which she has dedicated herself, coaches have tremendous power.

17.     When the coach of a Division I varsity athlete gives her an instruction, the player ignores it at her peril.

18.     For a Division I student-athlete, the coach is the university.

**Coach Karen Linder recruits Ms. Kesterson
and her twin sister to play softball at Kent State.**

19.     Ms. Kesterson and her twin sister began playing softball in their home state of Washington when there were six or seven. Both excelled on the field and in the classroom and were recruited to play softball in college.

20.     Coach Linder recruited the twins to play softball at Kent State. Coach Linder was their first contact with the University.

21.     In April 2011, as high-school juniors, the twins verbally committed to play softball at Kent State University as scholarship athletes.

22.     Ms. Kesterson graduated high school in the spring of 2012 in the top 5% of her class. That fall, she enrolled as a student at Kent as a scholarship athlete.

### At the end of the fall semester of 2012, Kent State baseball player Tucker Linder rapes Ms. Kesterson.

23.     Coach Linder's son, Tucker Linder, was also a freshman at Kent in the fall of 2012.

24.     According to Kent State's official athletics website, Mr. Linder was approximately 6'5" tall and weighed 210 pounds during his freshman season.[1]

25.     Mr. Linder and Ms. Kesterson developed a friendship. They had engaged in minor intimacies on one occasion before the attack.

26.     On approximately December 7, 2012, Mr. Linder called Ms. Kesterson and asked if she wanted to hang out. She went over to his dorm and they walked back to her dorm.

27.     Mr. Linder appeared to be intoxicated.

28.     Ms. Kesterson had not been drinking.

29.     Mr. Linder and Ms. Kesterson again engaged in minor intimacies, and Ms. Kesterson consented to this behavior. But unlike during their previous encounter, Mr. Linder did not stop when Ms. Kesterson stopped consenting.

30.     Ms. Kesterson told Mr. Linder at least ten times that she did not want to have sex.

31.     Mr. Linder ignored Ms. Kesterson's protestations.

---

[1] http://www.kentstatesports.com/roster.aspx?rp_id=4329&path=baseball (last visited Feb. 3, 2016).

32.     Mr. Linder is much larger than Ms. Kesterson and pressed himself on top of her. She tried to push him away to no avail.

33.     Mr. Linder raped Ms. Kesterson.

34.     Ms. Kesterson was horrified and distraught at what Mr. Linder had done. She was scared that he had forcibly exposed her to unwanted pregnancy and sexually transmitted disease.

35.     Ms. Kesterson sent Mr. Linder a text message to ask if he had been tested for STDs.

36.     Mr. Linder responded that he had not been tested but had never shown any symptoms of STDs.

37.     Ms. Kesterson was tested at the health center on campus for pregnancy and STDs.

### In the aftermath of the rape, Ms. Kesterson suffered in silence for months; she was ashamed and scared about what would happen if she reported the rape.

38.     Ms. Kesterson was sad and ashamed that she had been raped, and the experience stripped her of her sense of strength and confidence. Her emotional suffering was intense and debilitating. She tried her best to move past it on her own.

39.     Ms. Kesterson had excellent grades in high school, graduating in the top 5% of her class. Ms. Kesterson's academic success continued in her first semester of college when she earned a 3.98 grade-point average.

40.     Following the rape, Ms. Kesterson's academic performance began to slip. Previously a dedicated student, she struggled to attend class even on test days.

41.     Ms. Kesterson's respite would have been the ability to play the sport she had always loved. She was the starting shortstop on the softball team as a freshman. But

after the rape, softball also caused her to suffer additionally. Baseball and softball are sister sports: the teams share a hitting facility and training areas as well as a weight room. Being around softball meant being around her rapist.

**Mr. Linder verbally abuses Ms. Kesterson at a party,
which leads her to confront the reality of having been raped.**

42.    In approximately September 2013, Ms. Kesterson and her boyfriend were at a party. Mr. Linder was at the same party.

43.    During the party, Mr. Linder, who was intoxicated, screamed at Ms. Kesterson's boyfriend, "Just so you know: I fucked your girl."

44.    Mr. Linder's outburst made Ms. Kesterson relive his attack. It forced Ms. Kesterson to confront the reality of the experience. She began to have nightmares and flashbacks. She began to vomit frequently and lost weight. She began to realize that she could not move past it on her own. She began to confide in her closest friends. And she confided in her parents about what happened.

45.    Unable to attend class except on test days, Ms. Kesterson's G.P.A. dropped to a 3.1 during the fall of her sophomore year. She withdrew from two classes that semester because she was unable to concentrate due to the emotional strain.

46.    Ms. Kesterson's parents arranged for her to see a trauma therapist when she returned home for winter break. Despite receiving treatment, Ms. Kesterson continues to have a physical and emotional reaction when she thinks or talks about the rape.

**Despite receiving treatment,
Ms. Kesterson continues to suffer the effects of the rape.**

47.    Ms. Kesterson continued to suffer the physical and emotional effects of the rape through the spring semester of her sophomore year.

48.     Ms. Kesterson continued to lose sleep and weight. She continually relived the rape and experienced nightmares and flashbacks.

49.     Again, despite what she was enduring, Ms. Kesterson had softball to help hold herself together. During the 2014 season, she was again the starting shortstop for the softball team.

50.     Still struggling to attend class, Ms. Kesterson's grades continued to drop. Her G.P.A. during the spring semester of her sophomore year was 2.84.

51.     At the end of the spring semester during a team meeting, Ms. Kesterson and her teammates and Coach Linder were discussing the year and looking ahead to next year. Ms. Kesterson spoke up at the meeting and thanked everyone for helping her deal with her issues. Ms. Kesterson became emotional while she offered her teammates thanks.

52.     Ms. Kesterson's suffering was so apparent that, following that meeting, Coach Linder asked Ms. Kesterson's twin sister and one of their teammates if Ms. Kesterson had been sexually assaulted. The teammate and Ms. Kesterson's sister both told Coach Linder that she would have to ask Ms. Kesterson for an answer to that question.

### Ms. Kesterson lodges a Title IX complaint with the University by reporting the rape to Coach Linder.

53.     Before she was raped, Kent State provided Ms. Kesterson with no training, guidance, or instructions regarding what to do if she experienced sex-based harassment or discrimination including sexual assault on campus.

54.     In mid-May 2014, at the end of the spring semester, Ms. Kesterson met with Coach Linder for a routine exit meeting. During this meeting, Ms. Kesterson lodged a Title IX complaint with the University.

55.    During this meeting with Ms. Kesterson, Coach Linder, referring to Ms. Kesterson's comments at the team meeting, asked Ms. Kesterson if she had been through anything that she would like to talk about. Coach Linder asked Ms. Kesterson directly if she had been sexually assaulted.

56.    Ms. Kesterson reported that she had been sexually assaulted.

57.    Coach Linder acknowledged that she had to report what Ms. Kesterson had told her.

58.    Coach Linder asked Ms. Kesterson, "It wasn't my son, was it?"

59.    Ms. Kesterson responded, "What if it was?" She emphasized that she did not want to leave Kent State or the team. Ms. Kesterson did not want to lose her opportunity to participate in the softball program because of her Title IX complaint that she had been raped. Ms. Kesterson said, "I know that he's your kid."

60.    Coach Linder responded, "You're my kid, too."

61.    When Ms. Kesterson acknowledged that Tucker Linder was the rapist, Coach Linder started crying and apologized to Ms. Kesterson.

62.    After Ms. Kesterson lodged her Title IX complaint with Coach Linder, the coach suggested that perhaps Mr. Linder did not know that he had raped Ms. Kesterson.

63.    After Ms. Kesterson lodged her Title IX complaint with Coach Linder, the coach repeatedly asked Ms. Kesterson if she would like to talk to Mr. Linder about the situation. Ms. Kesterson got the impression that Coach Linder was trying to convince Ms. Kesterson to meet with Mr. Linder to resolve the issue between them. Ms. Kesterson did not want to meet with Mr. Linder and declined.

64.    After Ms. Kesterson lodged her Title IX complaint with Coach Linder, the coach asked Ms. Kesterson if she wanted to press criminal charges against Mr. Linder. Ms.

Kesterson—fearful of what pressing charges against her coach's son would mean for her opportunity to play softball—said that she did not.

65.     Coach Linder asked Ms. Kesterson who else knew about the rape. Ms. Kesterson told Coach Linder that Ms. Kesterson's parents, her sister, and another teammate knew. Coach Linder said, "I would appreciate if you would not tell anybody else and that we keep this between the people that know."

66.     Ms. Kesterson got the impression from Coach Linder that Ms. Kesterson had to agree to remain silent if she wanted to keep her spot on the team. Ms. Kesterson was afraid that if she did not comply with Coach Linder's instruction, she would kick Ms. Kesterson off the softball team and non-renew her scholarship.

67.     Coach Linder told Ms. Kesterson that Mr. Linder was considering not returning to the University. Coach Linder admitted that her son had been struggling and had gotten into trouble. He had been arrested on St. Patrick's Day that semester due to an alcohol-related incident. "Tucker," Coach Linder said, "is not right."

68.     Coach Linder told Ms. Kesterson that Coach Linder would handle this and do whatever she could to help Ms. Kesterson. Coach Linder said she loved Ms. Kesterson.

69.     Ms. Kesterson displayed great courage in lodging her Title IX complaint with Coach Linder about the fact that Tucker Linder had raped Ms. Kesterson. Had Coach Linder responded to this complaint in accordance with University policy and as required by Title IX and the United States Constitution, things would have turned out much differently.

70.     Ms. Kesterson trusted that her coach would take the appropriate steps to address Ms. Kesterson's Title IX complaint that a fellow Kent State student-athlete had raped her.

71.     The day after Ms. Kesterson lodged the Title IX report, Coach Linder called Ms. Kesterson's mother and apologized to her. Coach Linder assured Ms. Kesterson's mother that Coach Linder would do everything she could to help Ms. Kesterson.

72.     After Ms. Kesterson reported the rape to Coach Linder, Tucker Linder sent Ms. Kesterson a text message in which he acknowledged that "[he] never should have put [Ms. Kesterson] in a situation like that" and that "[his] actions caused [her] pain for all this time." He claimed he had been "going through a lot of shit in [his] life lately" and had been "miserable and depressed for two years" because " [t]he expectations of being perfect have really taken its toll on" him. He indicated that he was "strongly considering transferring next year for different reasons, so [he] hope[d] [she could] stay at Kent State." He said, "I want to help you overcome what you're going through so you can get back to enjoying softball and enjoying life," and told Ms. Kesterson, "[i]f ignoring me, hating me, and forgetting I exist is better for you to cope with this, I understand."

73.     During the summer, while Ms. Kesterson was home in Washington, Coach Linder called and told her that Mr. Linder would not be returning to Kent in the fall. She told Ms. Kesterson that it would be better for Mr. Linder not to return to the University because he had been "struggling."

### Rather than report the rape as required by University policy and federal law, Coach Linder covered up what had happened.

74.     Coach Linder failed to take appropriate steps to address the sex-based assault that Ms. Kesterson endured and reported.

75.     Following Ms. Kesterson's report in May 2014, Coach Linder did not follow the University's policies regarding sexual harassment.

76.     Following Ms. Kesterson's report in May 2014, Coach Linder did not comply with her duty to report the assault to the Title IX coordinator or a deputy coordinator under the following University policies:

    a.    Policy Register 5-16.2(D) (requiring employees to report all instances of sexual harassment and sexual misconduct to the Title IX coordinator or deputy coordinator);

    b.    Policy Register 5-16.2(D)(4) (requiring such reports to be made "as quickly as possible");

    c.    Policy Register 5-16(D)(2) (requiring all offices receiving complaint to notify Title IX coordinator or deputy coordinator);

    d.    Policy Register 5-6(G)(2) (describing expectation that all members of university community report all instances of discrimination and harassment as part of their shared responsibility to prevent discrimination and harassment);

    e.    Division of Diversity, Equity & Inclusion Reporting Mandates ("All Kent State University employees are REQUIRED to report any instance of sexual harassment or misconduct to the Title IX Coordinator or a Deputy Coordinator, and in the case of sexual assault, to the police.")

77.     Following Ms. Kesterson's report in May 2014, Coach Linder did not provide Ms. Kesterson with a copy of any University policies or procedures regarding sex-based harassment.

78.     Following Ms. Kesterson's report in May 2014, Coach Linder did not provide Ms. Kesterson with any information about how to access services or resources for victims of sexual abuse.

79.    Following Ms. Kesterson's report in May 2014, Coach Linder took no steps to address the assault. All she did was instruct Ms. Kesterson not to tell anyone about it.

**Coach Linder knew exactly what to do when a softball player reported a rape because she had done it just days earlier when another softball player reported during her exit meeting that she had been raped.**

80.    A few days before Ms. Kesterson reported to Coach Linder during her exit meeting that Mr. Linder had raped Ms. Kesterson, *another* softball player reported to Coach Linder during *her* exit meeting that she had been raped (also by a Kent State student-athlete).

81.    When this other softball player reported a rape, Coach Linder immediately escorted her to Sexual and Relationship Violence and Support Services on campus.

82.    When this other softball player reported a rape, Coach Linder reported it to Janet Kittell, the Senior Women's Administrator and a deputy Title IX coordinator.

83.    Coach Linder knew exactly how to handle a rape allegation. She just chose to ignore the policy and the law in Ms. Kesterson's case.

**Throughout her junior year,**
**Ms. Kesterson struggles under the thumb of her rapist's mother.**

84.    When Ms. Kesterson returned to school in the fall of 2014 for her junior year, Coach Linder never mentioned the rape again. Having told Coach Linder the truth—and seeing her everyday knowing that she knew—made the rape even more real and difficult to move past. Ms. Kesterson struggled to function as a result. She was miserable at practice under the thumb of her rapist's mother.

85.    In the fall of 2014, Coach Linder would host team events at her home, where Tucker Linder still resided. Coach Linder required Ms. Kesterson to attend mandatory events at the Linder house, including a team meeting and a team Christmas party, where

photographs of Mr. Linder adorned the walls. Ms. Kesterson had to exchange gifts with her teammates under a life-sized Fathead® wall decal of her rapist.

86.     When Ms. Kesterson asked Coach Linder if there was anywhere besides Coach Linder's house where they could meet, Coach Linder responded, "It'll be fine. Tucker's not going to be there."

87.     Coach Linder also kept photographs of Mr. Linder in her office. Ms. Kesterson would see them when she was in her coach's office.

88.     Ms. Kesterson continued to attend practices, classes, games, and weight training, and kept quiet about her rape at her coach's insistence. But she occasionally lost her composure due to the mental anguish she was suffering. Attending practice and other softball activities was extremely difficult. Coach Linder's treatment of Ms. Kesterson caused her constant pain.

89.     Coach Linder generally acted with extreme indifference toward Ms. Kesterson throughout the 2014–15 academic year.

90.     Ms. Kesterson was still a starter, but Coach Linder moved Ms. Kesterson from the more important position of shortstop (her preferred position) to second base.

91.     When Coach Linder wasn't indifferent, she was making matters worse. One day during practice, Ms. Kesterson became emotional. The following day, Ms. Kesterson went up to Coach Linder's office to turn in Ms. Kesterson's study sheets. Ms. Kesterson overheard Coach Linder say to Coach Oakley, "We can't have that, we can't have someone losing control over themselves at practice. Next time she has to go home." When Coach Linder looked up and saw Ms. Kesterson, she said, "Speak of the devil." Coach Linder continued, "I hope you understand that you can't act like that in a practice or game setting."

92.     Coach Linder knew exactly was plaguing Ms. Kesterson. But rather than take any steps to assist Ms. Kesterson in obtaining the additional help that she needed—or even acting with a semblance of empathy for her son's rape victim—Coach Linder heaped abuse on Ms. Kesterson.

93.     Ms. Kesterson spent her entire junior year under the control of her rapist's mother, a woman who displayed no compassion for what Ms. Kesterson had endured. Coach Linder's treatment of Ms. Kesterson substantially diminished Ms. Kesterson's capacity to function as a student-athlete and her ability to equally participate in the University's programs and activities.

94.     Coach Linder violated University policies regarding conflict of interest and receiving a personal advantage by virtue of her employment when she abused her authority as the head softball coach to pressure Ms. Kesterson to keep quiet about the fact that she was raped by Coach Linder's son.

### Ms. Kesterson realizes that Coach Linder covered up the rape in violation of the law and University policy.

95.     The trauma that Ms. Kesterson suffered due to the rape was compounded by Coach Linder's and other Kent State officials' handling of the matter.

96.     After she returned home to Washington after her junior year, Ms. Kesterson began to investigate what Coach Linder *should* have done in response to Ms. Kesterson's rape complaint under Title IX.

97.      Ms. Kesterson learned that, rather than suppress the information and do nothing, as Coach Linder did, the law and University policy require much more in response to a rape report.

98.     Rules mean a lot to athletes like Ms. Kesterson. Ms. Kesterson had trusted that her coach—who represented the University in recruiting Ms. Kesterson and had almost complete control of Ms. Kesterson's existence as a student-athlete—would follow the rules.

99.     Ms. Kesterson decided that she would file another Title IX complaint—this time against Coach Linder—when Ms. Kesterson returned to campus in the fall.

100.    As the gravity of Coach Linder's betrayal set in, Ms. Kesterson realized that she could no longer play for Coach Linder. But she still wanted to play softball and she did not want to lose her scholarship because of her Title IX reports.

### Ms. Kesterson files a Title IX complaint against Coach Linder.

101.    When Ms. Kesterson returned to the University in the fall of 2015, on or about August 24, she met with Erin Barton, the Deputy Coordinator for Title IX in the Equal Opportunity and Affirmative Action Department responsible for conducting interviews regarding Title IX complaints.

102.    During their meeting, Ms. Barton expressed sympathy for what Ms. Kesterson had endured and said, "We are going to make this right." Ms. Barton had Ms. Kesterson sign what Barton described as a formal Title IX complaint.

103.    Ms. Barton promised Ms. Kesterson that within 24 hours, the formal complaint and no-contact orders against Coach Linder and Tucker Linder (who was registered for fall classes) would be filed. Ms. Barton described the complaint process to Ms. Kesterson and explained that once Ms. Barton filed the formal complaint against Coach Linder, her boss (the Athletic Director) and everyone above him in the university hierarchy would receive a copy of the formal complaint.

104.    But on August 25, Ms. Barton told Ms. Kesterson that Ms. Barton would not be filing the no-contract orders or the formal complaint. Ms. Barton explained that she had spoken to and met with Athletic Director Joel Nielsen. Mr. Nielsen had intervened to prevent the filing of a formal complaint. Ms. Barton reported that she and Mr. Nielsen had decided that they would be conducting a "surprise interview" of Coach Linder instead of following the University's sexual-harassment policy. Ms. Kesterson got the impression from Ms. Barton that Mr. Nielsen's motivation was to keep the matter as quiet as possible and prevent notifying his superiors about what had happened in his department on his watch.

105.    The failure to file the official complaint and no-contact orders violated University policy.

106.    The failure to file the official complaint and no-contact orders violated federal law.

107.    University policy does not provide for conducting a "surprise interview" with the subject of a Title IX complaint in lieu of filing the formal complaint.

108.    Mr. Nielsen had no right to intervene or attempt to impact the course of Ms. Kesterson's Title IX complaint.

109.    On or about the afternoon of August 25, 2015, Ms. Kesterson and her father spoke with Mr. Nielsen. Mr. Nielsen was gruff with Ms. Kesterson and told her, "nobody wins in this situation." Ms. Kesterson explained that she wasn't trying to "win" anything; she just wanted things to be done correctly. She impressed upon Mr. Nielsen that she did not want to lose her scholarship over her Title IX reports. Mr. Nielsen responded, "Obviously, we would like to give our scholarships to athletes who are on the field."

110.     On or about August 26, 2015, Ms. Barton and Mr. Nielsen interviewed Coach Linder about Ms. Kesterson's report. Ms. Kesterson was unaware that this interview had taken place until she received the University's report on the investigation in January 2016.

111.     Ms. Kesterson heard nothing from the University about her complaint on August 26 or 27. No one notified her that Coach Linder had been interviewed or updated Ms. Kesterson on the status of her complaint or that Coach Linder was about to resign.

**Linder resigns; blames "entitled" student-athletes for her "retirement."**

112.     On or about August 28, 2015, assistant coach Jessica Toocheck sent an email to the softball team announcing an emergency team meeting later that day.

113.     Ms. Kesterson panicked: no one had told Ms. Kesterson that Coach Linder had resigned. Ms. Kesterson was scared that Coach Linder was going to be at the meeting and would be upset with Ms. Kesterson for reporting her cover up of the rape to Ms. Barton. Ms. Kesterson was too afraid to attend the meeting.

114.     At the meeting that afternoon, Mr. Nielsen and Senior Women's Administrator Janet Kittell met with members of the softball team, Coach Oakley, and Coach Toocheck. Mr. Nielsen and Ms. Kittell announced that Coach Linder had decided to resign and Coach Oakley would be the interim head coach.

115.     During the meeting, Ms. Barton called Ms. Kesterson and told her that Coach Linder had resigned.

116.     After the emergency meeting, Coach Linder sent a group text message to the softball team, including Ms. Kesterson, stating that Coach Linder didn't choose for this to happen, that she was put into this situation, and that she was sorry she was not going to be there this season.

117.    Coach Linder also called members of the softball team in the wake of her resignation. But Coach Linder did not call Ms. Kesterson or her twin sister.

118.    Coach Linder spoke publicly about her resignation with Allen Moff, a staff writer from the *Record-Courier*. On August 31, 2015, she was quoted in a published article as follows:

> "It's time for me to move in another direction, because the world of athletics has changed," said Linder. "The kids are different, the recruiting process is different, the university and administration is [*sic*] different. I feel like my job has become centered around trying to make everyone happy, and it's becoming increasingly difficult to do that without compromising my values and principles."

> "There are so many people that we have to please, and I don't think that's what athletics is supposed to be about. It's made coaching increasingly more difficult. So I feel that it's time for me to move on."

> \*\*\*

> "When I first started coaching kids wanted to play, and they looked at you as a leader. If you told kids to do something, they would do it because they trusted that it was going to help them get better. Now when you tell a kid to do something, some of them need three reasons why they need to do it this way. It's a world of entitlement, and I've struggled with that."

119.    Coach Linder's remarks were a direct shot at Ms. Kesterson. Ms. Kesterson knew that Coach Linder had resigned mere days after Ms. Kesterson reported Coach Linder's scheme to cover up the fact that Tucker Linder raped Ms. Kesterson. Ms. Kesterson's failure to follow Coach Linder's instruction to keep the information to herself and stay quiet is what led to Coach Linder's abrupt "resignation."

120.    Coach Linder's comments did not stop with the *Record-Courier*. Coach Linder also spread her message to Kent State alumni, prompting them to take to social media to condemn the "selfish" student-athlete and her parents who complained about Coach

Linder. Coach Linder fostered and encouraged this narrative amongst her former players and participated in the creation of hostility against Ms. Kesterson for lodging her Title IX complaint against Coach Linder. That hostility infected the softball community including Ms. Kesterson's teammates who did not know what had really happened.

121.    On information and belief, Coach Linder told a Kent State alumna, All-American Carrie Eneix (softball coach at Pickerington Central High School and former high-school coach of two current Kent State players: Hunter Brancifort and Allie Luther) that "the twins" had reported Coach Linder to the Kent State administration and were the reason Coach Linder had to resign. Ms. Kesterson and her sister were the only twins on the Kent State softball team.

122.    On information and belief, in conversations with Ms. Eneix and other alumni, Coach Linder has admitted breaking the law but claimed she did it for the right reasons.

123.    Ms. Kesterson was aware of Coach Linder's public statements and the fact that she blamed Ms. Kesterson for her demise.

124.    Kent State took no steps to dispel the false statements from Coach Linder about her "resignation."

125.    Despite all the vicious gossip spawned by Coach Linder's victim-blaming, Ms. Kesterson still wanted to continue as a softball player.

126.    On or about August 30, she attended the mandatory compliance meeting.

**Coach Oakley and Coach Linder retaliate against Ms. Kesterson.
She realizes that she can no longer be a part of the softball program.**

127.    On or about August 31, 2015, Coaches Oakley and Toocheck held a meeting with the incoming seniors on the softball team in the locker room. Coach Oakley told Ms.

Kesterson and her teammates that anyone who said anything bad about Coach Linder would be off the team. He emphasized that there would be "no warnings given."

128.    While Coach Oakley threatened anyone who spoke negatively about Coach Linder, Coach Toocheck was crying and shaking her head. After Coach Oakley delivered his threat, Coach Toocheck thanked him and said, "I just feel so bad for that woman [Linder]."

129.    Even though—per University policy—Ms. Kesterson's report was supposed to remain confidential, Coach Oakley was aware that Ms. Kesterson made the report against Coach Linder. Jennifer O'Connell from the Office of Sexual & Relationship Violence Support Services (Ms. Kesterson's assigned Title IX advocate) confirmed this to Ms. Kesterson. Coach Oakley had admitted to O'Connell that he knew Ms. Kesterson had filed the complaint and that was why Coach Linder was no longer with the program. Ms. Kesterson shared her concerns about the social-media atmosphere with Ms. O'Connell and asked her about arranging a meeting for Ms. Kesterson with the softball team to share what had actually happened.

130.    Ms. Kesterson experienced heightened stress and pressure in the wake of Coach Linder's resignation and Coach Oakley's retaliation. She found herself physically unable to practice. She struggled to get out of bed. She questioned whether she could continue. She knew that she could not spend another year under someone who was going to hold her Title IX complaint against her as Coach Linder had done the previous year.

131.    Under the circumstances, Ms. Kesterson and her sister were uncertain as to whether they could continue with the softball program given the retaliatory climate. Ms. Kesterson tried to arrange a meeting with the Title IX coordinator, Loretta Shields, but

was rebuffed. Ms. O'Connell told Ms. Kesterson that Ms. Shields could not help Ms. Kesterson and would not meet with her.

132.    Eventually, Ms. Kesterson's teammates learned that she had complained. She and her sister were blamed for Coach Linder's forced resignation.

133.    Ms. Kesterson did her best to continue to go to practice and function under the direction of Coach Oakley and Coach Toocheck. But it was becoming increasingly difficult.

134.    Ms. Kesterson missed an individual workout scheduled for September 2.

135.    On or about September 5–7, 2015, the softball team was supposed to take a team-building camping trip. Under the circumstances, Ms. Kesterson and her sister were fearful of more retaliation and could not bring themselves to attend.

136.    On or about September 9, Ms. Kesterson confronted Mr. Nielsen about the fact that Coach Oakley knew about her complaint. Mr. Nielsen denied being the source of the information and blamed Coach Linder saying that she probably told Coach Oakley while she was moving her things out of the office.

137.    On or about September 9, Ms. Kesterson asked Mr. Nielsen to ensure that Tucker Linder was ordered to remain off campus. Mr. Nielsen said that Kent State would not take any steps to prevent Ms. Kesterson's rapist from coming on to campus.

138.    Ms. Kesterson found herself unable to continue with softball under those circumstances.

139.    Ms. Kesterson's continued participation in the softball program should not have been compromised by her Title IX complaints. Ms. Kesterson would never have quit the softball team had Kent State's handling of the situation—including tolerating

retaliation—not made continued participation emotionally and physically unbearable for her.

140.    Ms. Kesterson's sister shared her distress. She likewise decided not to continue on the softball team.

141.    As she felt her final season of softball slipping away, Ms. Kesterson began to experience panic attacks. She lost consciousness and was hospitalized on September 30.

142.    Ms. Kesterson's mother took a leave-of-absence from work to come support her daughter through the turmoil and stress she was enduring.

### Kent State permitted Coach Linder to be on campus and around the softball team throughout the 2015 fall softball season.

143.    Coach Linder attended all Kent State softball games during the fall 2015 season. She was present in the locker room and participated in team activities. She cried in the presence of the team in the locker room. She continued to leave the impression that it was Ms. Kesterson and her sister's fault that Coach Linder was no longer the head coach.

144.    During the alumni football weekend, there was an alumni softball game scheduled (which was rained out). Coach Linder was present in the Field House with the current and former softball players for a luncheon. Alumna Carrie Eneix had t-shirts made to sell at the alumni game that read "We Support Karen Linder."

145.    Members of the Kent State softball team were permitted to wear the t-shirts that read "We Support Karen Linder" in the Field House for the alumni activities.

146.    On information and belief, Ms. Eneix used the funds raised from the sale of those t-shirts to purchase alcohol for the softball team on the evening of the scheduled alumni game.

147.    Ms. Eneix qualifies as a booster under NCAA guidelines. She assisted Coach Linder in recruiting Ms. Brancifort and Ms. Luther to Kent State and has been otherwise involved in promoting Kent State athletics.

148.    Kent State is permitting Coach Linder to use its facilities for private lessons and other activities. Most recently, Coach Linder was participating in a winter softball camp at the Field House with Kent State softball players during the winter break.

## Additional allegations

149.    Participating in a college varsity sport is comparable to having a full-time job. It can be difficult for student-athletes, given their obligations outside the classroom, to take enough credits to graduate within four years. Student-athletes often take summer classes to earn a few extra credit hours per year, which can help keep them on track to graduate in four years. As a matter of custom and practice, Kent State, like other major universities, regularly pays for the tuition, room, and board of former athletes who take summer classes.

150.    At the end of each season and school year, Ms. Kesterson could not bring herself to remain on campus to take summer classes given what she had endured. She also had to drop two classes during her sophomore year due to her inability to concentrate in the aftermath of the rape. So even though she is a senior, she will not graduate at the end of the current academic semester. She needs one additional semester to complete her degree requirements.

151.    As a matter of custom and practice, Kent State, like other major universities, regularly pays for the tuition, room, and board of former athletes who must return to school for a fifth year to complete their degree requirements.

152.    On September 22, 2015, Erin Barton abruptly resigned her position as the Deputy Coordinator for Title IX in the University's Equal Opportunity and Affirmative Action Department. As of February 8, 2016, the Kent State website still listed Ms. Barton as someone to whom sex discrimination or harassment should be reported.[2]

### CLAIM 1
### SEX DISCRIMINATION INCLUDING RETALIATION AGAINST KENT STATE UNIVERSITY UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. §§ 1681–88

153.    Plaintiff incorporates all previous allegations.

154.    Title IX prohibits sex discrimination by recipients of federal education funding.

155.    Title IX is of particular importance in the athletics context given the dramatic impact the statute has had on the availability of athletics-participation opportunities for female athletes that resulted from its passage.

156.    Kent State agreed to comply with all applicable federal statutes relating to nondiscrimination by recipients of federal financial assistance.

157.    Kent State had notice when it accepted federal funding under Title IX that the institution would be liable for intentional sex discrimination and deliberate indifference to sexual harassment.

158.    A private right of action to enforce Title IX's guarantees encompasses deliberate indifference to sexual harassment of a student by another student.

159.    Sexual assault is the most vicious form of sexual harassment.

160.    Tucker Linder's rape of Ms. Kesterson constituted sex-based harassment.

161.    Ms. Kesterson's first Title IX complaint—her report to Coach Linder that Ms. Kesterson had been raped—gave Kent State actual notice of Tucker Linder's sexual assault, which was gender based.

---

[2] http://www.kent.edu/srvss/reporting-mandates (last visited Feb. 8, 2016).

162. Coach Linder was an appropriate official of Kent State University for purposes of reporting Ms. Kesterson's Title IX complaint.

163. Coach Linder was in a position to vindicate Ms. Kesterson's rights.

164. Coach Linder had authority to address the discrimination.

165. Coach Linder had authority to institute corrective measures.

166. Ms. Kesterson expected Coach Linder to act in accordance with the law.

167. It was reasonable for Ms. Kesterson to expect that her coach would act in accordance with the law.

168. Ms. Kesterson expected Coach Linder to act in accordance with university policy.

169. It was reasonable for Ms. Kesterson to expect that her coach would act in accordance with university policy.

170. Coach Linder was deliberately indifferent to the sex-based harassment that Ms. Kesterson reported.

171. Coach Linder intentionally discriminated against Ms. Kesterson by trying to cover up her complaint and urging her silence.

172. Coach Linder acted with gender-based discriminatory intent in failing to respond to Tucker Linder's attack on Ms. Kesterson.

173. Coach Linder's response—to do nothing but insist the Ms. Kesterson remain silent—was clearly unreasonable in light of the known circumstances, i.e., that a Kent State baseball player raped a Kent State softball player.

174. Coach Linder's failure to take action in response to Ms. Kesterson's report violated Kent State policy and federal law.

175. Coach Linder's failure to act tacitly endorsed Tucker Linder's rape of Ms. Kesterson and made all female student-athletes more vulnerable to sexual assault.

176. Coach Linder retaliated against Ms. Kesterson because she reported sex discrimination.

177. Coach Linder's harsh treatment of Ms. Kesterson during the 2014–15 academic and athletic year was in retaliation for Ms. Kesterson's Title IX complaint. That mistreatment included the following:

    a.    Drastically changing her demeanor toward Ms. Kesterson following her Title IX report;

    b.    Forcing Ms. Kesterson to attend a team meeting at the Linder home in September 2014 despite Ms. Kesterson's protestations;

    c.    Forcing Ms. Kesterson to attend a team Christmas party at the Linder home in December 2014 despite Ms. Kesterson's protestations;

    d.    Responding with callous indifference to Ms. Kesterson's ongoing emotional issues including when they manifested themselves in the softball context.

178. Ms. Kesterson's second Title IX complaint—her report to Ms. Barton that Coach Linder had covered up her first Title IX complaint about the rape—gave Kent State actual notice of the discrimination.

179. Ms. Barton was in a position to vindicate Ms. Kesterson's rights.

180. Ms. Barton had authority to address the discrimination.

181. Ms. Barton had authority to institute corrective measures.

182. Ms. Kesterson expected Ms. Barton to act in accordance with the law.

183. It was reasonable for Ms. Kesterson to expect Ms. Barton to act in accordance with the law.

184. Ms. Kesterson expected Ms. Barton to act in accordance with University policy.

185.   It was reasonable for Ms. Kesterson to expect Ms. Barton to act in accordance with University policy.

186.   Mr. Nielsen was in a position to vindicate Ms. Kesterson's rights.

187.   Mr. Nielsen had authority to address the discrimination.

188.   Mr. Nielsen had authority to institute corrective measures.

189.   Ms. Kesterson expected Mr. Nielsen to act in accordance with the law.

190.   It was reasonable for Ms. Kesterson to expect Mr. Nielsen to act in accordance with the law.

191.   Ms. Kesterson expected Mr. Nielsen to act in accordance with University policy.

192.   It was reasonable for Ms. Kesterson to expect Mr. Nielsen to act in accordance with University policy.

193.   Coach Oakley was in a position to vindicate Ms. Kesterson's rights.

194.   Coach Oakley had authority to address the discrimination.

195.   Coach Oakley had authority to institute corrective measures.

196.   Ms. Kesterson expected Coach Oakley to act in accordance with the law.

197.   It was reasonable for Ms. Kesterson to expect Coach Oakley to act in accordance with the law.

198.   Ms. Kesterson expected Coach Oakley to act in accordance with University policy.

199.   It was reasonable for Ms. Kesterson to expect Coach Oakley to act in accordance with University policy.

200.   Kent State was deliberately indifferent to the sex-based harassment that Ms. Kesterson reported.

201.   Kent State acted with gender-based discriminatory intent in failing to respond to her complaints including taking adequate steps to prevent retaliation.

202.    Kent State's response—to allow Coach Linder to resign—was clearly unreasonable in light of the known circumstances, i.e., that a Kent State baseball player raped a Kent State softball player and a Kent State coach used her authority over the softball player to cover it up.

203.    Kent State's failure to take appropriate action in response to Ms. Kesterson's outcry violated University policy and federal law.

204.    Kent State's failure to act tacitly endorsed Tucker Linder's rape of Ms. Kesterson and Coach Linder's cover up and made all female student-athletes more vulnerable to sexual assault.

205.    Kent State failed to follow its own sexual-harassment policy in response to Ms. Kesterson's Title IX complaint that she was raped.

206.    Kent State failed to follow its own sexual-harassment policy in response to Ms. Kesterson's Title IX complaint that Coach Linder covered up Ms. Kesterson's rape.

207.    Kent State allowed Coach Linder to resign to attempt to cover up her intentional refusal to abide by federal law and University policy to protect Ms. Kesterson from sex-based harassment.

208.    Allowing Coach Linder to resign—rather than firing her for cause—in light of her admitted violation of university policy by covering up Ms. Kesterson's rape was not appropriate action under the law.

209.    Allowing Coach Linder to resign—rather than firing her for cause—permitted Coach Linder to slander Ms. Kesterson and blame her for Linder's own failures that ended her coaching career. Kent State's failure allowed Coach Linder to create a false narrative regarding her departure that poisoned the well for Ms. Kesterson and her sister's continued participation in the softball program.

210.    Kent State failed to take appropriate action to prevent retaliation against Ms. Kesterson after Coach Linder's resignation.

211.    As a result of Kent State's deliberate indifference, Coach Oakley was openly hostile to Ms. Kesterson following Coach Linder's resignation.

212.    As the interim head coach, Coach Oakley stepped into Coach Linder's shoes and held a position over power and authority over Ms. Kesterson.

213.    Coach Oakley's hostility was in retaliation for Ms. Kesterson's Title IX complaint about Coach Linder.

214.    Coach Oakley was aware that Ms. Kesterson had complained about Coach Linder when he issued the directive that any player with anything bad to say about Coach Linder would be dismissed.

215.    Athletic Director Nielsen's response to Ms. Kesterson's complaints was retaliatory.

216.    Assistant Coach Jessica Toocheck's response to Ms. Kesterson's complaints was retaliatory.

217.    The conduct of Kent State and its current and former officials and employees in the wake of Ms. Kesterson's complaint against Coach Linder would dissuade a person of ordinary firmness from engaging in protected activity. Their conduct led to Ms. Kesterson's constructive discharge from the softball team.

218.    Having witnessed firsthand what Ms. Kesterson endured, it is highly unlikely that any Kent State softball player will ever report any discrimination.

219.    The actions of Kent State officials described above unreasonably interfered with Ms. Kesterson's participation in the educational and athletic programs at the University.

220.   As a direct and proximate result of these unlawful and malicious acts, Ms. Kesterson has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

**CLAIM 2**
**42 U.S.C. § 1983**
**DENIAL OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT AGAINST BOTH DEFENDANTS**

221.   Plaintiff incorporates all previous allegations.

222.   Section 1983 creates a federal cause of action to redress violations of federal statutory or constitutional rights by state officials acting under color of law.

223.   At all relevant times, Defendants were acting under color of law.

224.   At all relevant times, Defendants were empowered with a legal obligation to act in response to Ms. Kesterson's rape complaint and/or her complaint against Coach Linder.

225.   Defendants were deliberately indifferent to the sex-based harassment that Ms. Kesterson reported.

226.   Defendants acted with gender-based discriminatory intent in failing to properly respond to Tucker Linder's attack on Ms. Kesterson.

227.   Defendants acted with gender-based discriminatory intent in failing to properly respond to Coach Linder's efforts to silence Ms. Kesterson and cover up the rape.

228.   Defendants acted with gender-based discriminatory intent in retaliating against Ms. Kesterson for her protected activity.

229.   The right to be free from gender-based discrimination has been clearly established for decades.

230.   As a direct and proximate result of Defendants' unlawful and malicious acts, Ms. Kesterson has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

231.   Ms. Kesterson is entitled to punitive damages for Defendants' intentional and malicious violations of her constitutional rights.

### CLAIM 3
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST KAREN LINDER (INDIVIDUALLY)

232.   Plaintiff incorporates all previous allegations.

233.   In conducting herself as she did, Coach Linder either intended to cause emotional distress or knew or should have known that her actions would result in serious emotional distress to Ms. Kesterson.

234.   Coach Linder's use of her substantial influence over Ms. Kesterson to pressure her into keeping quiet about her rape was extreme and outrageous.

235.   Coach Linder's insistence that Ms. Kesterson repeatedly attend required team functions at Linder's residence—where Ms. Kesterson was surrounded by photographs and FatHeads® of her rapist—was extreme and outrageous.

236.   Coach Linder's conduct went beyond all possible bounds of decency and is considered intolerable in civilized society.

237.   A civilized community simply cannot tolerate a Division I softball coach using her influence to pressure one of her student-athletes to cover up for the coach's rapist son.

238.   As a direct and proximate result of Coach Linder's extreme and outrageous conduct, Ms. Kesterson suffered and will continue to suffer mental anguish so severe that no reasonable person could be expected to endure it and for which Coach Linder

liable. Ms. Kesterson has been in therapy and taking medication to manage these symptoms, and is expected to be for the foreseeable future.

239.  Ms. Kesterson is entitled to punitive damages based on this egregious conduct.

**PRAYER FOR RELIEF**

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A.   Declare that Defendants' acts and conduct constitute violations of federal and state law;

B.   Enjoin Defendants from further retaliating against Ms. Kesterson;

C.   Enter judgment in Ms. Kesterson's favor on all claims for relief;

D.   Award Ms. Kesterson full compensatory damages, economic and non-economic, including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that Ms. Kesterson has suffered and is reasonably certain to suffer in the future;

E.   Award Ms. Kesterson punitive damages as appropriate for Defendants' intentional and malicious violations of federal and state law;

F.   Award pre-judgment and post-judgment interest at the highest lawful rate;

G.   Award Ms. Kesterson her reasonable attorneys' fees (including expert fees) and all other costs of this suit;

H.   Award all other relief in law or equity to which Ms. Kesterson is entitled and that the Court deems equitable just, or proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM, LLC

*/s/ Subodh Chandra*
Subodh Chandra (0069233)
Ashlie Case Sletvold (0079477)
Peter Pattakos (0082884)
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Peter.Pattakos@ChandraLaw.com

*Attorneys for Plaintiff Lauren Kesterson*