# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LAUREN KESTERSON, | ) | CASE NO. 5:16-cv-298 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| KENT STATE UNIVERSITY, *et al.*, | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

There are several motions before the Court. Plaintiff Lauren Kesterson ("plaintiff" or "Kesterson") has moved for leave to file a first amended and supplemental complaint (Doc. No. 18 ["Mot. Amend"]). Kent State University ("Kent State" or "the University") has moved to strike a portion of the proposed first amended and supplemental complaint (Doc. No. 24 ["Mot. Strike"]). Plaintiff opposes the motion to strike (Doc. No. 27 ["Mot. Strike Opp'n"]), and Kent State has filed a reply (Doc. No. 28 ["Mot. Strike Reply"]). Additionally, defendant Karen Linder ("Linder") has moved to dismiss plaintiff's first amended and supplemental complaint (Doc. No. 26 ["Linder MTD"]). Plaintiff opposes Linder's dispositive motion (Doc. No. 29 ["Linder MTD Opp'n"]), and Linder has replied (Doc. No. 30 ["Linder MTD Reply"]). Finally, the other individual defendant, Eric Oakley ("Oakley"), seeks dismissal of all claims against him (Doc. No. 31 ["Oakley MTD"]). Plaintiff opposes this motion, as well (Doc. No. 32 ["Oakley MTD Opp'n"]), and Oakley has filed a reply (Doc. No. 33 ["Oakley MTD Reply"]). For the reasons that follow, plaintiff's motion to amend and Oakley's motion to dismiss are granted in part, and Linder's motion to dismiss and Kent State's motion to strike are denied.

## I. BACKGROUND

Because defendants' respective motions all address the allegations contained in the proposed first amended and supplemental complaint ("FAC"), the Court shall rely on this pleading, in addition to undisputed material facts, to supply the factual background for the case.[1] All disputed facts are presented in a light most favorable to the plaintiff.

In this action, plaintiff, a student at Kent State and a former student athlete, alleges that defendants infringed upon her constitutional rights in the wake of a report she made to her softball coach regarding a sexual assault perpetrated against her by another student-athlete, the softball coach's son. Claim 1 of the FAC raises a sexual discrimination claim against Kent State under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1682 *et seq.* ("Title IX"). Claim 2 raises an equal protection claim against Linder and Oakley. Plaintiff raises two more claims against the individual defendants: Claim 3 sets forth a First Amendment prior restraint claim, and Claim 4 alleges First Amendment retaliation. Kesterson seeks declaratory and injunctive relief, compensatory and punitive damages, costs, interest, and attorney's fees.[2]

Kent State is a public university with a NCAA Division I varsity athletics program. (FAC ¶ 3, *see* ¶¶ 8-19.) Prior to August 28, 2015, Linder was employed by Kent State as the head coach of the women's softball team. (*Id.* ¶¶ 4, 127.) Linder recruited plaintiff, and her twin sister, to play softball for Kent State. In April 2011, as high-school juniors, plaintiff and her sister verbally committed to accepting sport scholarships from the University. (*Id.* ¶¶ 21-22.) Plaintiff

---

[1] After plaintiff filed her motion to amend, to which she appended a copy of the proposed FAC, plaintiff filed the FAC on the docket. (Doc. No. 20.)

[2] Plaintiff brings Claim 2 against Linder in her individual capacity and against Oakley in his official capacity, only. Claim 3 and 4 are raised against Oakley in both his official and individual capacities.

graduated from high school in the spring of 2012 in the top 5% of her class, and, that fall, enrolled with her sister at Kent State as scholarship athletes. (*Id.* ¶ 23.) Linder's son, Tucker Linder ("Tucker"), was also a freshman at Kent State in the fall of 2012 and played for the University's men's baseball team. (*Id.* ¶¶ 24-25.) Tucker and plaintiff developed a friendship, and engaged in "minor intimacies on one occasion" prior to the alleged assault that underlies the present action. (*Id.* ¶ 26.)

On December 7, 2012, Tucker called plaintiff and invited her to "hang out" with him. She agreed, and the two walked to Tucker's dorm room. (*Id.* ¶ 27.) While plaintiff had not been drinking, Tucker appeared to be intoxicated. (*Id.* ¶¶ 28-29.) Plaintiff and Tucker again engaged in consensual "minor intimacies[.]" But unlike the previous encounter, Tucker "did not stop" when plaintiff "stopped consenting." (*Id.* ¶ 30.) Despite the fact that plaintiff indicated "at least ten times" that she did not want to have sex—and even tried to push Tucker away—Tucker ignored plaintiff's protests and raped her. (*Id.* ¶¶ 31-34.)

Plaintiff was "horrified" and "distraught[,]" and the encounter with Tucker caused her debilitating emotional distress. (*Id.* ¶¶ 35, 40.) She alleges that her academic performance suffered as a result, and plaintiff struggled to attend classes or sit for exams. (*Id.* ¶ 42.) Plaintiff's G.P.A. dropped from a 3.98 her first semester to a 3.1 during the fall of her sophomore year, and a 2.84 by the end of her sophomore year. (*Id.* ¶¶ 41, 47, 52.) Plaintiff was also forced to withdraw from two classes because she was unable to concentrate. (*Id.* ¶ 47.) She also experienced nightmares, vomiting, and unintentional weight loss. As her physical and mental state deteriorated, she began to share with family and close friends the details of the assault by Tucker. (*Id.* ¶¶ 46, 50.) Plaintiff's parents arranged for her to receive trauma therapy to cope with

3

the aftermath of the attack. (*Id*. ¶ 48.)

Even softball failed to offer plaintiff respite. In fact, because the women's softball team and the men's baseball team shared hitting and training facilities, softball became an additional stressor because it brought plaintiff into regular contact with Tucker. (*Id*. ¶ 43.) Plaintiff also encountered Tucker on campus and at school functions. At a party in September 2013, plaintiff and her boyfriend ran into Tucker. Intoxicated, Tucker bragged about his conquest in front of plaintiff's boyfriend. (*Id*. ¶¶ 44-45.)

At the end of the softball season plaintiff's sophomore year, the team held a meeting to discuss the next season. During the meeting, plaintiff became emotional and thanked her teammates for "helping her deal with her issues." (*Id*. ¶ 53.) Plaintiff's "suffering was so apparent" that, following the meeting, Linder asked plaintiff's sister and another teammate whether plaintiff had been sexually assaulted. The two told Linder that she would have to ask plaintiff directly. (*Id*. ¶ 54.)

In mid-May 2014, plaintiff met with Linder "for a routine exit meeting. During the meeting, [Kesterson alleges that she] lodged a Title IX complaint with" Kent State. (*Id*. ¶ 56.) According to the FAC, Linder asked plaintiff if "she had been through anything that she would like to talk about[,]" and she specifically, and directly, asked plaintiff "if she had been sexually assaulted." (*Id*. ¶ 57.) Plaintiff confirmed that she had been sexually assaulted, and Linder advised plaintiff that she would have to report it. (*Id*. ¶¶ 57-59.) Linder then asked plaintiff, "It wasn't my son, was it?" (*Id*. ¶ 60.) Plaintiff responded, "What if it was?" Plaintiff did not want to jeopardize her opportunity to play softball for Kent State because of a report. Plaintiff added, "I know that he's your kid." (*Id*. ¶ 61.) Linder assured plaintiff, "You're my kid, too." Linder then

began to cry and apologized to plaintiff. (*Id*. ¶¶ 61-63.)

After plaintiff reported the assault, Linder suggested to her that perhaps Tucker was unaware that he had raped her. Plaintiff rebuffed Linder's repeated suggestions that plaintiff speak with Tucker about the situation. Kesterson believed that Linder wanted her try to resolve the matter informally with Tucker. (*Id*. ¶¶ 65-67.) Linder asked plaintiff if she wanted to press criminal charges against Tucker, but—"fearful of what pressing charges against her coach's son would mean for her opportunity to play softball—said that she did not." (*Id*. ¶ 67.)

Linder also asked plaintiff who else knew about the incident. Plaintiff indicated that she had told her parents, her sister, and another teammate. Linder responded, "I would appreciate it if you would not tell anybody else and that we keep this between the people that know." (*Id*. ¶ 68.) Plaintiff "got the impression from Coach Linder that [] Kesterson had to agree to keep silent if she wanted to keep her spot on the team. [] Kesterson was afraid that if she did not comply with Coach Linder's instruction, she would kick [plaintiff] off the softball team and non-renew her scholarship." (*Id*. ¶ 69.)

Additionally, Linder confided in plaintiff that Tucker was considering not returning to Kent State, and that he had recently been in trouble. She volunteered that Tucker had been arrested on St. Patrick's Day due to an incident involving alcohol, and described him as "not right." (*Id*. ¶ 70.) Linder assured plaintiff that she would handle the matter, that she would help plaintiff anyway she could, and that she loved her. (*Id*. ¶ 71.) The following day, Linder called plaintiff's mother and apologized to her, assuring her that she would do everything she could to help Kesterson. (*Id*. ¶ 74.) During the summer, Linder called plaintiff and advised her that Tucker would not be returning to Kent State in the fall because he was "struggling". (*Id*. ¶ 77.)

It is undisputed that Linder never reported the assault or advised Kent State's Title IX coordinator about plaintiff's allegations, despite the fact that Kent State's policies regarding sexual harassment obligated her to do so. (*Id.* ¶¶ 78-80.) Further, plaintiff alleges that Linder was well aware of her reporting obligations. A few days before plaintiff informed Linder of Tucker's assault, another softball player reported during her exit meeting that she had been raped by a different male student athlete. According to the FAC, Linder immediately "escorted her to Sexual and Relationship Violence and Support Services on campus." Linder also reported the conversation to Janet Kittell, the Senior Women's Administrator and a deputy Title IX coordinator. (*Id.* ¶¶ 84-87.)

Plaintiff continued to struggle with the fallout from the assault into her junior year at Kent State. She further alleges that "Linder engaged in a campaign of intimidation and control to suppress [] Kesterson's victimization and punish her for exercising her constitutional right to complain about discrimination." (*Id.* ¶ 90.) This campaign also had the effect of dissuading her from pursuing available criminal, civil, and university-related remedies. (*Id.*) According to plaintiff, Linder required plaintiff to attend team events in her home, where photographs and a life-sized cut of Tucker were in plain view. She also kept photographs of Tucker in her office. (*Id.* ¶¶ 91-93.)

Plaintiff also alleges that Linder's treatment of her changed. In addition to regularly ignoring plaintiff, Linder attempted to bench plaintiff. When that did not work, Linder moved plaintiff from her preferred position of short-stop, a position she had played the first two years at Kent State, to second base. The freshman who replaced plaintiff at short-stop failed to come to practice for more than a week before a spring tournament. While the freshman was deciding

whether she even wanted to play for the team, at all, Linder moved a third baseman to short-stop, even though plaintiff had previously beaten out the third baseman for the short-stop position. When the freshman decided that she wanted to continue on the team, Linder moved her to short-stop and benched plaintiff. (*Id*. ¶¶ 98-100.)

Linder also became noticeably irritated with plaintiff. After a practice during which plaintiff was visibly upset, Linder advised then-Assistant Coach Oakley: "We can't have that, we can't have someone losing control over themselves at a practice. Next time she has to go home." (*Id*. ¶ 102.) When Linder looked up and saw plaintiff, she said: "Speak of the devil." Linder continued, "I hope you understand that you can't act like that in a practice or game setting." (*Id*.) Plaintiff alleges that Linder continued her abusive behavior through the end of Kesterson's junior year. (*See id*. ¶¶ 103-104.)

When plaintiff returned to Kent State to start her senior year, she met with Erin Barton, the Deputy Coordinator for Title IX in the Equal Opportunity and Affirmative Action (EOAA) Department to discuss bringing a Title IX claim against Linder. Barton explained that the process was confidential until after the investigation was completed. Plaintiff "understood [] Barton to be instructing her, on the University's behalf, not to talk about what [Tucker] and Linder had done to" her. (*Id*. ¶¶ 113-115.) Barton had plaintiff sign what Barton described as a formal Title IX complaint. (*Id*. ¶ 116.)

On August 25, 2015, Barton advised plaintiff that she would not be filing the Title IX complaint, or a no-contact order against Tucker and Linder, but would be conducting a "surprise interview" of Linder instead. She explained that the athletic director, Joel Nielsen, had intervened to prevent the filing of a formal complaint. (*Id*. ¶ 118.) Plaintiff "got the impression"

that Nielsen's motivation was to keep the matter as quiet as possible and prevent his superiors from ever learning what had transpired between plaintiff, Tucker, and Linder. (*Id*.) In a conversation with Nielsen later that same day, plaintiff gleaned that Nielsen was trying to dissuade her from pursuing her complaint. (*Id*. ¶ 123.)

Three days later (on August 28, 2015), Linder resigned her position as head coach. As part of her severance package, Linder received 25% of salary in a lump sum payment. (*Id*. ¶¶ 127-128.) At the time she resigned, Linder told then-Assistant Coach Oakley that she was resigning because of plaintiff's complaint. (*Id*. ¶ 136.) That same day, Oakley was named interim head coach of the women's softball team. (*Id*. ¶ 139.)

Linder spoke publically about her resignation, and was quoted in a newspaper interview stating that she left because coaching had changed and student athletes believed that they were entitled to certain privileges. She also contacted members of the softball team—other than plaintiff or her sister—and told them that she had not done anything wrong. Additionally, she spread the rumor that she disagreed with the University over some matter and stood her ground. (*Id*. ¶¶ 142-144.) According to the FAC, Linder also commented publically about a "selfish," "spoiled," "disgruntled," "petty" and "entitled" student-athlete and her parents, which plaintiff took as a reference to her. (*Id*. ¶ 147.)

Coach Oakley held a team meeting on August 30, 2015 wherein he threatened that anyone "who said anything bad about Coach Linder would be off the team. He emphasized that there would be 'no warnings given.'" (*Id*. ¶ 156.) Despite the fact that her sexual assault complaint was supposed to be confidential, Oakey's warning confirmed for plaintiff that Oakley was aware of the complaint. Believing that she was being punished and tormented for filing a

Title IX complaint, plaintiff quit the softball team. (*Id.* ¶ 169.) Plaintiff's sister also quit the team. Nielson offered to permit the sisters to retain their scholarships if they signed a waiver to hold Kent State harmless for the incident and its aftermath. Plaintiff's sister signed the waiver, but plaintiff refused. (*Id.* ¶¶ 175-176.) Kent State issued a report regarding its internal investigation on January 8, 2016. (*Id.* ¶ 188.) Plaintiff ultimately lost her scholarship, and—owing to the emotional distress she believes she suffered at the hands of Tucker and defendants—will not graduate on time.

Plaintiff filed the present lawsuit on February 9, 2016 against Kent State and Linder. Kent State subsequently moved for partial judgment on the pleadings because the complaint improperly pleaded an equal protection claim against it. (Doc. No. 14.) Linder also moved, pursuant to Fed. R. Civ. P. 12(b)(6), for dismissal of all claims against her raised in the complaint. (Doc. No. 15.) Plaintiff subsequently filed a motion to amend the complaint to remove the equal protection claim against Kent State and to add a new defendant, Oakley, to the pleadings. Both Oakley and Linder moved for dismissal of the FAC. Accordingly, Kent State's motion for partial judgment on the pleadings and Linder's motion to dismiss the original complaint are denied as moot.

## II. KENT STATE'S MOTION TO STRIKE

### A. The Motion and the Standard

Kent State moves to strike from the FAC fifteen (15) paragraphs detailing an incident in 2015 wherein a female employee of the University's Athletics Communication Department complained to Barton that she believed she was being sexually harassed by Colin Miller, the Senior Fiscal Manager for Athletics. The FAC provides that, notwithstanding the fact that Kent

State's internal investigation of the female employee's complaint demonstrated that Miller sexually harassed the female employee, creating a hostile work environment, the University took no action to discipline Miller or restrict his access to the complaining employee. (FAC ¶¶ 194-208.)

In its motion to strike, Kent State complains that the allegations of an unrelated internal investigation have nothing to do with Kesterson, her alleged sexual assault and Linder's attempted cover up, the University's response, and her allegations of retaliation. (Mot. Strike at 259.) It claims that the only purpose for these "logically separated" allegations is to "smear" Kent State. (*Id*.) Kent State also insists that the inclusion of these paragraphs will cause it to expend resources conducting unnecessary discovery on matters that have no bearing on plaintiff's allegations.

The University's motion to strike is governed by Rule 12(f) of the Federal Rules of Civil Procedure, which provides that a court may strike from pleadings any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A court has broad discretion in determining whether to strike material from a pleading. *Frisby v. Keith D. Weiner & Assoc. Co., LPA*, 669 F. Supp. 2d 863, 867 (N.D. Ohio 2009) (citation omitted); *see Jeeper's of Auburn, Inc. v. KWJB Enters., L.L.C.*, No. 10-13682, 2011 WL 1899195, at *1 (E.D. Mich. Mar. 16, 2011) (noting that a court has "liberal discretion" to strike any filing it deems appropriate under Rule 12(f)) (quoting *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000); 2 Moore's Federal Practice § 12.37 (3d ed. 2002)).

Because striking a portion of a pleading is a "drastic remedy," motions to strike are generally disfavored and should only be granted "when the pleading to be stricken has no

possible relation to the controversy." *Jeeper's of Auburn*, 2011 WL 1899195, at \*2 (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)); *see Damron v. ATM Cent., LLC*, No. 1:10-cv-1210-JDB-egb, 2010 WL 6512345, at \*1 (W.D. Tenn. Oct. 29, 2010) ("Motions to strike are 'disfavored remedies to be used sparingly only when the ends of justice require it.'") (quoting *Overnite Transp. Co. v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 168 F. Supp. 2d 826, 850 (W.D. Tenn. 2001)). "As a general rule, courts should not strike a matter 'unless the court can confidently conclude that the portion of the pleading to which the motion is addressed is redundant or is both irrelevant to the subject matter of the litigation and prejudicial to the objecting party.'" *McKinney v. Bayer Corp.*, No. 10-CV-224, 2010 WL 2756915, at \*2 (N.D. Ohio July 12, 2010) (quoting *Aqua Bay Concepts, Inc. v. Grosse Point Bd. of Relators*, No. 91-CV-74819, 1992 WL 350275 (E.D. Mich. May 7, 1992); *see also Norton Const. Co v. U.S. Army Corps of Eng'rs*, No. 03-CV-02257, 2006 WL 3526789, at \*10 (N.D. Ohio Dec. 6, 2006) (stating that motions to strike "are not typically granted absent a showing of significant prejudice") (citing 5C Charles Alan Wright, *et al.*, *Federal Practice & Procedure*, 1382 p. 441 (3d ed. 2004)).

**B.    Discussion**

In opposition to Kent State's argument that the material sought to be struck is immaterial, plaintiff argues that "[h]ow this University responds to allegations about sexual misconduct or harassment goes directly to the heart of the issue for both Title IX and equal-protection purposes." (Mot. Strike Opp'n at 349.) Kent State retorts by underscoring the fact that the FAC only raises a Title IX claim against it. The University argues that its past practices of responding to sexual harassment complaints cannot go to support a finding of the third element of a Title

IX—deliberate indifference—because plaintiff must prove that the University had "actual knowledge and acted with deliberate indifference to the known harassment." (Mot. Strike Reply at 372 (citing, among authority, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 258-59 (6th Cir. 2000))).

Kent State misunderstands the nature of the allegations plaintiff offers in support of her Title IX claim against the University. According to the heading introducing these paragraphs, the allegations are offered to show that Kent State "has a custom, policy, or practice of coddling perpetrators of sexual harassment[.]" (FAC at 179 (bolding omitted).) The paragraphs that follow discuss an internal investigation that allegedly resulted in a determination by the University that the male employee in question had violated the school's sexual harassment policy, that the complaining witness had been and continued to be exposed to pervasive sexual harassment, and yet the University allegedly took no action. Plaintiff suggests that such a response to *known* discrimination demonstrates deliberate indifference by showing that Kent State "generally fails to take appropriate action in response to gender-based harassment and specifically failed to take such steps in response to [plaintiff's] complaints." (Mot. Strike Opp'n at 351.)

This case is in the pre-discovery stage. At this early juncture, the Court cannot confidently conclude that the alleged policy, custom, or practice of "coddling perpetrators of sexual harassment," or failing to take appropriate action in the face of known acts of sexual harassment, would not support a finding of deliberate indifference. *See generally Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 804-05 (M.D. Tenn. 2016) (collecting cases and finding that the amended complaint sufficiently set forth allegations demonstrating that the university had official policies, including policies failing to change ineffective remedial measures, that left

12

female students vulnerable to sexual assault by male athlete recruits). It remains to be seen whether the law and the evidence will support her claim of deliberate indifference; neither question, however, is properly addressed in a motion to strike. *See Damron*, 2010 WL 6512345, at *2 ("Motions to strike should not be used to decide substantive issues of law or disputed fact[.]") (citation omitted). The Court will leave that discussion for later date.[3] *See Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio Sept. 19, 2005) ("Rule 12(f) permits the Court to act with discretion in that it *may* strike irrelevant and superfluous defenses or let them stand. There is absolutely no harm in letting them remain in the pleadings if, as Plaintiff contends, they are inapplicable.") (emphasis in original).

Accordingly, Kent State's motion to strike is denied.

### III. DEFENDANT LINDER'S MOTION TO DISMISS

Linder maintains, pursuant to Rule 12(b)(6), that the FAC fails to state a claim against her upon which relief can be granted under any theory advanced by plaintiff. She also insists that she enjoys qualified immunity from all claims raised in the FAC.

### A.     Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleading. *Davis H. Elliot Co., Inc. v. Caribbean Util. Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir. 1975). All allegations of fact by the non-moving party are accepted as true and construed in the light most favorable to that party. *See Grindstaff v. Green*, 133 F.3d 421, 421 (6th Cir. 1998) (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). The Court, however, "need not accept as

---

[3] Plaintiff also offers other reasons why such evidence would be admissible to establish liability and damages against Kent State. At this stage, the Court declines to pass on the legal sufficiency of these theories. Additionally, the Court makes no ruling, at this time, as to whether evidence of an unrelated sexual harassment investigation would be admissible at trial.

true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Nor is the Court required to accept as true complaint allegations that are contradicted by public records and other evidentiary materials of which the Court may take judicial notice. *See Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d 869, 874-75 (W.D. Mich. 2014) ("court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint") (quotation marks and citations omitted); *see also Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document") (quotation marks and citation omitted).

The sufficiency of the pleading is tested against the notice pleading requirements of Fed. R. Civ. P. 8. Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [her] claims

14

across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570 (citation omitted).

In deciding a motion to dismiss and/or a motion for judgment on the pleadings under Rule 12, the Court generally may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment under Rule 56. As the Sixth Circuit has held, however, there are a number of exceptions to this rule. Indeed, it is well settled that, in ruling on a Rule 12 dispositive motion, a district court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted); *see Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted); *see also Commercial Money Ctr., Inc. v. Illinois Union Ins. Co*., 508 F.3d 327, 335 (6th Cir. 2007) (court may consider documents that govern a party's rights and are necessarily incorporated by reference in the complaint on a motion to dismiss) (citations omitted).

A review of the FAC reveals that plaintiff clearly references numerous University policies relating to the reporting of sexual harassment and sexual assault, and these policies are integral to plaintiff's claims. Accordingly, the Court may consider these policies without converting the present motion to dismiss into one for summary judgment.

### B.    Discussion

#### 1.    Equal Protection Claim

In Claim 2 of the FAC, plaintiff alleges that Linder deprived her of her right to equal

protection under the law. Specifically, she asserts that Linder acted with gender-based discriminatory intent in failing to properly respond to Tucker's attack, and acted with discriminatory intent in treating Kesterson differently than other athletes who reported that they had been sexually assaulted. (FAC ¶¶ 303-304.) "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356 (6th Cir. 2014) (citing *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010)); *see Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citation omitted); *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 815 (S.D. Ohio 2014) (citations omitted).

As an initial matter, Linder argues that the FAC fails to allege any facts from which it can be reasonably inferred that Linder treated plaintiff's complaint about sexual harassment differently than she treated similar complaints from male student athletes. Indeed, Linder notes that the "only allegation about Linder's response to another student's report of a sexual assault involved another *female* student's report." (MTD at 327 (citing FAC ¶¶ 84-86, 311) (emphasis in original).) Plaintiff does not dispute the absence of allegations that she was treated differently than similarly-situated male students. Nonetheless, she insists that she has properly pleaded an equal protection action for a "class of one."

The Supreme Court has "recognized that the Equal Protection Clause gives rise to a cause of action for a 'class of one.'" *Klimik v. Kent Cnty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). To present a "class of one" equal protection claim, a plaintiff must demonstrate

16

"that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564 (citations omitted). "Where a plaintiff succeeds in identifying similarly-situated individuals, plaintiff must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will." *Benjamin v. Brachman*, 246 F. App'x 905, 927 (6th Cir. 2007) (citation omitted).

Here, plaintiff has alleged that days before plaintiff made her complaint to Linder regarding the assault by Tucker, another female softball player complained to Linder that she, too, had been assaulted by a male baseball player. The FAC further alleges that, while Linder immediately reported the complaint of plaintiff's teammate, as she was required to do under federal law and the University's sexual harassment policy, she failed to report plaintiff's complaint. According to the pleading, there was no rational basis for treating the two complaints differently (FAC ¶¶ 84-88). Instead, plaintiff alleges that Linder intentionally discriminated against plaintiff and abused her position as plaintiff's softball coach to pressure plaintiff "to keep quiet about the fact that she was raped by Coach Linder's son." (*Id*. ¶ 106.) The decision to deny someone redress for a sexual assault, and deprive them of their rights under Title IX, in order to shield the alleged attacker because he is a blood relative constitutes ill-will or animus necessary to dispel the existence of a legitimate government purpose. This allegation, coupled with allegations which, if believed, would establish that plaintiff was treated differently than a similarly-situated female teammate, are sufficient to set forth a class-of-one equal protection

claim.[4]

Linder notes, however, that courts have been unwilling to recognize the class-of-one equal protection claim in the context of educational discipline "due to the inherently discretionary decisionmaking that occurs there." (Linder MTD at 331 (quoting *Nofsinger v. Va. Commw. Univ.*, No. 12-236, 2012 WL 2878608, at *11 (E.D. Va. July 13, 2012) (further citations omitted)). For example, in *Nofsinger*, the court refused to find the availability of a class-of-one equal protection claim for a student challenging his expulsion from a PhD program for lack of academic progression and professional behavior. In declining to entertain such a cause of action in the educational setting, the court noted that "[g]rading and assessing professionalism— especially in the graduate school context—by necessity involves a host of subjective, individualized assessments." *Nofsinger*, 2012 WL 2878608, at *11; *see generally Enquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 609, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) (drawing the distinction between the government as a manager of its affairs versus the government in its

---

[4] Linder also argues that plaintiff has not pleaded facts that would demonstrate that she is similarly situated to someone who received more favorable treatment. (Linder MTD at 333.) According to Linder, the complaints lodged by the two softball players are dissimilar because the other player "brought forward" her complaint, "suggesting that she wanted Linder to act on it[.]" (*Id.*) By comparison, Linder notes that she had to coax the truth out of plaintiff. The FAC does not allege that plaintiff's teammate volunteered the information; it merely states that she reported the incident to Linder, as did plaintiff. In any event, such a factual dispute cannot be resolved on a Rule 12(b)(6) motion. More to the point, the FAC alleges that, according to the University's policies, employees have a duty to report all instances of sexual harassment and sexual misconduct, which would seem to remove the complaining witness's desire to pursue a complaint from the equation. (FAC ¶ 80.) At this stage of the proceedings, the Court cannot find that Linder's factual distinction carries any weight. Likewise, Linder's argument that the two players are dissimilar because only plaintiff's complaint alleged that the assailant was "someone in a close blood relationship or even a personal relationship with Linder" lacks merit. (Linder MTD at 334.) "In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)). The FAC alleges an incident wherein another female softball player brought a factually similar complaint to Linder during the same routine exit interview, and Linder promptly reported it, ensuring the comparator's claim would be addressed. Given the relevant similarity in the two female athlete's situations, the Court finds that the FAC amply points to a legally sufficient comparator.

regulatory role, noting that the "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies") (quotation marks and citation omitted).

In another case cited by Linder, a male student challenged his expulsion for sexual misconduct, claiming that other male students with similar misconduct violations were permitted to continue their education and sit for final examinations. The district court refused to recognize the existence of a class-of-one claim in such an instance. *Salau v. Denton*, 139 F. Supp. 3d 989, 1007 (W.D. Mo. 2015). In rejecting such a claim, the court reasoned that "Defendants were presented with the challenge of evaluating the evidence and facts to make a subjective, individualized assessment. Due to the nature of the alleged misconduct, treating similarly situated people differently than Plaintiff is an accepted consequence of the discretion granted to the University when handling student misconduct allegations." *Id.*; *see, e.g., Smith ex rel. Smith v. Seligman Unified Sch. Dist. No. 40 of Yavapai Cnty., Ariz.*, 664 F. Supp. 2d 1070, 1078 (D. Ariz. 2009) (student could not mount a class-of-one equal challenge to his suspension for drug and alcohol violations because to "say that a principal must uniformly apply the same level of punishment to all violators of a particular policy is to rob him or her of the important discretion that is inherent in the position of principal").

Linder suggests that the allegations against her "speak to [her] actions as a manager of university affairs," wherein she was called to exercise her discretion as an administrator. She posits that there is "no one-size fits-all approach to be followed by an athletic coach when a student reports she is an assault victim." (Linder MTD at 332.) According to Linder, a "coach must exercise discretion based on her assessment of the great number of variables that may come

19

into play, including, [but not limited to], e.g., is the report credible? Did the student ask for help? . . . ." (*Id.*)

There are two problems with Linder's argument. First, plaintiff has pleaded, and Linder does not seriously dispute, that the relevant college policies require an administrator to report *all* instances of sexual harassment.[5] (FAC ¶¶ 79-80.) According to the FAC, the discretionary questions Linder posed in her motion have no role in an administrator's duty to promptly report all instances of sexual assault. (*See id.*) The discretion that a coach has in other facets of her employment with a university does not extend to deciding whether to report sexual assault, a fact that Linder is alleged to have conceded to plaintiff before she was aware that her son was the alleged attacker. (*Id.* ¶ 59.) Second, plaintiff's claim does not represent a simple disagreement with a disinterested administrator over the handling of a school disciplinary matter. Instead, plaintiff has alleged that Linder used her position to deprive plaintiff of her rights under federal law in order to protect Linder's son. Such a claim falls well outside of the day-to-day decisions school administrators are asked to make regarding educational standards and disciplinary matters for which prior courts have recognized are beyond the reach of the Equal Protection Clause. Even

---

[5] Actually, Linder only goes so far as to acknowledge that there is a "prefere[nce]" set forth in federal and state law and relevant University policies, for reporting sexual assault. (Linder MTD at 332-33.) Instead, she focuses on the fact that the failure to following a University policy cannot establish a constitutional violation. (*Id.* at 333 (case citation omitted).) It is true that a policy violation alone *generally* cannot give rise to a procedural due process claim. *See Jaber v. Wayne State Univ. of Bd. of Govenors*, 487 F. App'x 995, 998 (6th Cir. 2012) (citing *DePiero v. City of Macedonia*, 180 F.3d 770, 787-88 (6th Cir. 1999)). However, plaintiff alleges that Linder's intentional refusal to follow policy gave rise to an equal protection claim. *See id.* ("'[I]t is only when the agency's disregard of its own rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions.'") (quoting *Bates v. Sponberg*, 547 F.2d 325, 329-30 (6th Cir. 1976)).

though class-of-one claims are rare, the facts in the FAC easily lend themselves to such a claim.[6] The Court will not dismiss this claim on the pleadings.

2.    *First Amendment Claims*

In Claim 3, plaintiff alleges that Linder imposed a prior restraint on plaintiff's freedom to speak publically about her sexual assault. (FAC ¶¶ 317-322.) In Claim 4, plaintiff alleges that Linder deprived her of her First Amendment rights by retaliating against her for engaging in protected conduct. (*Id.* ¶¶ 323-328.)

a.    Retaliation

The Court begins with plaintiff's retaliation claim. "To survive dismissal, a plaintiff pleading a First Amendment retaliation claim must allege that (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thompson*, 990 F. Supp. 2d at 809 (citing *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012)); *see Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 645 (6th Cir. 2015) (citation omitted); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (collecting cases).

The focus of Linder's motion to dismiss the retaliation claim is her argument that plaintiff

---

[6] These facts clearly distinguish the present case from *Heike v. Guevara*, 519 F. App'x 911 (6th Cir. 2013). There, the Sixth Circuit refused to recognize a class-of-one equal protection claim for a student-athlete who alleged that the decision to discontinue her athletic scholarship, purportedly because she was considered "too girly," deprived her of equal protection under the law. In rejecting the claim, the court reasoned that "[t]o subject run-of-the-mill coaching decisions to class-of-one equal-protection challenges would be to expose collegiate athletics to an unprecedented, unjustified, and unjustifiable level of judicial oversight." *Heike*, 519 F. App'x at 922 (quoting *Engquist*, 553 U.S.at 607)).

cannot satisfy the first prong because her report[7] of sexual assault did not go to a matter of public concern. The "public concern test" was first announced in *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Recognizing that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possess in connection with regulation of the speech of the citizenry in general[,]" the Supreme Court held that the government may impose restraints on a public employee's speech that does not touch upon a matter of public concern. *See Pickering*, 391 U.S. at 568. By carving out for protection an employee's right to free speech on matters of public concern, the Supreme Court balanced the First Amendment rights of government workers in their capacities as citizens against the need of a State as an employer to deliver critical services without unduly being hampered in the performance of its public functions. *Id.*; *see Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).

Linder argues that plaintiff's sexual assault complaint does not constitute protected speech because specific, individual incidents of misconduct "are viewed as matters of private concern." (Linder MTD at 337.) In support of her position, she cites a number of cases outside the Sixth Circuit that have held that individual sexual assault complaints by students and private employees are not protected by the First Amendment because they do not involve matters of public concern. (*Id.* at 338 (collecting cases).) Linder's argument and case authority are

---

[7] Linder also argues, without authority, that plaintiff failed to "report" an assault because she was initially reluctant to discuss it with Linder. The Court will permit the parties to develop the record before it passes on the factual sufficiency of the alleged sexual assault complaint.

unavailing because the Sixth Circuit has held that the "public concern" test does not apply outside the context of public employment.

In *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir. 2008), the parents of a student complained that the school had retaliated against them and their child after they wrote a letter that appeared in a local newspaper criticizing the school's handling of their child's diabetic condition. The Sixth Circuit reversed the district court's grant of summary judgment on the basis that the letter only involved a private concern over one student's treatment. In refusing to extend the reach of the public concern test, the court underscored the fact that "[s]peech is generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words[,]" none of which was applicable to the parents' speech. *Jenkins*, 513 F.3d at 588 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382-83, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)). The court held that restricting private speech that would otherwise receive protected status by "applying 'the public concern test outside the public employment setting would require [the court] to rend it from its animating rationale and original context.'" *Id.* at 586-87 (quoting *Van Deelen v. Johnson*, 497 F.3d 1151, 1156-57 (10th Cir. 2007) (further citations omitted)); *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 131 S. Ct. 2488, 180 L. Ed. 2d 408 (2011) ("Outside the public employment context, constitutional protection for petitions does not reasonably turn on whether these petitions relate to a matter of public concern.") In light of the holding in *Jenkins*, the public concern test is inapplicable to plaintiff's retaliation claim.

Even if plaintiff's speech did constitute protected activity, Linder argues that her retaliation claim would fail because she has not alleged a link between her speech and an adverse

action. With respect to the decision to change plaintiff's position and eventually bench her, Linder observes that a coach's decision as to whom to play and how much time each student-athlete receives are matters that fall within the "broad discretion that typically characterizes the coach-player relationship." (Linder Mot. at 339 (quoting *Heike v. Guevara*, 519 F. App'x 911, 922 (6th Cir. 2013)). Linder insists that "[n]othing in Kesterson's allegations suggests Linder's decision to change Kesterson's position and Linder's treatment of Kesterson was anything more than the broad discretion that characterizes the coach-player relationship." (*Id.*)

The Court disagrees. While a university coach may enjoy substantial discretion in making staffing decisions on her team, such discretion does not extend to retaliating against a student-athlete because she has exercised her First Amendment rights. *See also Heike*, 519 F. App'x at 918 (noting that the discretion to determine which student scholarships will be renewed does not permit a coach to deprive a student of equal protection under the law). Here, the FAC alleges that, shortly after plaintiff complained about Tucker's assault, Linder changed her position and ultimately benched her. It further alleges facts which, if believed, would demonstrate that the reason was unrelated to superior skill or dedication of other players. (FAC ¶¶ 90, 96-97, 104.) At this stage in the litigation, these facts are sufficient to set forth a retaliation claim. *See generally Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (temporal proximity alone may be sufficient to set forth retaliation claim) (citation omitted); *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008) (similar) (collecting cases).

b.    <u>Prior Restraint</u>

In Claim 3, plaintiff alleges that Linder imposed on her an unconstitutional prior restraint of her right to free speech when she asked her not to speak to anyone about Tucker's assault.

(FAC ¶¶ 68-69, 318.) The elements of a prior restraint are: (1) one who seeks to exercise First Amendment rights is required to apply to the government for permission; (2) the government is empowered to determine whether the applicant should be granted permission on the basis of a review of the content of the proposed expression; (3) approval is dependent upon the government's affirmative action; and (4) approval is not a routine matter, but involves an examination of the facts, an exercise of judgment, and the formation of an opinion. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) (citation omitted).

The Court has doubts as to whether Linder's request that plaintiff not discuss the incident with Tucker with anyone other than those with whom she had already spoken would satisfy several of the elements of a prior restraint, making the denial of Linder's motion to dismiss this particular claim a close call. For example, though plaintiff alleges that she "got the impression from Coach Linder that [plaintiff] had to agree to remain silent if she wanted to keep her spot on the team" . . . and further alleges that she "was afraid that if she did not comply with Coach Linder's instruction, she would kick [plaintiff] off the softball team and non-renew her scholarship[,]" she fails to identify specific facts offered to support this conclusory impression. (*See* FAC ¶ 69.)

Still, the Court finds that dismissal of the prior restraint claim at this time would be inappropriate. The allegations in plaintiff's pleading describe Linder's alleged plan and scheme to ensure that plaintiff's complaint against Tucker never saw the light of day. Such a plan was more likely to succeed if plaintiff was unable to speak of the incident. Therefore, the Court cannot determine that plaintiff's impression is entirely unsupported by factual allegations. This is

especially true given the fact that the complaint allegations spell out the authority Linder had over plaintiff and suggest that Linder could exert pressure on plaintiff to keep her silence. The Court will wait and see whether, after discovery, the record will support this claim.

IV. **DEFENDANT OAKLEY'S MOTION TO DISMISS**

According to the FAC, Claim 2 (Equal Protection) is asserted against Oakley in his official capacity only, while Claim 3 (First Amendment Prior Restraint) and Claim 4 (First Amendment Retaliation) are brought against Oakley in both his official and individual capacities. According to Oakley, he is immune from suit in his official capacity for claims arising under 42 U.S.C. § 1983. As for the claims asserted against him in his individual capacity, Oakley argues that the complaint allegations fail to set forth facts that, if believed, would establish that, in the thirty-three (33) days in which he served as the interim head coach of the women's softball team following Linder's resignation, he deprived plaintiff of her constitutional rights.[8]

A.    **Official Capacity and § 1983**

"A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.'" *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 56, 68, 109 S. Ct. 2304, 2310-11, 105 L. Ed. 2d 45 (1989)). Kent State is a public university, and therefore qualifies as a governmental entity as an arm of the state. *See McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000)); *see also Sheppard v. Kent State Univ.*, No. 5:

---

[8] Oakley alleges that, "to the extent" that plaintiff has attempted to assert a Title IX claim against Oakley, such a claim would fail as a matter of law because such a claim cannot be asserted against individual school officials. (Oakley MTD at 437 (citations omitted)). Plaintiff makes clear in her response that she has not pleaded a Title IX claim against Oakley, so "there is nothing to dismiss." (Oakley MTD Opp'n at 456 n.1.)

15 CV 417, 2015 WL 4743893, at *3 (N.D. Ohio Aug. 11, 2015) (Kent State is an agency or instrumentality of the State of Ohio). "It is well-established that States and agencies and instrumentalities of the State, including public universities . . . ," are not 'persons' subject to suit under Section 1983." *Sheppard*, 2015 WL 4743893, at *3 (citing, among authority, *Will*, 491 U.S. at 66); *see Johnson*, 215 F.3d at 571(citations omitted); *see also Ward v. Members of Bd. of Control of E. Mich. Univ.*, 700 F. Supp. 2d 803, 812 (E.D. Mich. 2010) ("Eleventh Amendment immunity bars recovery of money damages under 42 U.S.C. § 1983 against state officials sued in their official capacities.") (citing, *among authority, Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).

Plaintiff concedes that she cannot recover money damages against Oakley in his official capacity, adding that she is properly seeking prospective injunctive and declaratory relief against Oakley (and by extension Kent State). The Supreme Court has carved out a narrow exception to sovereign immunity for suits against state officials in their official capacities where the plaintiff is seeking prospective injunctive and declaratory relief. *Ex parte Young*, 209 U.S. 123, 150-56, 28 S. Ct. 441, 52 L. Ed. 714 (1908); *see McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000) (citing *Will*, 491 U.S. at 70-71). According to plaintiff, while the FAC "details a long track record of past misconduct, it also includes allegations that raise the specter of future injuries." (Oakley MTD Opp'n at 459.) She claims that, in addition to damages for past wrongs, her amended pleading seeks prospective relief—"including an end to the ongoing indifference and retaliation." (*Id.* at 460.)

"In order to qualify under *Ex parte Young*, such an action must seek prospective relief to end a continuing violation of federal law." *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th

Cir. 2002) (citation omitted). Here, the FAC clearly seeks prospective injunctive relief by way of the request to enjoin defendants from further retaliating against or depriving her of her constitutional rights.[9] (FAC at 195.) *Cf. Phi Kappa Tau Chapter House Ass'n of Miami Univ. v. Miami Univ.*, No. 1:12-cv-657, 2013 WL 427416, at *5 (S.D. Ohio Feb. 4, 2013) (motion to amend complaint to add claims against university and its officials in their official capacity denied as futile where the amended complaint did not seek to prohibit defendants from violating federal law in the future).

Oakley complains that, even if prospective relief is sought, he is the wrong university official to provide it. (Oakley MTD at 440.) However, the FAC details the authority of NCAA Division I coaches over scholarship athletes. (FAC ¶¶ 8-11, 13-15, 17-19, 262-264.) Again, it remains to be seen whether these factual allegations will find support in a fully developed record. The Court will not, however, dismiss these official capacity claims at the pleading stage.

## B.     First Amendment Claims

The Court now turns to the First Amendment claims brought against Oakley in his individual capacity.

### 1.     Retaliation

Oakley offers several arguments as to why he believes that plaintiff has failed to state a First Amendment retaliation claim against him in his individual capacity. First, like Linder, Oakley argues that plaintiff has not engaged in protected activity because her complaints to Linder and to the Title IX coordinator involved personal matters that did not touch upon a public

---

[9] In reaching this conclusion, the Court does not rely upon plaintiff's suggestion that she might be seeking to further amend her complaint to add recent incidents of discrimination and retaliation. (Oakley MTD Opp'n at 459.)

concern. As the Court has already determined, the "public concern" test is inapplicable in this case because plaintiff is not a public employee.

Second, Oakley posits that plaintiff fails to allege facts that, if believed, would establish the causation element of her retaliation claim. He notes that the August 30, 2015 meeting he held with the incoming seniors on the softball team took place more than a year after plaintiff reported the assault to Linder, destroying plaintiff's temporal proximity argument. The Court agrees. Additionally, the Court observes that plaintiff fails to allege any action that Oakley took against plaintiff, including the alleged prior restraint, that was in retaliation for plaintiff's engagement in protected activity. While plaintiff alleges that, in the wake of Linder's resignation, Oakley was "openly hostile" to plaintiff, she fails to set forth any facts to support this conclusory allegation. (FAC ¶ 288.) She also fails to allege that Oakley was responsible for the team hostility that she alleges followed Linder's resignation. While plaintiff claims in her reply brief that Oakley took no steps to prevent Linder and Kent State alumnae from engaging in conduct that she alleges created a hostile environment that made her continued presence on the team "unbearable," she offers no factual allegations in the FAC that would substantiate such representations. (Oakley MTD Opp'n at 466.) In the absence of factual allegations supporting causation, Oakley is entitled to dismissal of plaintiff's First Amendment retaliation claim.

### 2.    *Prior Restraint*

Plaintiff's prior restraint claim against Oakley stands on different footing. Plaintiff alleges that a mere two days after Linder resigned, Oakley threatened to remove anyone from the softball team who made a disparaging remark about Linder. (FAC ¶ 156.) She further alleges facts that would demonstrate that Oakley was aware of plaintiff's complaint against Linder when

29

he issued the directive to the team. (*Id*. ¶¶ 136, 158-59.)

"The Supreme Court . . . [has] identified perhaps the most important characteristic that sets apart legitimate government regulations from impermissible prior restraints: content-neutrality." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 508 (6th Cir. 2001) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 795, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). Here, Oakley's alleged threat was not content-neutral but was very specific in that it forbid only speech that spoke ill of Linder. Moreover, Oakley is alleged to have foreclosed any possible avenue for objection or appeal by suggesting that there would be no warnings given, and the allegations support a finding that the determination as to what constitutes "anything bad about Coach Linder" would be made by him. While Oakley makes much of the fact that the threat was issued as a "blanket statement" to all incoming senior players in attendance at the meeting, the fact remains that it is alleged to have had the effect of precluding plaintiff from exercising her right to free speech regarding the assault and related matters.

As was the case with the prior restraint claim against Linder, discovery may not reveal sufficient evidence to establish that the statement constituted a prior restraint. For now, the allegations are sufficient to withstand a Rule 12(b)(6) challenge.[10]

---

[10] The Court does not interpret the FAC as asserting an equal protection claim against Oakley in his individual capacity. Nevertheless, assuming such a claim has been asserted, Oakley argues that plaintiff has failed to allege facts that would support a finding that Oakley treated plaintiff differently than similarly-situated male student-athletes. Plaintiff fails to respond to this argument, suggesting only that Oakley stands in Linder's shoes with respect to prospective injunctive relief. The Court has reviewed the FAC and agrees that, with respect to plaintiff's request for damages, plaintiff has failed to allege facts that would establish that Oakley treated plaintiff differently than similarly-situated individuals. Additionally, the allegations going toward the "class-of-one" theory of liability relate solely to Linder's actions. Therefore, to the extent that plaintiff's equal protection claim seeks damages from Oakley, his motion to dismiss this claim is granted.

## V.  QUALIFIED IMMUNITY

Linder maintains that, even if the Court refuses to dismiss the claims against her on the merits, the Court should find that qualified immunity shields her from liability for all claims brought against her in her individual capacity. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). The doctrine "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 543 U.S. 194, 125 S. Ct. 596, 599, 160 L.Ed.2d 583 (2004).

It is well-settled that the immunity analysis proceeds in two stages. First, the Court considers the "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If that question is answered in the affirmative, the Court next asks "whether the right was clearly established . . . in light of the specific context of the case[.]" *Id.* "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quotation marks and citations omitted); *see Plumhoff v. Rickard*, --U.S.--, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014) ("[A] defendant cannot be said to have violated a clearly established right unless the

31

right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.") (quotation marks and citations omitted); *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (In determining whether a constitutional right is clearly established, a district court looks for binding Supreme Court or Sixth Circuit authority, or finally, in extraordinary cases, decisions of other circuit courts.), *superseded on other grounds as recognized by Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407-08 (6th Cir. 2007) (citation omitted).

A district court enjoys "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (observing that, while the two-stage *Saucier* protocol approach is no longer mandatory, the Supreme Court "continue[s] to recognize that it is often beneficial").

When a defendant raises a qualified immunity defense, the burden is on the plaintiff to prove that the officials are not shielded by qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citation omitted); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (The plaintiff bears the ultimate burden of proving "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct.") (citation omitted). "Stated differently, the issue is 'whether the defendant had fair warning that their actions were unconstitutional.'" *Ward v. Members of Bd. of Control of E. Mich. Univ.*, 700 F. Supp. 2d 803, 813 (E.D. Mich. 2010) (quoting *Grawey v. Drury*, 567 F.3d 302, 313-14 (6th Cir.

2009)).

While a court may consider the issue of qualified immunity on a motion brought under Fed. R. Civ. P. 12(b)(6), *see Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001), "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) "Although an officer's 'entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point' . . . that point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)) (further citations omitted).

Defendant Linder's request for qualified immunity is premature. At this time, it is unclear whether qualified immunity would even be available for her actions. For example, plaintiff's equal protection claim centers around Linder's alleged refusal to report plaintiff's sexual assault. However, the pleadings provide that Linder had no discretion—University policies require the reporting of all accusations of sexual assault and sexual harassment. (FAC ¶ 80.) Qualified immunity is only available for *discretionary* decisions, and the record has not been developed to a point where the Court can determine whether Linder had any discretion in the matter. *See Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) ("Qualified immunity is an affirmative defense that extends to government officials performing *discretionary* functions.") (citing *Harlow*, 457 U.S. at 817-18 ) (emphasis added); *see Sellers ex rel. Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994) (a duty is ministerial, and outside the context of a discretionary function, "only where the statute or regulation leaves no room for discretion—that is, 'it specifi[es] the precise action that the official must take in each instance.'") (quoting *Davis v. Scherer*, 468 U.S. 183, 196 n.14, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)); *Hudson v. Hudson*, 475 F.3d 741, 744

(6th Cir. 2007) (similar) (citation omitted).

Early qualified immunity rulings are also difficult in situations, such as the present case, where an improper motivation constitutes an element of one or more of the claims. The fact-intensive nature of the qualified immunity analysis makes them poor candidate for consideration before discovery has taken place. *Proctor v. Applegate*, 661 F. Supp. 2d 743, 761-62 (E.D. Mich. 2009) (citation omitted). Many of the claims asserted against Linder in her individual capacity involve such improper motivation or intent. *See Shively*, 579 F. App'x at 356 (discriminatory intent is an element of an equal protection claim) (citations omitted); *Thompson*, 990 F. Supp. 2d at 809 (First Amendment retaliation includes an element of retaliatory motive) (citation omitted). Consistent with this requirement of showing an improper motive, plaintiff has alleged that "Coach Linder intentionally discriminated against Ms. Kesterson by trying to cover up her complaint and urging her silence." (FAC ¶ 240.) Given that most of plaintiff's claims involve such intent, Linder's motion to dismiss on the basis of qualified immunity is improper at this juncture. *See, e.g., Proctor*, 661 F. Supp. 2d at 762 (because most of plaintiff's claims, including a First Amendment retaliation claim, involve an element of intent, "defendants' motion to dismiss in this regard is improper and premature and should be denied without prejudice").

## VI. PLAINTIFF'S MOTION TO AMEND

Plaintiff moves to amend to add the allegations contained in the proposed FAC. Rule 15(a)(2) of the Federal Rules of Civil Procedure governs plaintiff's motion to amend. It provides, in relevant part, that the Court should "freely give leave" to amend pleadings "when justice so requires." "Nevertheless, denying leave is appropriate in instances of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility or amendment, etc.'" *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 458 (6th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). Courts should freely give leave to amend in the absence of these factors. *Foman*, 371 U.S. at 182.

The Court finds that none of the justifications for denying a motion to amend are present, as there is no evidence that plaintiff was dilatory in seeking such relief, that she has acted in bad faith, or that she has repeatedly tried unsuccessfully to cure deficiencies in her original pleading. Moreover, the Court's analysis of defendants' motions above demonstrates that, with the exception of the First Amendment retaliation claim against Oakley in his individual capacity, amendment would not prove futile. Accordingly, plaintiff's motion to amend is granted, in part.

## VII. CONCLUSION

For all of the foregoing reasons, plaintiff's motion to amend is granted in part. Kent State's motion to strike is denied, as is Linder's motion to dismiss. Oakley's motion to dismiss is granted in part. This case shall go forward on plaintiff's Title IX claim against Kent State, her equal protection and First Amendment prior restraint claims against Oakley in his official capacity, her First Amendment prior restraint claim against Oakley in his individual capacity, and her equal protection and First Amendment claims against Linder in her individual capacity.

**IT IS SO ORDERED**.

Dated: March 15, 2017
_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**