**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LAUREN KESTERSON,**

     **Plaintiff,**　　　　　　　　　　　**Case No. 5:16-cv-00298**

**v.**　　　　　　　　　　　　　　　**Judge  SARA LIOI**

**KENT STATE UNIVERSITY,** *et al.***,**　　　**Magistrate Judge Kathleen Burke**

     **Defendants.**

---

### DEFENDANT ERIC OAKLEY'S MOTION FOR SUMMARY JUDGMENT

---

NOW COMES Defendant ERIC OAKLEY, by and through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves the Court for an order granting him summary judgment as to Plaintiff's First Amended and Supplemental Complaint with Jury Demand (the "Complaint").  This Motion is well founded because there are no genuine issues of material fact that would preclude the entry of judgment in Defendant Eric Oakley's favor.

A Memorandum in Support of this Motion is attached.

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*/s/ Anna M. Seidensticker*

ANNA M. SEIDENSTICKER (0046761)
*Trial Counsel*
Principal Assistant Attorney General
Employment Law Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7257 – Telephone
(614) 752-4677 – Facsimile
elsreview@ohioattorneygeneral.gov

*Counsel for Defendant Eric Oakley*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

MEMORANDUM IN SUPPORT ........................................................................1

I.      Summary Of Argument And Statement Of Legal Issues ...................................1

II.     State Of Facts Relevant To Plaintiff's Claims Against Oakley ..........................3

        A.  Background Facts And The Critical Spring 2015 Evaluations ...............3

        B.  Oakley Becomes Interim Head Softball Coach ......................................6

        C.  The Senior Meeting, The All-Team Meeting, And The Camping Trip ..................8

        D.  Plaintiff's Decision Regarding A University-Arranged Meeting To Speak To The
            Softball Team ........................................................................11

        E.  Plaintiff's Communications With KSU Administration And the SRVSS Office
            Continue ..............................................................................13

        F.  Plaintiff Decides Not To Continue With The Softball Team, And Graduates From
            KSU In December 2016 ...........................................................14

III.    Law And Argument ......................................................................15

        A.      Standard Of Review ........................................................15

        B.      Plaintiff's 42 U.S.C. § 1983 Claims Against Oakley Fail Because She Cannot
                Establish That He Denied Her Constitutional Rights To Equal Protection Or
                Deprived Her Of Any Rights Under The First Amendment ..................16

                1.      Plaintiff's 42 U.S.C. § 1983 Claims Against Oakley In His Official
                        Capacity For Alleged Violations Of The First (Prior Restraint) And
                        Fourteenth Amendments (Equal Protection) Fail As A Matter Of Law ....17

                2.      Plaintiff's 42 U.S.C. § 1983 Claim Against Oakley In His Individual
                        Capacity For Alleged Violation Of The First Amendment (Prior Restraint)
                        Fails As A Matter Of Law ........................................21

                3.      Oakley Is Entitled To Qualified Immunity As To The First Amendment
                        Prior Restraint Claim, The Sole Remaining Claim Against Him In His
                        Individual Capacity ..............................................27

IV.     Conclusion ..............................................................30

CERTIFICATE OF COMPLAINCE ..............................................................................31

CERTIFICATE OF SERVICE ....................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Ohio Univ.*,
No. 2:17-CV-200, 2018 U.S. Dist. LEXIS 39634 (S.D. Ohio Mar. 12, 2018)........................17

*Anderson v. Creighton*,
483 U.S. 635 (1987).......................................................................................28, 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................21

*Bass v. Robinson*,
167 F.3d 1041 (6th Cir.1999) ("Supervisory liability under § 1983 cannot
attach where the allegation of liability is based upon a mere failure to act.")........................16

*Brosseau v. Haugen*,
543 U.S. 194 (2004).......................................................................................27

*Burkes v. Tranquilli*,
2008 U.S. Dist. LEXIS 51403 (W.D. Pa. July 2, 2008) ........................................21

*Carten v. Kent State Univ.*,
282 F.3d 391 (6th Cir. 2002) ..............................................................................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................15

*Copeland v. Machulis*,
57 F.3d 476 (6th Cir.1995) ...............................................................................16

*Diaz v. Mich. Dep't of Corr.*,
703 F.3d 956 (6th Cir. 2013) .............................................................................17

*Ex Parte Young*,
209 U.S. 123 (1908).......................................................................................17

*Feathers v. Aey*,
319 F.3d 843 (6th Cir. 2003) .............................................................................28

*Gallagher v. C.H. Robinson Worldwide, Inc.*,
567 F.3d 263 (6th Cir. 2009) .............................................................................16

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) .............................................................................22

iii

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).................................................................................27

*Hudson v. Hudson*,
    475 F.3d 741 (6th Cir. 2007) ..............................................................28

*Idaho v. Coeur d'Alene Indian Tribe*,
    521 U.S. 261 (1997).................................................................................17

*Kentucky v. Graham*,
    473 U.S. 159 (1985).................................................................................17

*Loggins v. Franklin County*,
    218 Fed. Appx. 466 (6th Cir. 2007) ......................................................18

*Malley v. Briggs*,
    457 U.S. 335 (1986).................................................................................28

*Marshall v. Ohio Univ.*,
    No. 2:15-CV-775, 2015 U.S. Dist. LEXIS 155291 (S.D. Ohio Nov. 17, 2015)....................17

*McCloud v. Testa*,
    97 F.3d 1536 (6th Cir. 1996) ..............................................................29

*McCormick v. Miami Univ.*,
    693 F.3d 654 (6th Cir. 2012) ..............................................................17

*McKenna v. Bowling Green State Univ.*,
    568 Fed. App'x 450 (6th Cir. 2014) ......................................................16

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978)...........................................................................16, 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)...................................................................................17

*Phi Kappa Tau Chapter House Ass'n of Miami Univ. v. Miami Univ.*,
    No. 1:12-cv-657, 2013 U.S. Dist. Lexis 15030 (S.D. Ohio Feb. 4, 2013)............................21

*Plumhoff v. Rickard*,
    134 S. Ct. 2012 (2014)............................................................................28

*Poe v. Haydon*,
    853 F.2d 418 (6th Cir. 1988) (supervisors who did not participate in sexual
    harassment but were merely aware of it and failed to act are not liable under §
    1983) .......................................................................................................16

*Polaris Amphitheater Concerts, Inc. v. City of Westerville,*
   267 F.3d 503 (6th Cir. 2001) ................................................22

*Polk County v. Dodson,*
   454 U.S. 312 (1981) (a governmental entity is liable under § 1983 only when
   the entity itself is a "'moving force'" behind the deprivation) ...............................18

*Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986).................................................................22

*Saucier v. Katz,*
   522 U.S. 194 (2001) (abrogated on other grounds by *Pearson v. Callahan*, 555
   U.S. 223 (2009)) ................................................................28

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546 (1975).................................................................22

*Sellers ex rel. Sellers v. Baer,*
   28 F.3d 895 (8th Cir. 1994) ...............................................27

*Sheets v. Mullins,*
   287 F.3d 581 (6th Cir. 2002) ...............................................29

*Shehe v. Luttrell,*
   199 F.3d 295 (6th Cir 1999) ...............................................27

*Sheppard v. Kent State Univ.,*
   No. 5:15-CV-417, 2015 U.S. Dist. LEXIS 105325 .........................17

*Silberstein v. City of Dayton,*
   440 F.3d 306 (6th Cir. 2006) ...............................................29

*Soper v Hoben,*
   195 F.3d 845 (6th Cir. 1999), *cert. denied, Soper ex rel. Soper v. Hoben*, 530
   U.S. 1262 (2000).................................................................16

*Untulan v. City of Lorain,*
   430 F.3d 312 (6th Cir. 2005) ...............................................29

*Ward v Members of Bd. of Control of E. Mich. Univ.,*
   400 F. Supp. 2d 803 (E.D. Mich. 2010)...................................29

*Wood v. Moss,*
   134 S. Ct. 2056 (2014).................................................27, 29, 30

*Woodruff v. Ohman,*
   29 Fed. Appx. 337 (6th Cir. 2002).........................................21

**STATUTES**

42 U.S.C. § 1983....................................................................................................................... passim

<u>**MEMORANDUM IN SUPPORT**</u>

**I.      <u>Summary Of Argument And Statement Of Legal Issues</u>**

Plaintiff Lauren Kesterson ("Plaintiff" or "Ms. Kesterson") filed her First Amended and Supplemental Complaint on June 10, 2016 (the "Amended Complaint"), in which for the first time, she added Eric Oakley ("Oakley") as a Defendant along with previously-named Defendants Kent State University ("KSU") and Karen Linder ("Linder"). [Doc. #20].  On September 2, 2016, Oakley filed his Motion to Dismiss the Amended Complaint. [Doc. #31].  The Court issued its Memorandum Opinion ("MO") granting Oakley's Motion to Dismiss in part – dismissing Plaintiff's 42 U.S.C. § 1983 claims against Oakley for First Amendment retaliation and for denial of equal protection under the Fourteenth Amendment to the extent that such claim seeks damages from Oakley, and allowing the following claims against Oakley to proceed:

(i) <u>Claim 2</u>:  a 42 U.S.C. § 1983 claim for denial of equal protection under the Fourteenth Amendment against Oakley in his official capacity only; and

(ii) <u>Claim 3</u>:  a 42 U.S.C. § 1983 claim for violation of free speech (prior restraint) under the First Amendment against Oakley in his individual and official capacities.

[Doc. #34 at 518; Doc. #137 at 1166; Doc. #20].

Plaintiff's remaining claims against Oakley fail because, based upon all of the materials in the record before the Court including the deposition transcripts, exhibits, declarations, and other evidence gathered during discovery, Plaintiff cannot show that she suffered any cognizable violations based upon the First and Fourteenth Amendments as a result of Oakley's actions or inactions.  The evidence is uncontroverted that any statements made by Oakley about not tolerating Linder "bashing" were made in the context of player evaluations that were critical of Linder, her coaching decisions, and manner.  Specifically, Oakley's statements about Linder had nothing to do with Plaintiff and her Title IX Complaint or any other matter outside of softball,

but related to the harsh reviews of Linder from the previous spring (May 2015) where she was called a "dinosaur" who used "seventeenth century techniques" in her coaching. Further, Plaintiff acknowledges that Oakley also stated that complaining that Linder was no longer the Head Softball Coach would likewise not be tolerated. These statements were directed to all of the softball players – first at a meeting of the senior players, including Plaintiff, and then at an all-team meeting that Plaintiff did not attend. Others in attendance confirm that Oakley's statements were directed to the entire team, and were in relation to the general belief that Linder's resignation was due to the critical player evaluations. They also understood that Oakley was working to move the team forward from the difficult, "shocking" news of Linder's resignation earlier that day. Oakley continued to treat Plaintiff as he did every other player in terms of communication and support.

Plaintiff's assertions that Oakley violated any of her Constitutional rights to equal protection and free speech in the *few weeks* between the time that he became the interim Head Softball Coach and Plaintiff's decision to stop playing softball with the team, are meritless. Plaintiff relies on her own speculation and conjecture, but the facts adduced during discovery establish no Constitutional deprivation. Oakley's statements at the senior meeting were content-neutral because he referred to Linder "bashing," as well as complaints that she was no longer the Head Softball Coach. Additionally, Plaintiff was not prohibited from speaking about Linder or any other topic, and after August 30, 2015, continued to communicate with KSU administrators, counselors, teammates, and others about her alleged sexual assault, her Title IX Complaint against Linder, her participation or lack thereof with the softball team, or any other topic.

Moreover, Oakley did not require Plaintiff to seek his permission for any of her communications; nor did he censor any communications or other expression on the part of

Plaintiff.  In fact, Oakley was not directly involved in any of Plaintiff's communications with anyone at KSU or anyone else about Linder, Plaintiff's Title IX Complaint, the alleged sexual assault, or any other topic.  To the contrary, the evidence confirms that it was Plaintiff who directed Oakley as to what he should say in relation to Plaintiff and her sister's absence from softball team practices and events.

Both of Plaintiff's § 1983 claims relative to Oakley in his official capacity are predicated on past conduct and do not demonstrate any continuing violations of federal law.  Plaintiff's decision not to continue with the softball team was her own voluntary decision.  She declined to return to the team even though she had an additional year of eligibility, and she graduated from KSU in December 2016.  There is no admissible evidence demonstrating any Constitutional deprivation, much less any *ongoing* Constitutional deprivation; nor does Plaintiff set forth any appropriate prospective injunctive relief that Oakley can provide.  Consequently, Plaintiff's § 1983 official capacity claims against Oakley fail as a matter of law and should be dismissed.

As to the sole remaining claim asserted against Oakley in his individual capacity – the First Amendment prior restraint claim – even assuming, arguendo, that such claim is viable, Oakley is entitled to qualified immunity.  Plaintiff cannot demonstrate that Oakley violated a clearly established right of which a reasonable person would have known.  Nor can she show any improper motivation or intent on the part of Oakley, and he should be awarded qualified immunity as to such claim.

## II.    Statement Of Facts Relevant To Plaintiff's Claims Against Oakley

### A.    Background Facts And The Critical Spring 2015 Evaluations

In August 2012, Plaintiff began her freshman year as a student at KSU and was also a member of KSU's varsity softball team, having been recruited by then Head Softball Coach

Linder. [Kesterson, Ex. 12, 24-26].[1]  Plaintiff alleges that during the evening of December 7, 2012, she was a victim of a non-consensual sexual encounter between herself and Linder's son, Tucker Linder, a KSU baseball player at the time.  Plaintiff further alleges that, in mid-May 2014 at the end of her sophomore softball season, during her routine exit interview, Plaintiff told Linder about the alleged sexual encounter. [Doc. #20 at 205-207, 209].  Plaintiff played softball for KSU during her freshman, sophomore, and junior years. [Oakley Dec., Ex. 1, ¶7].

On July 1, 2014, Oakley began working at KSU as an Assistant Softball Coach, primarily responsible for the pitchers and catchers.  Oakley was an Assistant Softball Coach during Plaintiff's junior year (2014-2015) at KSU. [Kesterson, Ex. 12, 229].  Jessica Bachkora was also an Assistant Softball Coach during the 2014-2015 year. [Oakley Dec., Ex. 1, ¶¶ 2-3, 5, 7].

At the end of each softball season, the KSU softball players completed evaluations of the program, which included evaluations of the coaching staff. [Kesterson, Ex. 12, 234; Oakley Dec., Ex. 1, ¶8; Oakley, Ex. 13, 108; Warren, Ex. 23, 8; Duffy, Ex. 21, 7; Tilton, Ex. 20, 9-10; Frankenfield, Ex. 18, 125].  At the end of the 2014-2015 softball season (in approximately May 2015), consistent with previous years, the softball players completed their annual evaluations of the program, the substance of which were set forth in a summary (the "Evaluations). [Oakley_Ex. 3; Danesis Dec., Ex. 2, ¶3].  These reviews were especially critical as compared with prior years, and in particular, very harsh regarding Linder. [Kesterson, Ex. 12, 236-237; Oakley Dec., Ex. 1, ¶¶8-10; Oakley, Ex. 13, 110-111, 115-116; Linder, Ex. 14, 180-181].

---

[1] The transcripts of all referenced depositions and deposition exhibits have been filed with the Court by Defendant KSU.  Referenced transcript excerpts are attached hereto as Oakley MSJ Exhibits 12-23.  For ease of reference, citations to the deposition transcripts, excerpts of which are provided as exhibits hereto, are identified as [(Deponent Name), Ex. (msj ex. no.), (depo. pg. no.)].  The referenced declarations will be referred to as [(Declarant name) Dec., Ex. (msj ex. no.), ¶(para. no.)].  Except as set forth below, all referenced party exhibits are attached and will be referred to as [(Party Name)_Ex. (no.) at (page/bates/para. no., as applicable)].  The declarations of Jennie O'Connell and Joel Nielsen, along with any exhibits referenced therein, have been filed by Defendant KSU at Docs 150 and 148, respectively.  Defendant Oakley refers to such declarations and/or exhibits herein, but is not making duplicative filings of the same.

Oakley stated that "I felt that they went into insults, which I … didn't feel was necessary."  "I just felt the tone was pretty … harsh."  Oakley recalls that a few of the comments were that Linder used "seventeenth century techniques," and was a "dinosaur."  [Oakley Dec., Ex. 1, ¶10; Oakley, Ex. 13, 116-117].  In June 2015, the KSU softball coaching staff, including Linder and Assistant Coaches Oakley and Bachkora[2] discussed the Evaluations, and how to begin addressing the concerns raised without considering the harsh manner in which those concerns were delivered. [Oakley Dec., Ex. 1, ¶11; Oakley, Ex. 13, 115-117].  The Evaluations were also discussed with the team captains during the summer of 2015 in order to begin to develop a plan to address the concerns. [Duffy, Ex. 21, 8-9].  Even though they had not seen the Evaluations, Kesterson and a number of the other players were aware that they were critical of Linder. [Kesterson, Ex. 12, 236-237; Duffy, Ex. 21, 8-12; Tilton, Ex. 20, 13, 20-21; Cregan, Ex. 19, 107; Frankenfield, Ex. 18, 126-127; Warren, Ex. 23, 8-10].

Plaintiff returned to KSU in the late summer of 2015 to begin her senior year.  On August 24, 2015, along with her father and twin sister, she met with KSU's Deputy Title IX Coordinator, Erin Barton, and filed a Title IX complaint against Linder (the "Title IX Complaint"). [Kesterson, Ex. 12, 167, 232; Barton, Ex. 16, 41-42, 46].  At Barton's suggestion, they met with KSU Athletic Director Joel Nielsen because Plaintiff had expressed concerns to Barton about her scholarship should she decide not to continue with softball. [Kesterson, Ex. 12, 168-169; Barton, Ex. 16, 56, 64-65, 68].  Plaintiff was also working with Jennifer ("Jennie") O'Connell, the Director of KSU's Office of Sexual & Relationship Violence Support Services ("SRVSS") and receiving additional support services through her. [O'Connell Dec., generally, and ¶¶ 11, 17].

---

[2] Jessica Bachkora left KSU in June 2015, and Jessica Toocheck became an Assistant Softball Coach beginning in July 2015. [Oakley Dec., Ex. 1, ¶¶5-6].

### B.        Oakley Becomes Interim Head Softball Coach

On August 28, 2015, Linder was scheduled to have a meeting with Nielsen.  Prior to the meeting, Linder telephoned Oakley (who was in Chicago, Illinois at the time), and told him about the meeting with Nielsen, and her belief that she might either be suspended, required to resign, or be fired.  Linder also told Oakley that Kesterson had reported to her that she had been raped during her freshman year, and that Linder did not report it to the KSU Title IX office at that time because Kesterson had requested that she not do so.  Linder indicated as well that, a few days prior to August 28th, Kesterson had filed the Title IX Complaint. [Oakley Dec., Ex. 1, ¶¶12-13; Oakley Dep., Ex. 13, 144-152].

This telephone call prompted Oakley to begin to return home earlier than he had planned.  During his travels back to Ohio, Oakley received another telephone call from Linder in which she told him that she had resigned.  Oakley also had a telephone call with Nielsen and KSU's Senior Woman Administrator, Janet Kittell (who supervises the softball program at KSU).  During that call, Nielsen confirmed that Linder had resigned earlier that day, and offered Oakley the interim Head Softball Coach position for the 2015-2016 year.  Oakley accepted the offer.  They also discussed as well the need for a meeting with the softball team.  Most of the players had recently arrived at KSU for the new school year.  The so-called "emergency" softball team meeting was scheduled to occur later that day; the exact time was adjusted because many of the team members were planning on attending a concert together that evening. [Oakley Dec., Ex. 1, ¶¶13-14; Oakley, Ex. 13, 161-162; Nielsen, Ex. 15, 25-26].

The emergency meeting occurred during the mid-afternoon of August 28, 2015. [Oakley Dec., Ex. 1, ¶15; Oakley, Ex. 13, 177-178].  In addition to twenty-three of the twenty-five members of the softball team, those in attendance included Nielsen, Kittell, Assistant Softball

Coach Jessica Toocheck, and Oakley. This was the first time that Oakley had seen most of the team members since May 2015. [Oakley Dec., Ex. 1, ¶15].   Kesterson did not attend the meeting because she was concerned that Linder would be there. [Kesterson, Ex. 12, 240-241, 254; Oakley Dec., Ex. 1, ¶15].   Another player was not in attendance because she had not yet arrived on campus from the summer break.   It is important to note that, heading into the emergency meeting, Oakley was assuming that many of the members of the team already knew about the circumstances leading to Linder's resignation.   That is, Oakley assumed that other players knew about Plaintiff's rape allegations, her having reported the allegations to Linder, and Plaintiff having recently filed a Title IX Complaint. [Oakley Dec., Ex. 1, ¶16].

The meeting began with Nielsen announcing that Linder had resigned, and Oakley would be the interim Head Softball Coach. [Oakley Dec., Ex. 1, ¶17; Oakley, Ex. 13, 177-178; Nielsen, Ex. 15, 109-110; Toocheck, Ex. 17, 74-76].   At this time, Oakley saw shock and tears on the players' faces and heard audible gasps from some of the players.   From this, Oakley concluded that the team members as a whole were not aware of the circumstances that had led to Linder's resignation.[3]   Oakley thought at the time that the returning team members likely concluded that the critical Evaluations were the reason for Linder's resignation.[4] [Oakley Dec., Ex. 1, ¶17; Oakley, Ex. 13, 169-173, 177-178].   Oakley also spoke to the team briefly to reassure them that, despite the shock of learning of Linder's resignation, they would be moving forward together as a team. [Oakley Dec., Ex. 1, ¶18; Oakley, Ex. 13, 198-199].   He was especially concerned about the freshmen players, who had just been recruited by Linder and, upon arriving on campus, learned that she was not going to be their Head Coach after all.   He encouraged the players to

---

[3] Players confirmed that they were shocked or confused at hearing the news of Linder's resignation. [Tilton, Ex. 20, 17; Duffy, Ex. 21, 19-20; Warren, Ex. 23, 15].
[4] A number of the seniors on the softball team confirmed that they did believe at the time that the critical Evaluations were the reason for Linder's resignation. [Duffy, Ex. 21, 18, 20, 23; Tilton, Ex. 20, 20-21; Roush, Ex. 22, 15; Warren, Ex. 23, 15; Frankenfield, Ex. 18, 130-131].

enjoy the weekend, and said that they would be talking further about moving forward as a team in light of Linder's sudden departure. Toocheck did not speak at the meeting and was not visibly crying during the meeting. [Oakley Dec., Ex. 1, ¶¶18-19; Oakley, Ex. 13, 176].

After the emergency team meeting, Oakley understood that he was to begin coaching the softball team as its interim Head Coach, and Kesterson would continue to be a part of the team as she had been previously. [Oakley Dec., Ex. 1, ¶20; Oakley, Ex. 13, 183]. On Saturday, August 29, 2015, Oakley communicated with Kesterson and the other player who was not at the meeting from the day before to tell them both that he was available to talk if they had any questions at all. [Oakley Dec., Ex. 1, ¶21].

### C.    The Senior Meeting, The All-Team Meeting, And The Camping Trip

Well before Linder's resignation, various team events and practices had already been scheduled (the "Fall Schedule"). According to the Fall Schedule, a meeting for senior members of the team was scheduled for Sunday, August 30, 2015[5], and an all-team meeting for Monday, August 31, 2015. [Oakley Dec., Ex. 1, ¶22; Oakley, Ex. 13, 179; Oakley_Ex. 4]. The senior meeting did occur as scheduled early on Sunday, August 30th in the locker room. Oakley and Toocheck were in attendance, as were all eight of the senior players on the team, which included Plaintiff and her twin sister. [Oakley Dec., Ex. 1, ¶23; Oakley, Ex. 13, 198].

Oakley intended to make the meeting a positive step forward with him as the new Head Softball Coach, and to allow his senior players to raise any questions/discussions about any team policies and drills, coaching philosophy, and any other topics that they would like to discuss. [Oakley Dec., Ex. 1, ¶23; Oakley, Ex. 13, 198]. [*See also,* Roush, Ex. 22, 21; Warren, Ex. 23, 16; Frankenfield, Ex. 18, 134-135; Toocheck, Ex. 17, 77-84]. Based upon the team members'

---

[5] The senior meeting or "breakfast" was an annual event. [Kesterson, Ex. 12, 237-238; Roush, Ex. 22, 18; Tilton, Ex. 20, 19-20; Frankenfield, Ex. 18, 131-132].

reactions during the emergency meeting two days before, Oakley was assuming that the team thought that Linder's resignation had some relation to the critical Evaluations.  The meeting was approximately forty-five minutes long.  A few minutes into the meeting, Oakley told the seniors something like "we will not tolerate any more Karen Linder bashing, nor will we tolerate complaints that she is gone; I read the Evaluations from the previous Spring, and they were mean; half of you wanted this; we are moving on." [Oakley Dec., Ex. 1, ¶¶24-25; Oakley, Ex. 13, 198-200;   Kesterson, Ex. 12, 245-249; Tilton, Ex. 20, 22-24; Cregan, Ex. 19, 112-113; Warren, Ex. 23, 20; Frankenfield, Ex. 18, 140-141].

Oakley's statements about Linder specifically referenced the Evaluations and referred to some of the players' negative attitudes about Linder's coaching from the previous year.  Oakley believed that many of the players had made their point in the Evaluations about their displeasure with Linder, she was no longer at KSU, and therefore, there was no longer a reason for them to complain about her and her coaching.  He also understood that some of the players were upset that Linder was no longer the Head Softball Coach, and he specifically mentioned that complaining about Linder no longer being there would also not be tolerated. [Oakley Dec., Ex. 1, ¶27; Oakley, Ex. 13, 199].  [*See also,* Duffy, Ex. 21, 19-20].  Toocheck was crying briefly during the meeting, and said she felt bad for Linder.  Oakley glanced at Toocheck, who had re-composed herself, and then proceeded with the meeting.  Additionally, most of the players at the meeting confirmed that the meeting was generally positive, upbeat, and focused on softball and moving the team forward despite Linder's abrupt resignation, and Oakley having suddenly become the interim Head Softball Coach. [Oakley Dec., Ex. 1, ¶¶31-32, 34; Oakley, Ex. 13, 224; Duffy, Ex. 21, 22; Tilton, Ex. 20, 23-24; Cregan, Ex. 19, 112-113; Roush, Ex. 22, 20-21, 25; Warren, Ex. 23, 16-17].

9

Oakley's goal with the team, at that point, was to create the most comfortable, positive environment for all of the student-athletes – including Plaintiff and her sister – as well as six newly-arrived freshmen who were unaware of any of the events leading up to Linder's resignation.  Oakley also wanted all of the softball facilities to remain safe, stable places for all of the players.  He did not know how each player was receiving the information about Linder's resignation.  However, he did know and appreciate that these athletes, some of them new to the team, had just lost the coach that had coached and/or recruited them, as well as their Assistant Coach Bachkora, who had been with the program during the two previous seasons, but who had left in June 2015.  Oakley was trying to create an environment free from that distraction, and to re-focus the team on the task at hand – to prepare for what hopefully would be a positive experience for the players and a successful softball season ahead. [Oakley Dec., Ex. 1, ¶29].

Oakley was not considering Kesterson or her Title IX Complaint when he made these brief statements that lasted less than five minutes; nor were his statements in any way directed at singling out Kesterson. [Oakley Dec., Ex. 1, ¶30; Oakley, Ex. 13, 203-206, 207-209]. Notwithstanding the conjecture of Kesterson and her twin sister to the contrary, others confirm that the statements that Oakley made relative to Linder were directed to the entire team, and did not single out Kesterson. [Tilton, Ex. 20, 23; Cregan, Ex. 19, 113; Warren, Ex. 23, 15-16; Roush, Ex. 22, 20-21, 114; Toocheck, Ex. 17, 92-93].  Plaintiff acknowledges that Oakley referenced the Evaluations, referred both to Linder bashing and complaining she was gone, and stated that the team was "moving on." [Kesterson, Ex. 12, 245-249].

An all-team meeting had been scheduled to occur and did occur on August 31, 2015. Oakley made the same presentation including the statements about Linder to the entire team as he had the day before with the seniors. [Oakley Dec., Ex. 1, ¶36; Roush, Ex. 22, 21, 25].  Neither

Plaintiff nor her sister attended the all-team meeting.  Plaintiff had informed Oakley via email that she would not be in attendance because of a class conflict.  Oakley encouraged Plaintiff to attend even part of the meeting if she was able, but she did not attend. [Oakley Dec., Ex. 1, ¶37; Kesterson, Ex. 12, 259, Oakley_Ex. 11].  Kesterson continued to miss softball practices and events, including the annual softball team camping trip (Saturday, September 5 through Monday, September 7, 2015). [Kesterson, Ex. 12, 262-270, 281-282; Oakley Dec., Ex. 1, ¶39].  She also began informing O'Connell of her absences from team events instead of Oakley.  For example, during the late afternoon on Friday, September 4, Kesterson emailed Kittell about the upcoming team camping trip:

> "Chloe and I do not feel comfortable going on the camping trip this weekend.  We would appreciate it if you could contact Coach Oakley and let him know we have a family issue that we are tending to.  *Please also make it clear to him that it is imperative he say exactly what Chloe and I request him to say.  If he lets on about anything different to the team we will find out.  I would also appreciate it if you do not notify Coach Oakley about Chloe and I not attending the camping trip until late tonight or early tomorrow morning.*  Thank you for your time."

[Oakley Ex._20 at KSU_1936] (emphasis added).  *See also,* [Kesterson, Ex. 12, 262-269; Oakley Dec., Ex. 1, ¶40; Oakley, Ex. 13, 262-270].

As shown above, it was Kesterson who was dictating to Kittell and Oakley what Oakley should know and when he should know it, and what he in turn should say to the team and others.  Oakley complied with Kesterson's dictate as conveyed through Kittell, and shared only the information he was directed to share. [Oakley Dec., Ex. 1, ¶40; Oakley, Ex. 13, 310-311].

### D.    Plaintiff's Decision Regarding A University-Arranged Meeting To Speak To The Softball Team

During late August and into September 2015, various communications occurred among Oakley, Kittell, and O'Connell regarding Plaintiff's continued involvement with the softball team and her expressed desire to speak with the team as a whole.  On August 31, 2015, a meeting

11

occurred with Kittell, O'Connell, Oakley, and Toocheck, at which they discussed:  providing support to Plaintiff and her sister; effectuating Plaintiff's expressed desire to speak with the team; the importance of Plaintiff maintaining communication with the coaches; and ways to keep moving the team forward should Plaintiff and/or her sister decide not to continue with the team. [Oakley Dec., Ex. 1, ¶38; O'Connell Dec., ¶30].

Oakley understood that Kesterson did not need anyone's permission to speak with anyone on the team or anyone else.  He understood that she could speak with any members of the team or anyone else anywhere, at any time, about whatever she chose.  Oakley did not oppose Kesterson's wish to speak with the team in a University-arranged meeting, but he did think it would be beneficial for a counselor to be present as support for Plaintiff and any other members of the team who might also have been victims of sexual assault.  Oakley also did not want Plaintiff to feel as if she had to speak to the team as a condition of her continuing as a member of the team or to acknowledge in some way that she had a role in Linder's resignation. [Oakley Dec., Ex. 1, ¶41; Oakley, Ex. 13, 260]. The decision of whether or not to speak to the team was entirely Plaintiff's and no one prevented her from speaking with anyone on the team.[6] [Kesterson, Ex. 12, 249-253, 283-284 and KSU_Ex. 129; Oakley Dec., Ex. 1, ¶42; Oakley, Ex. 13, 302-305].  Plaintiff was considering whether or not to speak to the team over a period of weeks.  She was discussing her intentions with Kittell and/or O'Connell.  Oakley was not involved in these communications directly, but Kittell would update him periodically.[7]

---

[6] Kesterson prepared drafts of statements that she was considering reading or referencing in a meeting with her teammates.  Oakley did not have any involvement with these statements, or in any way dictate what Kesterson could or could not communicate to her teammates or to anyone else.  [Oakley Dec., Ex. 1, 54; Kesterson, Ex. 12, 219-221; Linder_Ex. 12].

[7] Oakley was receiving information from Kittell and/or O'Connell relative to Plaintiff's interest in having a meeting, not from Plaintiff directly.  "So from my perspective, I was getting, they're telling the team today. … They want the coaches there.  They're not telling the team.  They're going to tell the team but they're just going to tell the returners.  They're going to tell them at their apartment.  And so I was kind of just getting this every day – and that's fine.  I understand.  You know, they were going through a confusing time.  From my perspective, it was just kind of

12

Ultimately, Plaintiff voluntarily made the decision not to go forward with speaking to the team as a whole, and Kittell shared that decision with Oakley.  Oakley was glad that a decision was finally made one way or the other.[8]  [Kesterson, Ex. 12, 283-284; Oakley Dec., Ex. 1, ¶42; Oakley, Ex. 13, 307; O'Connell Dec., ¶58].  Plaintiff did speak with her teammates individually about the alleged sexual assault, her title IX Complaint, Linder, and other topics. [Duffy, Ex. 21, 26-29; Frankenfield, Ex.18, 137-138, 143-145; Warren, Ex. 23, 18-20];].

### E. Plaintiff's Communications With KSU Administration And The SRVSS Office Continue

Oakley was not involved in the discussions between Plaintiff and her sister, and KSU administration and counselors, including O'Connell, Kittell, Barton, and Nielsen.  As far as Oakley was concerned, Plaintiff and her sister were still on the team even though they were not attending regularly during the first few weeks of September 2015.  Plaintiff still received all of the communications that others on the softball team received. [Kesterson, Ex. 12, 275].  Oakley was allowing Plaintiff and her sister their "space" and time to address the issues raised in the Title IX Complaint and any other concerns. [Oakley Dec., Ex. 1, ¶44; Oakley, Ex. 13, 299-300].

In the meantime, Oakley was working on transitioning into the Head Softball Coach role, building the softball team, retaining recruits, and moving the team forward in a positive manner. [Oakley Dec., Ex. 1, ¶45].  He and Kittell wanted Plaintiff and her sister to follow team protocol regarding communicating with the coaches if either were going to miss softball events and practices.  Oakley believed that this was important so when Plaintiff and her sister were ready to resume their participation on the team, if any of their teammates questioned their absence, he

---

waiting for … we can handle anything … [l]et's have it.  So if they would have had a meeting, told the team, in the room, not in the room, counselor – however we would have done it we would have moved forward.  We would have figured it out." [Oakley, Ex. 13, 308-309].
[8] "I was glad that there was a decision made, because I felt like every day it was [] something different. And so I was glad we kind of settled on a decision." [Oakley, Ex. 13, 306-309].

13

could respond by saying that they had taken some time away from softball for a family issue, but maintained contact with him.[9] [Oakley Dec., Ex. 1, ¶46; Oakley, Ex. 13, 261-271].

In addition to communicating with O'Connell, Barton, and Kittell, Plaintiff also communicated with Nielsen. She had a second in-person meeting with Nielsen on September 10, 2015 to discuss a list of demands that she had for the University relative to her scholarship and other matters. [Kesterson, Ex. 12, 179-183, 273-274; KSU_Ex. 129; Oakley Ex. 26, KSU_Ex. 129, Oakley_Ex. 20; Nielsen, Ex. 15, 131-132; Nielsen Dec., ¶8]. Throughout the Fall 2015 semester and into the Spring 2016 semester, Plaintiff also communicated with various teammates and others about various matters, including the sexual assault, Linder, her Title IX Complaint, and her decision not to continue playing softball. [Duffy, Ex. 21, 26-29; Frankenfield, Ex.18, 137-138, Warren, Ex. 23, 18-20]. [*See also,* O'Connell Dec., generally] Oakley did not in any way hinder these or other communications. [Oakley Dec., Ex. 1, ¶¶53-54].

### F. Plaintiff Decides Not To Continue With The Softball Team, And Graduates From KSU In December 2016

In late August and continuing into September 2015, Plaintiff had been considering whether or not to continue with the softball team. [Kesterson, Ex. 12, 273-275]. Each softball player was required to take and pass a conditioning test. As noted on the Fall Schedule, Plaintiff was scheduled to take the test on September 1, 2015 along with most of her teammates. She contacted Oakley on August 31, 2015 and stated that her boyfriend had been admitted to the hospital. As a result, she was not going to be able to take the conditioning test as originally scheduled. Plaintiff did eventually take the conditioning test, but did not pass it. She was offered the opportunity to take the test again, but declined to do so. Plaintiff was attending

---

[9] "So in my mind, giving them their space, was my way of saying, when they're ready to come back, they'll come back. … [W]e're moving forward. I'm not treating them any differently. … I had felt they were in good hands with [O'Connell], and I was focusing on the team as a whole. …" [Oakley, Ex. 13, 299-300].

softball practices, conditionings, and other softball-related events less and less during the first two to three weeks of September 2015.  Sometimes she would inform Oakley and other times she would inform O'Connell who would then let Oakley know.  Plaintiff acknowledges that the last softball practice she attended was within the first two weeks of September 2015. [Kesterson, Ex. 12, 220].  Ultimately in mid to late September 2015, Plaintiff and her sister made the decision not to continue with the softball team; Plaintiff called Oakley to let him know of their decision. [Oakley Dec., Ex. 1, ¶¶47-50; Oakley, Ex. 13, 261-271].  [*See also,* O'Connell Dec., ¶¶25, 33, 36-37, 48-49, 62-63; KSU_Ex. 110, 120, 128, 136-139].

Subsequently, Oakley saw Plaintiff at a softball event in October 2016 and told her that she still had one more year of eligibility if she wanted to return to the softball team.  Plaintiff responded by saying that she knew that she still had eligibility, but wanted to finish her softball year with her class.  Plaintiff graduated from KSU in December 2016.  [Oakley Dec., Ex. 1, ¶51; Oakley, Ex. 13, 298-299, 362-363].

## III.  Law And Argument

### A.  Standard Of Review

Fed.R.Civ.P. 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moreover, "[t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While a party cannot obtain summary judgment if there is a genuine dispute of a material fact, "[a] dispute is 'genuine' only if based on evidence upon which a reasonable jury

could return a verdict in favor of the non-moving party." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009).

As is detailed below, even considering the evidence adduced herein in a light most favorable to Plaintiff, she cannot demonstrate any genuine dispute of material fact and summary judgment in Oakley's favor should be granted.

**B.  Plaintiff's 42 U.S.C. § 1983 Claims Against Oakley Fail Because She Cannot Establish That He Denied Her Constitutional Rights To Equal Protection Or Deprived Her Of Any Rights Under The First Amendment**

The basic requirements of a § 1983 claim include a showing that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right. *See Soper v Hoben*, 195 F.3d 845, 852 (6th Cir. 1999), *cert. denied*, *Soper ex rel. Soper v. Hoben*, 530 U.S. 1262 (2000) (citations omitted).   A state actor may only be held liable under § 1983 for his "active, unconstitutional behavior." *McKenna v. Bowling Green State Univ.*, 568 Fed. App'x 450, 460 (6th Cir. 2014).  A person may not be held liable under § 1983 for a failure to act.  *Poe v. Haydon*, 853 F.2d 418 (6th Cir. 1988) (supervisors who did not participate in sexual harassment but were merely aware of it and failed to act are not liable under § 1983). *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir.1999) ("Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.").   Rather, a supervisor must have actively engaged in unconstitutional behavior.  Liability, therefore, must lie upon more than a mere right to control employees and cannot rely on simple negligence. *Id.  See also, Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir.1995)*; Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).

1.    Plaintiff's 42 U.S.C. § 1983 Claims Against Oakley In His Official Capacity For Alleged Violations Of The First (Prior Restraint) And Fourteenth Amendments (Equal Protection) Fail As A Matter Of Law

As the Court detailed in its MO, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v.* Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v Mich. Dep't of State Police,* 491 U.S. 56, 68 (1989)). The Eleventh Amendment bars § 1983 suits against officials sued in their official capacity for money damages. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Kent State is a public university, and therefore qualifies as a governmental entity as an arm of the state. *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012); *Sheppard v. Kent State Univ.*, No. 5:15-CV-417, 2015 U.S. Dist. LEXIS  105325 at *6.

The Eleventh Amendment does not, however, necessarily bar suits against officials for prospective injunctive relief. *Diaz v. Mich. Dep't of Corr.,* 703 F.3d 956, 964 (6th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123, 150-56 (1908)). "In order to qualify under *Ex Parte Young*, such an action must seek prospective relief to end a continuing violation of federal law." *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002). *See also, Idaho v. Coeur d'Alene Indian Tribe,* 521 U.S. 261, 281 (1997); *Adams v. Ohio Univ.*, No. 2:17-CV-200, 2018 U.S. Dist. LEXIS 39634 at *42-43 (S.D. Ohio Mar. 12, 2018); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984) (retroactive relief is barred by the Eleventh Amendment). To the extent that any alleged violations of federal law to support a § 1983 claim against an official for prospective injunctive relief are predicated upon past acts, and not continuing conduct, such claim is not viable as a matter of law. *Adams, supra* at 42-44. *See also, Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 U.S. Dist. LEXIS 155291 at *13 (S.D. Ohio Nov. 17, 2015) citing *Green*

*v. Mansour,* 474 U.S. 64, 70-73 (1985) (injunctive or declaratory relief is available only when violations of federal law are threatened or ongoing).

Oakley can only be liable in his official capacity if an official policy or custom caused a Constitutional violation. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). *See also, Loggins v. Franklin County*, 218 Fed. Appx. 466, 471 (6th Cir. 2007). *See also, Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation) (quoting *Monell, supra*, at 694). Thus, in an official capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell, supra.*

In the present case, Plaintiff fails to establish a continuing violation of federal law that would support her § 1983 claims against Oakley in his official capacity for violation of equal protection (Claim 2) or the First Amendment (Claim 3). While she asserts in the Complaint that she seeks an "end to the ongoing indifference and retaliation," she fails to point to any facts that demonstrate "threatened or ongoing" violations of federal law on the part of Oakley as Head Softball Coach. The facts are uncontroverted that, after Plaintiff filed her Title IX Complaint with Barton, Linder was forced to resign. Additionally, the facts are not in dispute that after the August 30, 2015 senior meeting where Oakley made the statements about Linder:

- Plaintiff and her sister met with Nielsen on two separate occasions and he permitted them to keep their scholarships and other benefits throughout their remaining time at KSU [Kesterson, Ex. 12, 274-277; Nielsen, Ex. 15, 131-132; Nielsen Dec., ¶8; KSU_Ex. 129];

- Plaintiff was not inhibited in any way from communicating with anyone about the alleged sexual assault, her report to Linder, Linder's actions or inactions in response, her Title IX Complaint, or any other topic related to her Title IX Complaint, and ultimately voluntarily

decided not to speak with the team as a whole [Kesterson, Ex. 12, 283-284; O'Connell Dec., ¶¶28, 29, 32, 51-52, 54-58; Oakley Dec., Ex. 1, ¶¶41-42];

- Even though he believed that Kesterson did not need anyone's permission to speak to the team, Oakley was willing to assist in facilitating a meeting with the team if Kesterson, through O'Connell and/or Kittell, decided that she wanted to proceed with such a meeting to make a statement to her teammates as a group [Oakley Dec., Ex. 1, 41; Oakley, Ex. 13, 306-309];

- Plaintiff did communicate with various members of the team about these topics throughout the Fall of 2015 and Spring of 2016 [Duffy, Ex. 21, 26-29; Frankenfield, Ex.18, 137-138; 143-145; Warren, Ex. 23, 18-20];

- Plaintiff, through O'Connell and Kittell, directed Oakley as to what he should say in response to other players inquiring about her and her sister's absence from the camping trip activity that occurred on September 5-7, 2015 [Oakley_Ex. 20 at KSU 1936; Kesterson, Ex. 12, 262-269; Oakley Dec., Ex. 1, ¶40; Oakley, Ex. 13, 262-270];

- Oakley complied with Kesterson's directive, and never deviated from the narrative that he was directed to use when asked about Kesterson or her sister's absence from team events [Oakley Dec., Ex. 1, ¶40];

- Plaintiff continued to communicate with KSU administration, athletics, and the SRVSS office freely and without any input by Oakley or anyone else [Oakley, Ex. 13, 264; O'Connell Dec., generally];

- Plaintiff remained a member of the softball team, and was permitted to have time away from the team to address her concerns, and to determine if she wanted to continue with the team [Oakley Dec., Ex. 1, ¶44;

- Plaintiff and her sister made the decision not to continue with the softball team [Oakley Dec., Ex. 1, ¶49];

- Oakley informed Plaintiff that she had another year of eligibility if she wanted to return to the softball team, but she declined [Oakley Dec., Ex. 1, 51; Oakley, Ex. 13, 361-363]; and

- Plaintiff graduated from KSU in December 2016 [Oakley Dec., Ex. 1, ¶51].

Plaintiff relies on her own conjecture and supposition in concluding that "it was a cold environment from [Oakley] and the other coaches," and she did not feel "comfortable" being around Oakley or the team.  In fact, Plaintiff merely relies on the statements that Oakley made during the August 30, 2015 senior meeting, and has no other facts that support her assertions of "ongoing indifference and retaliation."

> Q. So my question is, is there any fact that you can point to that you believe was retaliation against you by Coach Oakley?
> A. Aside from being told that there was no Karen Linder bashing and the course of that discussion, not much.
>
> * * *
>
> Q. What actions did he engage in that made you feel like you could not continue with softball?
> A. His speech at the senior meeting and then coming to find out that he knew what had happened and why I had filed a complaint.
> Q. Okay.  Anything else?
> A. Not at this time that I can remember.

[Kesterson, Ex. 12, 176-177, 263, 281].  In sum, Plaintiff cannot point to any specific *ongoing* violations of either the First or the Fourteenth Amendments that require redress and her official capacity claims therefore, are without merit.

Additionally, Plaintiff fails to articulate any prospective relief she seeks from Oakley:

> Q. … What do you want from Mr. Oakley in this lawsuit?
> A.  I just want him to acknowledge that his actions and his words played a role in me not being able to continue playing softball.

20

[Kesterson, Ex. 12, 281].  An acknowledgement of actions from the past is not prospective injunctive relief and is not the type of relief that is cognizable in a § 1983 action against a state official in his official capacity.  *See e.g., Woodruff v. Ohman*, 29 Fed. Appx. 337, 346 (6th Cir. 2002) (district court exceeded its equitable power when it ordered defendant to apologize), citing *McKee v. Turner*, 491 F.2d 1106, 1107 (9th Cir. 1974) (court stated, "we are not commissioned to run around getting apologies").  *See also, Burkes v. Tranquilli,* 2008 U.S. Dist. LEXIS 51403, at *13 (W.D. Pa. July 2, 2008) ("[t]o the extent that Plaintiff's requested relief regarding an apology can be construed as a request for injunctive relief against the Defendants, such a claim for injunctive relief fails to state a claim as a matter of law"). *Cf. Phi Kappa Tau Chapter House Ass'n of Miami Univ. v. Miami Univ.,* No. 1:12-cv-657, 2013 U.S. Dist. Lexis 15030, at *13 (S.D. Ohio Feb. 4, 2013).

Plaintiff fails to provide any specific facts to support her allegation that there is ongoing indifference and retaliation; nor does she identify any cognizable prospective injunctive relief she seeks from Oakley.  As a result, her § 1983 official capacity claims fails as a matter of law.

<div style="margin-left:2em;">

2.    <u>Plaintiff's 42 U.S.C. § 1983 Claim Against Oakley In His Individual Capacity For Alleged Violation Of The First Amendment (Prior Restraint) Fails As A Matter Of Law</u>

</div>

To establish § 1983 liability against a person in their individual capacity, a plaintiff must prove "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Additionally, as the Court enumerated in the MO, in order to establish First Amendment prior restraint violation, a plaintiff must show the following elements:  (i) one who seeks to exercise First Amendment rights is required to apply to the government for permission; (ii) the government is empowered to determine whether the applicant should be granted permission on the basis of a review of the

content of the proposed expression; (iii) approval is dependent upon the government's affirmative action; and (iv) approval is not a routine matter, but involves an examination of the facts, an exercise of judgment, and the formation of an opinion. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975).

As the Court enumerated in the MO, "[t]he Supreme Court . . . [has] identified perhaps the most important characteristic that sets apart legitimate government regulations from impermissible prior restraints: content-neutrality." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 508 (6th Cir. 2001) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 795, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). The essence of the prior restraint doctrine is censorship - a system in which bureaucrats screen material and remove from it parts that are considered too harmful or offensive for public consumption. *Id.* A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." *Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir. 2000) (citing *Ward, supra* at 791). A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). Moreover, "regulations of the time, place, and manner of expression which are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication" may be enforced. *Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir. 2000) (citing *Perry Educ. Association v. Perry Local Educators' Association*, 460 U.S. 37, 45 (1983).

Plaintiff cannot demonstrate any of the above elements necessary to show a First Amendment prior restraint violation; nor can she demonstrate that any purported restraint on her speech was not content-neutral, and did not afford her alternative means of speaking about

Linder or any other topic.  First, Plaintiff cannot show that she was seeking to exercise her First Amendment rights in regard to Linder or any other speech or other expression.  Plaintiff acknowledges that she was not intending to "bash" Linder by saying disparaging things about her or promoting others saying disparaging things about her. [Kesterson, Ex. 12, 174-176, 283].  Importantly, six days prior to the August 30th senior meeting, Plaintiff had met with Erin Barton and lodged her Title IX Complaint against Linder.  Plaintiff was continuing to work with the Title IX office at KSU, the SRVSS office, and others at KSU both before and after the August 30th meeting.  Oakley had no involvement in these meetings relative to Plaintiff's Title IX Complaint, and no influence, oversight, or discretion relative to any of her communications with anyone at KSU, both on and off the softball team. [Oakley Dec., 1, ¶54].

Plaintiff states that she "would have liked to share with [her] teammates why this was happening." [Kesterson, Ex. 12, 283].  She acknowledges though that she had asked for assistance in scheduling a meeting with the team as a whole, and was permitted that opportunity.  She prepared drafts to read or otherwise present to the team. [Oakley Dec., Ex. 1, 54; Kesterson, Ex. 12, 219-221; Linder_Ex. 12].  She was not required to obtain permission as to what she was going to say, nor did she obtain permission from Oakley or anyone else.  In sum, Plaintiff was able to meet with her teammates whenever she wanted, and at Plaintiff's request, O'Connell was working with her to coordinate a time when she could speak with all of the members of the team at once.  Oakley did not inhibit this effort in any way.  He did not communicate with Plaintiff regarding any statement she might make to the team, or influence what she should or should not express to her teammates or anyone else.  Oakley understood that Plaintiff could have met with the team or any players without anyone at KSU facilitating such a meeting,[10] but he was

---

[10] In fact, Plaintiff lived with several of her teammates and could have and did speak with them about her sexual assault allegations, Linder, the Title IX Complaint, or any other topic. [Kesterson, Ex. 12, 241-242].

supportive of Plaintiff and willing to coordinate the meeting with her teammates all together if that is what she chose to do.  In fact, Plaintiff decided against meeting with the team in a University-arranged meeting but did communicate with many of her teammates throughout the Fall of 2015 and Spring of 2016.

Similarly, Plaintiff cannot establish the second element of a prior restraint because she cannot show that she was required to obtain permission from Oakley or anyone else before saying anything about Linder.  The overwhelming evidence shows that Plaintiff was continuing to speak with others at KSU about Linder, her Title IX Complaint, her scholarship, and any other matter relative to her concerns.  Nothing in Oakley's statements indicate that Plaintiff was required to obtain permission for any expression about Linder or any other topic she was discussing with Barton, Nielsen, Kittell, O'Connell, her teammates, or anyone else.  Plaintiff was not required to consult with Oakley or anyone else, nor did she consult with Oakley or anyone else to obtain permission for any of her communications either before or after they occurred.

Finally, because Plaintiff was not required to and did not seek any type of "permission" from Oakley to express herself relative to Linder, her sexual assault allegations, or any other topic, she also fails to establish the third and fourth elements of a viable prior restraint violation. That is, Plaintiff is unable to show that approval of speech or expression was somehow reliant on Oakley's permission or affirmative action.  To the contrary, Plaintiff's speech and expression relative to Linder and her Title IX Complaint to KSU administration, her teammates, and others continued unabated.  Additionally, Plaintiff cannot show that Oakley reviewed or was in any way involved in any of Plaintiff's communications relative to Linder, her sexual assault allegations, her Title IX Complaint, or any other topic.  To the contrary, Plaintiff was primarily communicating with others at the University, including Barton, Nielsen, Kittell and O'Connell,

and not with Oakley directly.  Not only was Plaintiff not required to obtain any approval from Oakley for any of her communications, the record establishes that Plaintiff did not seek any such approval.  And there were no negative ramifications for Plaintiff not obtaining prior approval.  In sum, Oakley had no involvement in, and did not censor or review Plaintiff's communications or expressions either before or after they were made.

The August 30, 2015 senior softball player meeting at which Plaintiff asserts Oakley violated her First Amendment rights occurred less than two days after the long-time head coach suddenly resigned.  While Oakley knew the circumstances of Linder's resignation, he believed that the senior players thought that the Evaluations from the previous spring that were critical of Linder were the reason for Linder's sudden departure.  Linder's departure occurred just as the players were arriving on campus, including freshman members of the softball team whom Linder had recruited.  Oakley's statement to the seniors and then to the entire team detailed throughout this Memorandum referenced the Evaluations that were "mean" relative to Linder's coaching philosophies and decisions, and that as the newly-appointed head coach, they were "moving on" in a positive manner.  Most of the senior players at the meeting, even one who was aware of Plaintiff's sexual assault allegations, her Title IX Complaint, and the true reason for Linder's resignation, believed that Oakley's statements were directed to the entire team, related to the Evaluations, and were an effort to move the team forward after a shocking previous few days, and not directed at Plaintiff. [Oakley Dec., Ex. 1; ¶¶25-26, 30-33, 53; Oakley Ex. 13, 203-206, 207-209; Cregan, Ex. 19, 112-113].

Moreover, Oakley's statement to the seniors at the August 30, 2015 meeting and then again to the entire team on August 31, 2015 without Plaintiff in attendance, was content-neutral.

25

Plaintiff asserts that Oakley forbade only speech that spoke ill of Linder, but this assertion is belied by others in attendance, and Plaintiff's own deposition testimony:

> Q. So is it fair to say [Oakley] said we won't tolerate any more [Linder] bashing and
> we won't tolerate complaining that she's gone, did he say that?
> A. Something along those lines, yes.
> Q. He said I read the evaluations?
> A. Something along those lines, yes.
> * * *
> Q. But we're moving on, he said that; correct?
> A. Something along those lines.

[Kesterson, Ex. 12, 246].

Plaintiff's sole basis for her allegation that Oakley's statements at the senior meeting were directed at her is because of a subsequent conversation that she had with O'Connell who confirmed that Oakley was aware of Plaintiff's Title IX Complaint filing.  [Kesterson, Ex. 12, 248, 263, 282-283].   Oakley simply being aware of Plaintiff's Title IX Complaint does not, without more, demonstrate that Oakley's statements at the August 30th meeting were directed to her specifically, and were somehow meant to hinder her from continuing her communications with others about her Title IX Complaint, the alleged sexual assault, Linder, or any other topic. To the contrary, Plaintiff's belief that Oakley's statements were directed to her and meant to inhibit her First Amendment rights is unsupported by facts.  Oakley's statements were directed to the entire team – first, the seniors at the August 30th meeting, and then the entire team at the August 31st meeting that Plaintiff did not attend.  Oakley's statements regarding Linder were in relation to the Evaluations, and Oakley's efforts to move the team forward from the complaining about Linder as reflected in the Evaluations, her coaching decisions, training methods, etc., along with complaining that she was no longer the Head Softball Coach.

Even assuming, arguendo, that Plaintiff felt that she was limited as to what she could say regarding Linder in the team locker room or dugout, her actions demonstrate that she knew she

had alternative channels of communication and used those other channels.  Any contention otherwise is belied by the undisputed facts – Plaintiff had been communicating with Barton and Nielsen prior to the August 30th meeting, and continued those and other communications about Linder, the sexual assault, and numerous other topics after that meeting.

Accordingly, Plaintiff's assertion that she suffered a First Amendment prior restraint because of Oakley's brief statements on August 30, 2015 is without merit.

        3.    <u>Oakley Is Entitled To Qualified Immunity As To The First Amendment Prior Restraint Claim, The Sole Remaining Claim Against Him In His Individual Capacity</u>

Even assuming, arguendo, that Plaintiff is able to establish the elements necessary for a First Amendment prior restraint claim, any such claim against Oakley in his individual capacity is barred by the doctrine of qualified immunity.  Qualified immunity shields officials from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  *See also, Wood v. Moss*, 134 S. Ct. 2056 (2014) (state officials are sheltered from suit under the doctrine of qualified immunity when their conduct "does not violate clearly established constitutional rights a reasonable official, similarly situated, would have comprehended," citing *Harlow, supra*); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (the doctrine "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *Shehe v. Luttrell*, 199 F.3d 295, 299 (6th Cir 1999) ("[q]ualified immunity is an affirmative defense that extends to government officials performing discretionary functions.") (citing *Harlow*, 457 U.S. at 817-818).  A duty is ministerial, and outside the context of a discretionary function "only where the statute or regulation leaves no room for discretion – that is, 'it

specifi[es] the precise action that the official *must* take in each instance.'" *Sellers ex rel. Sellers v. Baer,* 28 F.3d 895, 902 (8th Cir. 1994) (quoting *Davis v. Scherer,* 468 U.S. 183, 196 n. 14 (1984)) (emphasis added); *Hudson v. Hudson,* 475 F.3d 741, 744 (6th Cir. 2007).

The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 457 U.S. 335, 341 (1986).  Qualified immunity is not a mere defense to liability, but constitutes immunity from suit and an entitlement not to stand trial.  *See Saucier v. Katz*, 522 U.S. 194, 201 (2001) (abrogated on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)).

As stated in the Court's MO, the immunity analysis proceeds in two stages.  First the Court considers the "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" *Saucier,* 522 U.S. at 201.  Second, the Court asks:  "Whether the right was clearly established … in light of the specific context of the case[,]" and not as a broad general proposition. *Id.* The contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).  *See also, Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014):

> "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.  *In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.*  In addition, we have repeatedly told courts ... not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."

134 S. Ct. at 2023 (internal quotations and citations omitted) (emphasis added).

28

The requirement that the alleged violation be clearly established "balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Wood, supra*, at 2067 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

The Supreme Court has described qualified immunity as "the general rule," characterizing it as almost a "guarantee of immunity." *Anderson,* 483 U.S. at 638. Therefore, the Sixth Circuit places the burden of disproving qualified immunity on plaintiffs. *McCloud v. Testa*, 97 F.3d 1536, 1542 (6th Cir. 1996); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *Untulan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (plaintiff bears the ultimate burden of proving "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct").  As this Court noted in the MO, "[s]tated differently, the issue is 'whether the defendant had fair warning that [his] actions were unconstitutional.'" *Ward v Members of Bd. of Control of E. Mich. Univ.,* 400 F. Supp. 2d 803, 813 (E.D. Mich. 2010) (citations omitted).

Plaintiff cannot point to any binding decisions issued by the U.S. Supreme Court, the Sixth Circuit Court of Appeals, or this Court that clearly establish that a newly-promoted head coach causes a prior restraint in violation of one's First Amendment rights when he:  (i) speaks to a team or a group of senior members of a team, (ii) in an effort to move them forward after a longstanding prior coach suddenly leaves in the wake of critical evaluations by many of those team members, and (iii) references the critical evaluations, telling the members of the team that he will not tolerate the players speaking critically about the former coach or complaining that she is no longer their head coach.  In addition to Plaintiff's inability to point to any binding decisions

29

establishing the contours of the First Amendment right that Plaintiff contends she enjoyed, she also cannot show that Oakley would have reasonably understood that he was violating such a right when he spoke to the senior members of the team on August 30, 2015.  Other than Plaintiff's own conjecture and speculation, she has no evidence demonstrating that Oakley had any improper motivation or intent for his statements to the seniors at the August 30, 2015 meeting or those similar statements that he made to the team as a whole the next day.  She also cannot show tht Oakley's brief statements actually caused Plaintiff to be restrained; she continued to speak with KSU administrators, her teammates, counselors, and others in any way and about any topic she chose without any permission, oversight or censor on the part of Oakley.

Given the state of the law relative to First Amendment rights and the uncontroverted facts relative to Oakley's actions and statements at issue herein, Oakley is clearly entitled to qualified immunity.  *See e.g., Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (the requirement that the alleged violation be clearly established "balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably").

## IV.  Conclusion

For all of the foregoing reasons and based upon all of the evidence before this Court, Oakley states that his Motion is well taken, there are no genuine issues of material fact as to Plaintiff's claims against him, and he is entitled to judgment as a matter of law, as well as to qualified immunity for any claim for money damages.

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*/s/ Anna M. Seidensticker*

ANNA M. SEIDENSTICKER (0046761)
*Trial Counsel*
Principal Assistant Attorney General
Employment Law Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
Telephone:  (614) 644-7257

*Counsel for Defendant Eric Oakley*

## CERTIFICATE OF COMPLIANCE

Anna M. Seidensticker, as trial counsel for Defendant in this case, hereby certifies in compliance with Loc. R. 7.1(f) that the within case is assigned to the standard track, and that the preceding memorandum is not in excess of 30 pages in length. The page limitation was previously modified by order of this Court in a non-document/Minutes of Proceedings on May 9, 2018, and this memorandum complies with this Court's page limit modifications.

*/s/ Anna M. Seidensticker*

ANNA M. SEIDENSTICKER (0046761)
*Trial Counsel*
Principal Assistant Attorney General

31

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Defendant Eric Oakley's Motion for Summary Judgment* was filed electronically on May 25, 2018.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's systems.

*/s/ Anna M. Seidensticker*

ANNA M. SEIDENSTICKER (0046761)
*Trial Counsel*
Principal Assistant Attorney General