# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

LAUREN KESTERSON,       )       CASE NO. 5:16-cv-298
                         )
                         )
          PLAINTIFF,     )       JUDGE SARA LIOI
                         )
vs.                        )
                         )       MEMORANDUM OPINION
KENT STATE UNIVERSITY, et al.,   )
                         )
                         )
         DEFENDANTS.   )

Plaintiff Lauren Kesterson ("Kesterson") brings this civil rights action against defendants Kent State University ("Kent State"), Eric Oakley ("Oakley"), and Karen Linder ("Linder"). Each defendant has moved for summary judgment. (Doc. No. 164 ["Kent State MSJ"]; Doc. No. 161 ["Oakley MSJ"]; Doc. No. 166 ["Linder MSJ"].) Plaintiff opposes each motion. (Doc. No. 173 ["Kent State MSJ Opp'n"]; Doc. No. 171 ["Oakley MSJ Opp'n"]; Doc. No. 175 ["Linder MSJ Opp'n"].) Defendants have filed reply briefs. (Doc. No. 178 ["Kent State MSJ Reply"]; Doc. No. 177 ["Oakley MSJ Reply"]; Doc. No. 179 ["Linder MSJ Reply"].)

## I. BACKGROUND

In the fall of 2012, Kesterson enrolled as a freshman student at Kent State on an athletic scholarship and joined the university's women's softball team. On December 7, 2012, she alleges that another student athlete, Tucker Linder ("Tucker"), raped her in her dorm room. (Doc. No.

156 (deposition of Lauren Kesterson ["Kesterson Dep."]) at 67.[1]) The facts surrounding this unfortunate encounter were discussed at length in the Court's March 15, 2017 memorandum opinion denying defendants' motions to dismiss, and familiarity with that opinion is presumed. *See Kesterson v. Kent State Univ.*, No. 5:16-cv-298, 2017 WL 995222, at *1-2 (N.D. Ohio Mar. 15, 2017). While the Court will briefly revisit the facts surrounding the alleged attack now that the record has been developed after discovery, it must be emphasized that this lawsuit concerns the events that transpired in the months and years that followed, and, particularly, defendants' various responses to Kesterson's reports of sexual assault.

*The Alleged Assault*

Tucker, a member of the university's male baseball team, was the youngest son of Linder, the head coach of the women's softball team. Linder had recruited Kesterson and her twin sister, Chloe Kesterson ("Chloe"), to play softball for Kent State while the girls were still high school juniors. (Doc. No. 155 (Deposition of Karen Linder ["Linder Dep."]) at 52-56.) Linder was responsible for arranging for both girls to receive athletic scholarships. (*Id.* at 52; *see generally id.* at 38.) Upon arriving at Kent State her freshman year, Kesterson developed a friendship with Tucker, and their relationship evolved to the point of a consensual romantic encounter in November 2012. (Kesterson Dep. at 42-45.)

In her deposition, Kesterson testified that, on the evening of December 7, 2012, Tucker contacted Kesterson and invited her to meet him in his room. (*Id.* at 49-51.) Kesterson went to Tucker's room and the two talked. Tucker appeared intoxicated. (*Id.* at 57.) Because Tucker's

---

[1] With the exception of deposition transcript citations, all page numbers refer to the page identification number generated by the Court's electronic docketing system. Given that many of the depositions are in a format containing multiple pages per page identification number, deposition citations shall refer to the page number assigned by the stenographer.

roommate was passed out in the room, Tucker and Kesterson jointly decided to retire to Kesterson's room. (*Id*. at 59.) When they first arrived, they found Chloe there, but she quickly retired to the adjoining room of another softball player. (*Id*. at 59-61.)

Once alone, Tucker and Kesterson began to kiss, which led to some consensual sexual touching, and the two began to remove their clothes. (*Id*. at 63-65.) After a brief interval where the two engaged in some discussion, Tucker attempted to remove Kesterson's underwear, at which time she told Tucker that she did not want to have sex. (*Id*. at 66.) According to Kesterson, Tucker ignored this and continued to remove her underwear. Kesterson tried to push him away, but Tucker continued to press his advantage and raped her. (*Id*. at 66-67.) The two eventually fell asleep. In the morning, Tucker "initiated again" with Kesterson and the two had sex for a second time. Kesterson testified that she would not call this second encounter "consensual," though she concedes that she neither consented nor withheld her consent. (*Id*. at 71.) Kesterson did not share the details of the alleged rape with any employee of the university for more than seventeen months. The first employee she told was Linder, her coach and her alleged attacker's mother.

*The 2014 Exit Interview*

In May 2014, Kesterson met with Linder for a routine exit interview following the 2014 spring softball season.[2] (Linder Dep. at 309.) When Linder asked Kesterson if she was all right, Kesterson informed her that she had been raped.[3] (Kesterson Dep. at 122; Linder Dep. at 92.)

---

[2] Linder testified that she routinely met with her players at the end of the spring season to discuss the season and to address any concerns for the next season. (Linder Dep. at 308-09.) Kesterson does not dispute that this was a routine meeting, nor does she suggest that she either arranged for the meeting or went to the meeting with the intent to report Tucker's assault to Linder.

[3] Linder testified that previously in a team meeting, she observed Kesterson get emotional and thank her teammates for helping her through the season. (Linder Dep. at 87.)

Linder then asked Kesterson if she was referring to her son, Tucker.[4] (Kesterson Dep. at 122-23; Linder Dep. at 92-93.) Kesterson initially hesitated but ultimately confirmed that she was referring to Tucker. (Kesterson Dep. at 123; Linder Dep. at 93.) Linder asked her if she wanted to bring criminal charges against Tucker, and Kesterson told her that she did not.[5] (Kesterson Dep. at 123; *see* Linder Dep. at 93.)

Linder then asked who else knew about the assault, and Kesterson informed her that she already told her parents, her twin sister, Chloe, and her roommate, Nicki. (Kesterson Dep. at 125.) Linder indicated that she believed that it would better if they kept this information limited to people who already knew and not tell anyone else, though Kesterson also testified that Linder "told me not to tell anybody" and "I mean, [Linder], had told me not tell anybody about me being raped." (Kesterson Dep. at 125, 131, 190-91, 198; *see id.* at 129 ["[Linder] asked me not to tell anybody about it."].) Linder did, however, suggest that Kesterson speak with Tucker about the incident. (*Id.* at 126-27; Linder Dep. at 138-39.) Kesterson "eventually" told Linder that she would not speak with Tucker. (Kesterson Dep. at 127.) Before the meeting concluded both women were crying, and Linder informed Kesterson that Tucker was struggling and that he "hadn't been right for a while." (*Id.* at 190; Linder Dep. at 136-38.) She also shared with Kesterson that Tucker was considering not returning to school in the fall. (Linder Dep. at 136.) Linder assured Kesterson that she would help her get through the rest of her time at Kent State. (*Id.* at 153.)

---

[4] Linder believed that she may have asked Kesterson when the assault took place, at which time Kesterson informed Linder that it had occurred in her freshman year. (Linder Dep. at 92.) According to Linder, at that point, she wondered whether Tucker was involved because she remembered that Kesterson and Tucker engaged in what she described as a "flirtation" during their freshman year. (*Id.*)

[5] In her deposition, Kesterson explained that she "didn't see how [she] could continue to play softball pursuing a rape case against [her] coach's son." (Kesterson Dep. at 124.)

Later that same day, Linder contacted Kesterson's mom and relayed that she was sorry for what had happened between Kesterson and Tucker, and that she wanted to help Kesterson work through the situation. (Kesterson Dep. at 138-39; Linder Dep. 153.) She discussed possible counseling, and her mother advised Linder that Kesterson was seeing a counselor. (Linder Dep. at 153.) Linder also checked in with Kesterson throughout the summer of 2014 to see how she was doing. (*Id*. at 152-53; Kesterson Dep. at 194.) When Kesterson returned to school in the fall, Linder asked her how she was doing. (Linder Dep. at 153.) She also informed Kesterson that a former university employee and "life coach," Deborah Keith, would be available to speak with Kesterson or Chloe, if either woman wanted to receive counseling. (*Id*. at 154, 311.)

Kent State's sexual harassment policy designates all employees as mandatory reporters. (Doc. No. 164-8, Kent State Policy Register 5-16.2(D) (requiring employees to report all instances of sexual misconduct to the Title IX coordinator or deputy coordinator). Yet, it is undisputed that Linder did not report the alleged assault by her son to any employee at Kent State. While Linder testified that she believed that Kesterson did not want her to report the assault, she admitted that she was concerned about the fallout and how it would affect her son if he was accused of rape and the matter was investigated. (Linder Dep. at 104, 107, 109, 120.)

*Linder Reports a Different Sexual Assault Claim*

Linder did, however, report the sexual assault of another female student athlete. Within days of her 2014 exit interview with Kesterson, another female softball player informed Linder that she had been assaulted by a different male Kent State student athlete. Linder connected the other softball player with the Office of Sexual & Relationship Violence Support Services ("SRVSS") at the Women's Center on campus. (*Id*. at 77-78.) She also reported the other softball

player's rape to Janet Kittell ("Kittell"), the senior woman administrator and a deputy Title IX coordinator. (*Id.* at 82-86.)

It is Kesterson's position that Linder's failure to report Tucker's alleged attack left her free to retaliate against Kesterson for mentioning the incident in her exit interview. Though Linder successfully coached Kesterson in a starting position for two years, Kesterson claims that Linder entirely changed her approach to coaching Kesterson in her junior year. (Kesterson Dep. at 195, 198.) According to Kesterson, Linder generally acted with extreme indifference toward Kesterson throughout her junior year. (*Id.* at 195 ["[Linder] didn't address me by my . . . nickname, or she didn't seem to talk to me or look at me."]; *id.* at 198 ["[I]t seemed like [Linder] wanted to act like I wasn't a part of the team anymore. . . . I used to be one of [Linder's] favorites, then [Linder's attention] completely dropped off like to where it was almost like she didn't want to recognize that I was still there."].)

In her deposition, Kesterson testified that, in the fall of 2014, she became emotional during a practice. After the practice, in the locker room, she heard Linder tell Oakley, one of Linder's assistant coaches, that they could not have Kesterson lose her composure during a practice, and that if she did it again, Kesterson should be asked to leave. (*Id.* at 196.) When Kesterson approached the two coaches, Linder exclaimed, "speak of the devil." After she asked if Kesterson was feeling better, she informed her that she could not act that way in practice in the future. (*Id.* at 196-97.)

Kesterson also claims that Linder retaliated against her by limiting her playing time. While Kesterson admits that she struggled "[a] little" with her on-field performance in the

aftermath of her report to Linder, she complains that Linder also retaliated against her by taking her out of the starting lineup for a period of time and by moving her from her preferred position of short stop to second base. (*Id*. at 199.)

Also during Kesterson's junior year, Linder required Kesterson and her teammates to attend team events, including a team bonfire and a team Christmas party, at Linder's home. Kesterson complains that it was difficult to participate in these team functions when pictures of Tucker adorned the walls of Linder's home. When Kesterson asked Linder if there was anywhere else these events could be held, Linder simply advised Kesterson that Tucker was not going to be there, so that it was not a big deal. (*Id*. at 195-96.)

*Kesterson Reports Linder to Kent State's IX Office*

On August 24, 2015, Kesterson returned to campus to start her senior year. Accompanied by Chloe and the twins' father, Kesterson met with Erin Barton, the deputy coordinator for Title IX in the Equal Opportunity and Affirmative Action ("EOAA") Department ("Title IX office") to file a complaint against Linder. (Doc. No. 153 (Deposition of Erin Barton ["Barton Dep."]) at 38-39.) Kesterson reported the details involving her 2014 exit interview with Linder, as well as those surrounding the underlying 2012 sexual assault by Tucker. During the meeting, Barton explained that the process was confidential until after the investigation was completed. (Kesterson Dep. at 251.)

At Barton's suggestion, Kesterson and her family met with Kent State Athletic Director

Joel Nielsen[6] on August 26, 2015, because Kesterson had expressed concerns to Barton about the continuation of her scholarship. (*Id*. at 168-69; Barton Dep. at 56.) From his discussions with Kesterson and Chloe, Nielsen understood that there was some question as to whether the twins would continue to play for Kent State. (Doc. No. 147 (Deposition of Joel Neilson ["Nielsen Dep."]) at 132.) Specifically, Kesterson expressed concerns about the treatment she had received from Linder following her 2014 exit interview. (*Id*. at 37-38.) Nielsen advised the girls that typically an athletic scholarship is no longer available if a student athlete elects not to continue with his or her school sport. (*Id*. at 139.) He told them that he would investigate and look into the possibility of the girls keeping their scholarships even if they did not return to the Kent State softball team. (*Id*. at 139-40.) During the meeting, Nielsen also commented about how these situations are difficult on both sides and there is never a winner. (*Id*. at 39-40.) Kesterson interpreted this statement to mean that Kent State was unlikely to do anything to improve her situation. (Kesterson Dep. at 170-71.)

*Kent State's Investigation and Linder's Resignation*

Notwithstanding Kesterson's impression, the record demonstrates that Barton had already begun to work with the Title IX Coordinator, Loretta Shields, and another deputy director, Pamela Fitzgerald, to develop a plan to expedite the investigation into the complaint against Linder so that it could be resolved before Tucker possibly returned to campus for fall classes.

---

[6] There is some question in the record as to the spelling of the Athletic Director's last name. For purposes of this memorandum opinion, the Court adopts the spelling used by this individual in his declaration.

(Barton Dep. at 45, 146-47.) The plan included following up with local authorities, interviewing multiple individuals—including Linder and Kesterson's mother—and meeting with Nielsen and Jennie O'Connell, a Kent State SRVSS official. (*Id*. at 38, 56-57.)

Although it was not her practice to provide a complainant with continual updates of a pending investigation (Doc. No. 151 (Declaration of Erin Barton ["Barton Decl."]) ¶ 7), Barton had regular contact with Kesterson during the investigation. (*See, e.g*., Barton Dep. at 91; Barton Decl. ¶¶ 12, 14-16.) Kent State also arranged for Jennie O'Connell from the SRVSS office to work with Kesterson, providing support services. (Barton Decl. ¶ 17.) Ms. O'Connell had substantial contact with Kesterson during the course of the investigation. (Doc. No. 150 (Declaration of Jennie O'Connell ["O'Connell Decl."]) ¶¶ 18-27.) The record also establishes that Kesterson and Chloe made certain requests of O'Connell as to how and when Oakley and others would be informed of their decision to attend certain practices and team events. These requests were honored. (O'Connell Decl. ¶¶ 15, 35-38; *see* Kent State MSJ at 4365, citing record.)

On August 25, 2015, Barton met with Nielsen to follow up with him regarding Kesterson's scholarship concerns. (Barton Dep. at 58-60; Doc. No. 140 (Declaration of Joel Nielsen ["Nielsen Decl."]) ¶ 4.) On August 26, 2015, Barton and Fitzgerald interviewed Linder about Kesterson's allegations without giving Linder advance notice of the claims. (Linder Dep. at 207.) Linder confirmed in the interview that Kesterson had reported a sexual assault to her the previous year, and Linder admitted that she violated Kent State's sexual harassment policy in not reporting it. (Barton Dep. at 76, 115.) While it was Linder's position that Kesterson did not want her to tell anybody about the assault, Barton concluded that Linder should have followed through

with her duty to report Kesterson's disclosure to university administration. (*Id*. at 78.) On August 27, 2015, Barton recommended to Shields that Linder be terminated for the policy violation, with an aggravating factor being the conflict of interest that was presented by Linder failing to report an issue involving her son. (*Id*. at 84, 86.)

On the morning of August 28, 2015, Linder called Oakley, who was still on summer vacation, to tell him that she would likely need to resign or be fired. (Doc. No. 158 (Deposition of Eric Oakley ["Oakley Dep."]) at 145.) Linder shared the details of the situation with Oakley, who cut his vacation short and immediately began driving back to Ohio. (*Id*. at 150.)

Also on August 28, 2015, Barton met with Nielsen, who agreed with the recommendation from the Title IX office that Linder be separated from Kent State for violating the university's policy and for disregarding her clear conflict of interest. (Nielsen Dep. 66-67.) However, in his deposition he testified that the university rarely terminates an employee for cause, and that ordinarily an agreement is reached as to the employee's separation. (*Id*. at 67.) Accordingly, Nielsen recommended to Kent State's president that Linder be given the opportunity to resign or be terminated, and the president accepted the recommendation. (*Id*. at 64, 71.) That same day (August 28, 2015), Nielsen met with Linder and presented her with two letters: a letter of termination and a letter of resignation, both of which had been prepared by the university's general counsel's office. (*Id*. at 72-73.) Linder chose to resign, effective August 28, 2015, rather than be terminated. (*Id*. at 79-80.) Had Linder been terminated for cause, under the terms of the contract, she would have owed Kent State 25% of her base pay. (*Id*. at 74.) Instead, as part of the negotiated resignation, Linder was permitted to receive the 25% in a lump sum. She and Nielsen agreed that the university would offer a neutral reason for her departure, citing "philosophical

differences." (Linder Dep. at 240.)

*Oakley Is Named Interim Head Coach*

Still on August 28, 2015, Oakley was named the interim head coach. (*See* Oakley Dep. at 160-61.) In a phone call with Nielsen and Kittel, Oakley discussed convening an emergency team meeting that same day for the purpose of announcing Linder's resignation. (*Id.* at 160-62.) At the direction of Kittel, Assistant Coach Toocheck notified the players of the emergency meeting. (Doc. No. 159 (Deposition of Jessica Toocheck ["Toocheck Dep."]) at 62.) When Kesterson received news of the meeting, she attempted to contact Barton by email, but Barton was off campus conducting an unrelated training session. (Kesterson Dep. at 253-54; Barton Dep. at 148-49.) Kesterson did not attend the meeting. (Kesterson Dep. at 240.)

During the meeting, which was attended by Nielsen, Kittel, and Toocheck, as well as all team members besides Kesterson and one other player, Oakley advised the team that Linder had resigned as head coach. (Oakley Dep. at 167-68, 170-71.) According to Oakley, members of the team appeared surprised and visibly upset by the news. Oakley testified that, because the players did not know about Kesterson's report, he attributed their reaction to a response to evaluations prepared by certain team members the year before that had been critical of Linder and her coaching style. (*Id.* at 167-70; *see* Linder Dep. at 180, 197.)

On August 30, 2015, Oakley and Toocheck met with the returning senior members of the softball team for the annual Senior Breakfast, where seniors traditionally met with the head coach to discuss plans for the upcoming year. (Oakley Dep. at 197.) During the meeting, Oakley advised the seniors that "there's going to be no more bashing Coach Linder, and we're not going to get into, nor are we going to complain, about her being gone." (*Id.* at 199.) As Oakley

addressed the team, Toocheck sobbed and expressed her concern for Linder. (*Id.* at 216-18; Kesterson Dep. at 245.) While Oakley maintained in his deposition that he was referring to the negative Linder evaluations from the previous season, Kesterson interpreted the remark as a reference to the complaint she lodged against Linder with the Title IX office, though she concedes that Oakley did reference the negative player evaluations in his remarks. (Oakley Dep. at 199, 203-04; Kesterson Dep. at 245-48.)

*News and Social Media Coverage*

After her departure, Linder spoke publically about her resignation, and was quoted in a newspaper interview stating that she left the university because coaching had changed and student athletes believed that they were entitled to certain privileges. (Linder Dep at 264-65; Doc. No. 159-3 (*Record-Courier* Article) at 3864.) Following news of her resignation and the publication of the article, alumni—including Toocheck—began to register social media posts supporting Linder. (Doc. No. 159-4 (Social Media Posts) at 3890-95.) Also, during alumni football weekend in early October 2015, several alumni softball players had planned to participate in an alumni softball game, and alumna Carrie Eneix had t-shirts made displaying the message "We Support Karen Linder" to be worn during the game. (Linder Dep. at 270-71; Toocheck Dep. at 142-43.) After the weekend, pictures of various alumni wearing the shirts appeared on social media. (Toocheck Dep. 142-43; Doc. No. 159-4 (Social Media Posts) at 3881-2.)

*Kent State's Final Investigative Report*

On January 8, 2016, Kent State issued a written report regarding its internal investigation of Kesterson's complaint, wherein it concluded that "[i]t's not clear whether or not Ms.

Kesterson asked that the alleged sexual assault be kept confidential or if Coach Linder instructed her not to tell anyone." (Doc. No. 155-35 (EOAA Investigation Report) at 2792.) Tucker did not return to Kent State for his senior year, and the university held a *persona non grata* hearing. It is undisputed that Kesterson had no further contact with Tucker. Kesterson and Chloe did not play softball for Kent State their senior year, but both kept their full scholarships and graduated in 2016. (Kesterson Dep. at 182.)

*Federal Lawsuit and Pending Motions*

Kesterson filed the present lawsuit against Kent State and Linder on February 9, 2016. After Kent State and Linder filed early motions under Fed. R. Civ. P. 12, Kesterson was granted leave to amend her complaint to, in part, add Oakley as a party defendant. Thereafter, Oakley also filed a Rule 12(b) motion to dismiss. On March 15, 2017, the Court issued a ruling disposing of the pending motions, and determining that the case would go forward on Kesterson's Title IX claim against Kent State, her equal protection and First Amendment prior restraint claims against Oakley in his official capacity, her First Amendment prior restraint claim against Oakley in his individual capacity, and her equal protection and First Amendment claims against Linder in her individual capacity. *Kesterson*, 2017 WL 995222, at *17. On June 6, 2018, the parties jointly moved to dismiss the remaining individual claim against Oakley, and the Court granted the motion. (Doc. No. 168; Minutes dated 6/7/18.)

All three defendants now seek summary judgment, pursuant to Fed. R. Civ. P. 56, on each and every claim asserted against them in the amended complaint. Linder also seeks

qualifed immunity.[7] Kesterson opposes the requests for summary dismissal, as well as Linder's request for qualified immunity.

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the

---

[7] Oakley also sought qualified immunity for the First Amendment prior restraint claim asserted against him in his individual capacity. Now that this claim has been dismissed by agreement of the parties, his request is rendered moot.

applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay,*

*Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

III. Kᴇɴᴛ Sᴛᴀᴛᴇ'ꜱ Sᴜᴍᴍᴀʀʏ Jᴜᴅɢᴍᴇɴᴛ Mᴏᴛɪᴏɴ

Kesterson brings a claim against Kent State under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*. Title IX provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a). As discussed below, the continued viability of Kesterson's Title IX claim turns largely on when Kent State had "actual knowledge" of the alleged assault involving Tucker.

This Court's analysis of Kesterson's Title IX claim is governed by the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999), which relied on *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998). In *Gebser*, the Court held that a school district cannot be held liable for sexual harassment of a student by one of the district's teachers "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser*, 524 U.S. at 277. One year later, in *Davis*, the Supreme Court recognized a private right of action for student-on-student sexual harassment if the Title IX funding recipient is "deliberately indifferent to sexual harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. *See Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (recognizing

that "[t]he standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment").

Focusing on the text and purpose of Title IX, the Court in *Gebser* underscored the fact that Congress expressly directed that an administrative agency could not initiate enforcement proceedings under Title IX until it "ha[d] advised the appropriate person or persons of the failure to comply with the requirement and ha[d] determined that compliance [could not] be secured by voluntary means." 20 U.S.C. § 1682. From this language, the Court reasoned that a judicially imposed system of enforcement should not be imposed upon an educational funding recipient without consideration of the recipient's knowledge or corrective actions. *Gebser*, 524 U.S. at 289. Title IX, therefore, does not permit a funding recipient to be held liable under a theory of respondeat superior. *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 511 (6th Cir. 2001); *see Davis*, 526 U.S. at 640 (confirming that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct").

Instead, an educational institution can be held liable for student-on-student sexual harassment under Title IX only "when a student can demonstrate: (1) she suffered harassment so severe as to 'deprive [her] of access to . . . educational opportunities,' (2) the institution had actual knowledge of that harassment, and (3) the institution was 'deliberately indifferent' to the harassment." *M.D. by and through Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 777 (6th Cir. 2017) (quoting *Davis*, 526 U.S. at 650); *see also Hill*, 797 F.3d at 970 (breaking down the same standard into five elements). The second element requires a plaintiff to prove that "an 'appropriate person' capable of putting the [school] on notice had 'actual knowledge' of [the student's sexual assault]." *Hill*, 797 F.3d at 970; *Brooks v. Skinner*, 139 F.

Supp. 3d 869 (S.D. Ohio 2015) (similar); *see Gebser*, 524 U.S. at 290 (noting that for a school district to be liable for damages, an "appropriate person" must have actual knowledge of the harassment and an opportunity to rectify any violation).

Kent State readily concedes that the alleged assault was sufficiently severe so as to satisfy the first element identified by the Sixth Circuit. *See Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (stating that rape "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [the victim] of access to the educational opportunities provided by her school"). Still, it argues that it did not have "actual knowledge" of the assault until it was reported to Barton in the Title IX office in 2015 because Linder was not an "appropriate person" for purposes of Title IX. It further argues that, once it was properly aware of the assault, the record conclusively shows that it acted swiftly and definitively, frustrating any claim that it was deliberately indifferent to Kesterson's complaint.

## A.     Linder was not an "Appropriate Person" under Title IX

The Supreme Court in *Davis* did not explicitly discuss the type of school employee who would be considered an "appropriate person" for purposes of putting a school on notice of a complaint of student-on-student sexual assault, and subsequent lower courts have recognized that the inquiry is fact intensive. *See Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1247 (10th Cir. 1999) ("Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry.") Nonetheless, the Court in *Gebser* described an appropriate person as an official of the recipient entity who "at a minimum has authority to address the alleged discrimination and to institute

corrective measures on the recipient's behalf[.]" *Gebser*, 524 U.S. at 290.[8]

In applying this standard, courts have found that employees without disciplinary authority over the bad actor and remediation authority for sexual harassment are not "appropriate persons" under Title IX. *See Hill*, 797 F.3d at 971 (teacher's aide "not high enough on the chain-of-command" to be an appropriate person, noting that there was "[n]o evidence in the record [to] suggest[] teacher's aides at [the school] ha[d] the authority to discipline students for sexual harassment"); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457-58 (8th Cir. 2009) (finding that while principal was an appropriate person, for purposes of Title IX, teacher and guidance counselor did not have sufficient remedial authority to be considered "appropriate persons"); *Baynard v. Malone*, 268 F.3d 228, 238-39 (4th Cir. 2001) (In teacher-on-student sexual harassment, principal who lacked the authority by statute to fire his teachers was not an appropriate person because he was not "invested with the power to take corrective action on behalf" of the school district and thereby become the "proxy" for the funding recipient.).

Kent State argues that Linder does not meet the standard set forth in *Gebser*. Specifically, it notes that, as a coach, Linder had no authority to impose discipline upon students who were not softball players. (Linder Dep. at 284.) She did not have the authority to issue no-contact orders prohibiting one student from speaking with another student. (*Id*. at 284.) She could not prevent a student from registering for classes, and she had no authority to change

---

[8] The Court in *Gebser*, likewise, did not identify job titles that would or would not adequately satisfy this requirement. Instead, it found that the only official alleged to have actual notice was the principal but that his only "notice" was of an inappropriate comment made by a teacher. The Court deemed this information insufficient to alert him to the possibility that the teacher had engaged in a sexual relationship with the student. *Gebser*, 524 U.S. at 291.

a student's course schedule so Title IX complainants would not meet accused students in class. (*Id.* at 285.) She also lacked the authority to investigate Title IX complaints or make findings and issue reports.[9] (*Id.* at 285.) Without the authority to address the sexual assault or take corrective actions, Kent State insists that Linder's notice of the assault in May 2014 cannot not be imputed to the university.

Kesterson disagrees, focusing on what Linder *could* or was *required* to do as the head softball coach. For example, she highlights the fact that, Linder (like any Kent State employee) was a mandatory reporter under Kent State's own sexual harassment policy. She complains that it is "ironic and improper that Kent State, on the one hand, designates Linder and all other employees . . . as mandated reporters and, on the other hand, distances itself" from any employee who refuses to follow that mandate. (Kent State MSJ Opp'n at 5253.)

Kesterson's argument misses the point, and courts have rejected similar arguments. In *Ross v. University of Tulsa*, 859 F.3d 1280 (10th Cir. 2017), the Tenth Circuit found that a security guard's status as a mandatory reporter under the university's sexual harassment policy was insufficient to establish that person as an "appropriate person" under Title IX. In so ruling, the court rejected, as too broad, the plaintiff's view that "anyone who participates in the initiation of a corrective process is an 'appropriate person.'" *Id.* at 1289. The court reasoned that,

> [t]o decide otherwise would turn the deliberate-indifference standard into vicarious liability. For example, consider a school where every employee receiving a report of sexual harassment must convey the report to the principal. If one employee fails to convey a report to the principal, that failure could be

---

[9] Additionally, as a coach, Linder had no authority to commit Kent State to providing medical services to a Title IX complainant, and she could not provide a scholarship to students who were not, or who were no longer, on the softball team. (Linder Dep. at 286; Nielsen Decl. ¶ 11.)

attributed to the school as a whole. This type of vicarious liability is precisely what the Supreme Court sought to avoid through the deliberate-indifference standard.

*Id*. at 1290 (citing *Gebser*, 524 U.S. at 287-90).[10] Courts, like the Tenth Circuit, have underscored the fact that "merely passing on a report of sexual harassment to someone authorized to take corrective action is not the same as corrective action." *Id*. at 1290 (citing *Plamp*, 565 F.3d at 459 (recognizing that specified school personnel were authorized to report discriminatory conduct, "[b]ut that authority does not amount to an authority to take a corrective measure or institute remedial action within the meaning of Title IX")); *Joyce v. Wright State Univ*., No. 3:17-cv-387, 2018 WL 3009105, at *9 (S.D. Ohio June 15, 2018) (same).

Kesterson cites to *Massey v. Akron City Board of Education*, for the proposition that the actual notice standard is met "'when notice is given to an employee whom the school has designated to respond to harassment complaints.'" (Kent State MSJ Opp'n at 5252 [quoting *Massey*, 82 F. Supp. 2d 735, 744 n.7 (N.D. Ohio 2000)].) Yet, as the case law identified above makes clear, there is a difference between an employee designated to *report* a sexual harassment complaint and an employee designated to *respond* to such a claim. Case authority relied upon by Kesterson is in accord with this principle. *See, e.g., Yog v. Tex. S. Univ*., No. H-08-3034, 2010 WL 4053706, at *4-5 (S.D. Tex. Oct. 14, 2010) (collecting cases where employee designated to respond to sexual harassment complaints was considered an appropriate person, and finding that sexual harassment compliance officer was an appropriate person because he had the authority to

---

[10] For all of the same reasons, the court in *Ross* also rejected an argument very similar to that of Kesterson's that a university's policy that identifies employees as mandatory reporters creates an expectation among students that a report to any employee would trigger the corrective process (*see* Kent State MSJ Opp'n at 5253). *See Ross*, 859 F.3d at 1292 ("To the extent that university policy indicates that campus-security officers would begin the university's 'corrective process,' that fact would not justify treating the officers as appropriate persons for purposes of Title IX.").

investigate reports of sexual harassment and report the results of those investigations to university officials).

Kesterson also notes that Linder had the ability to take certain steps to make things easier for Kesterson. Specifically, she identifies a laundry list of actions Linder could have taken—such as notifying Kesterson that she could press criminal charges or obtain a restraining order against Tucker, rescheduling training schedules to avoid contact with the boy's baseball team, assisting Kesterson with class scheduling, and referring Kesterson to a university official "who would take her complaint seriously"—to ease her distress following the rape. (Kent State MSJ Opp'n at 5250.)

Again, Kesterson's expansive definition of "appropriate person" would result in respondeat superior liability for the university, as it would permit an employee without the ability to officially address and remedy the alleged sexual harassment to bind Kent State. However, the "high standard imposed in *Gebser* sought to eliminate any 'risk that the recipient [of Title IX funding] would be liable in damages not for its own official decision but instead for its employees' independent actions.'" *Davis*, 526 U.S. at 643 (quoting *Gebser*, 524 U.S. at 290-91). Accordingly, a query that focuses on whether Linder had the power to take corrective measures on a *complainant's* behalf fails because it misdirects the focus away from whether the Linder had the authority to implement corrective measures on the *funding recipient's* behalf.

Because Linder lacked the authority to address and institute corrective measures on behalf of Kent State, she does not qualify as an "appropriate person" for purposes of Title IX

notice.[11] Therefore, Kesterson cannot maintain that Kent State had actual notice in 2014 of Tucker's assault, and Linder's alleged conduct toward her between the exit interview and the 2015 report to Barton cannot factor into the deliberate indifference analysis.

**B.      Kent State's Response Was Not Deliberately Indifferent**

Having concluded that the second element of the Title IX deliberate indifference prong, notice, was not satisfied until Barton received Kesterson's complaint on August 24, 2015, the Court must determine whether there is evidence that Kent State's response was deliberately indifferent. The Court finds that the evidence, viewed in a light most favorable to Kesterson, does not support this final element.

"[A] university is deemed 'deliberately indifferent' to acts of student-on-student harassment only when the [university's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Ross*, 859 F.3d at 1292 (quotation marks omitted). This is a "high bar" and is not a "mere reasonableness" standard. *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016) (quotation marks omitted); *see Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1259 (11th Cir. 2010) (deliberate indifference is an "exacting standard"). It is also a standard that is amenable to summary judgment, as "there is no reason . . .

---

[11] In opposition to summary judgment, Kesterson argues that, prior to filing her report with Barton, she also reported the assault to several other Kent State employees, including Assistant Coach Jessica Bachkora, Assistant Coach Mandee Luers, Deborah Keith, an academic advisor in the Athletic Department, and Heather Adams, the executive director of SRVSS. She claims that each of these reports took place in 2014, and each of these employees were also "appropriate persons" under Title IX. (Kent State MSJ Opp'n at 5236.) While it is likely that none of these individuals would qualify as "appropriate persons" for the same reasons that Linder fails to qualify, the Court need not reach this issue. Allegations relative to these alleged reports were absent from Kesterson's complaint and amended complaint. Further, in its May 8, 2018 memorandum opinion, the Court denied Kesterson's belated request to further amend to add facts relative to these additional reports to support a new theory of deliberate indifference because these allegations, if true, would have been known to Kesterson at the time she filed her complaint and her amended complaint. Having rejected Kesterson's request to insert these allegations and theories into the action after the conclusion of discovery, it is improper for her to attempt to rely on them now to defeat summary judgment. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788-89 (6th Cir. 2005).

why courts [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Stiles*, 819 F.3d at 848 (alternation in original) (quotation marks omitted); *see also Hill*, 797 F.3d at 973 ("To survive a summary judgment motion, a Title IX plaintiff must present evidence from which a reasonable juror could conclude 'the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination.'" (quoting *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296 (11th Cir. 2007))).

Mere acts of employee negligence do not establish deliberate indifference. *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 365 (6th Cir. 2012). Instead, the question is whether Kent State made "'an official decision'" not to remedy a Title IX violation. *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Davis*, 526 U.S. at 290).

The record is clear that Kent State acted quickly and decisively once Barton was made aware of the 2012 assault and Linder's failure to report it. Within four days of Kesterson's meeting with Barton, Linder was directed to either resign or be terminated. Three days later, Barton confirmed that Tucker was no longer registered for classes and placed a hold on his account to prevent him from re-registering, and Kesterson concedes that she had no further contact with Tucker. (Barton Dep. at 150-51.) Barton also immediately placed Kesterson in contact with a sexual assault survivor advocate to further address Kesterson's emotional needs. (*Id*. at 15-16; 34; Barton Decl. ¶ 17.) Further, on September 10, 2015, Kesterson and her sister presented the athletic director with a list of demands. Kesterson confirmed that Kent State met those demands, including continuing the scholarships for her and her sister despite the twins' decisions not to play softball. (Kesterson Dep. at 182.) This course of action was both swift and effective, in that it did not subject Kesterson to any further sexual assault or harassment. *See*

*Davis*, 526 U.S. 645 ("[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it.") (quotation marks omitted); *see, e.g., Soper*, 195 F.3d at 855 (finding the "prompt and thorough response by school officials" precluded a finding of deliberate indifference).

Kesterson cites Kent State's failure to follow its "own rules and policies" as evidence of its deliberate indifference. In particular, Kesterson notes that Kent State failed to complete its investigation and file its final investigative report within the sixty days mandated by its own Title IX policy. (Kent State MSJ Opp'n at 5257 [citing Doc. No. 164-8 (Kent State University Policy Register) at 4466].) "The salient flaw in this argument is that the Supreme Court has held that the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX." *Doe v. Bd. of Educ. of Prince George's Cty.*, 982 F. Supp. 2d 641, 657 (D. Md. 2013) (citing *Gebser*, 524 U.S. at 291-92).

Kesterson also registers a list of complaints as to the quality of the investigation. Specifically, she complains that she was not continually apprised as to every step taken during the investigation and she was not given advance notice of Linder's resignation, she was given no "assurance" that her scholarship would be unaffected by her report (though she concedes that she did not lose her scholarship), she was given the "impression" that she was not permitted to speak with anyone during the pendency of the investigation because she was told that the investigation was confidential, that the university should not have permitted Linder to resign and/or receive a lump sum settlement, and that Kent State should have controlled Linder's post-resignation

remarks in the press and the social media posts of former employees and alumni.[12]

Title IX "does not afford a claimant the right 'to make particular remedial demands.'"[13] *Workman v. Univ. of Akron*, No. 5:16-cv-156, 2017 WL 6326898, at *11 (N.D. Ohio Dec. 11, 2017) (quoting *Davis*, 526 U.S. at 648); *see Ramser v. Laielli*, 276 F. Supp. 3d 978 (S.D. Cal. 2017) ("'An aggrieved party is not entitled to the precise remedy that he or she would prefer.'" (quoting *Oden*, 440 F.3d at 1089)). Further, the funding recipient's response need not be perfect. Rather, liability will only attach where the record establishes that the funding recipient "[chose] to ignore Title IX's mandate for equal educational opportunities." *Murrell*, 186 F.3d at 1246; *see, e.g., Ramser*, 276 F. Supp. 3d at 994 (granting university summary judgment on student's Title IX claim, noting that the school's "response may not have been perfect and it may not have done everything that [the student] would have liked, but that is not the standard for a Title IX claim").

Here, the university took seriously Kesterson's complaint against Linder, as well as her allegations of assault against Tucker, and acted quickly to ensure that the offending conduct was halted. Kent State unambiguously responded to a report with investigation, discipline, and remediation. While Kesterson would have preferred a slightly different tack, there is absolutely no evidence in the record that would support a finding that Kent State chose to ignore Title IX's mandate for equal education opportunities. Kent State's motion for summary judgment is

---

[12] Kesterson offers no support for her position that Kent State should be responsible for statements made by Linder to a reporter after she left the university, and for the social media posts of former employees and alumni. Sixth Circuit law provides that a public school is not responsible for the social media posts of its students absent evidence that the social posts were made during school hours, when the school can arguably control a student's access to social media. *See Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 324 (6th Cir. 2017). Of course, Kent State has no control over the cyber-activities of alumni and former employees. *See also Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368-69 (S.D.N.Y. 2017) (finding university had no control over social media postings), *appeal withdrawn*, No. 17-900, 2017 WL 4404575 (2d Cir. July 10, 2017).

[13] While Title IX does not protect a complainant's demands, the record demonstrates that Kesterson made demands and that her demands were met. In addition to demanding that she and her sister keep their scholarships, despite their decision to not remain on the team, the twins controlled how and when information was conveyed to coaches.

**GRANTED**.

## IV. LINDER'S SUMMARY JUDGMENT MOTION

Kesterson claims that Linder violated her constitutional right to equal protection by exhibiting deliberate indifference toward her complaint and by treating her differently than another female softball player who made a report of sexual assault, that she unlawfully restrained Kesterson's First Amendment rights by prohibiting her from exercising her right to speak regarding Tucker's assault, and that she retaliated against Kesterson for reporting the assault. Linder seeks dismissal of each of these claims, and also reasserts her right to qualified immunity as to all claims.

### A.    Equal Protection Claim

"The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356 (6th Cir. 2014) (citing *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010)); *see Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005); *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 815 (S.D. Ohio 2014). Kesterson seeks damages from Linder under two equal protection theories: deliberate indifference and "class-of-one" discrimination.

### 1.    Deliberate Indifference

The Sixth Circuit has recognized that a student may prove an equal protection violation by showing an official's deliberate indifference to allegations of student-on-student harassment. *Shively*, 579 F. App'x at 356-57 (collecting cases). Linder correctly point out that the standard

27

for deliberate indifference under equal protection is "substantially the same" as the standard under Title IX. *Stiles*, 819 F.3d at 852 (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)). "[A] plaintiff may demonstrate defendant's deliberate indifference to discrimination only where the recipient's response to [allegations of misconduct] or lack thereof is clearly unreasonable in light of the known circumstances." *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (quotation marks omitted).

Linder posits that Kesterson cannot demonstrate that Linder's response to her claims of sexual assault were deliberately indifferent because Kesterson waited seventeen months to report the sexual encounter, and, when she did mention it, Linder demonstrated "only empathy" toward Kesterson, apologizing to her and, eventually to her mother, and offering to put her in touch with counseling services. (Linder MSJ at 4929.) She claims that the concern she exhibited toward Kesterson defeats any claim that she was deliberately indifferent to her situation. She further notes that, by the time she learned of the assault, Tucker was no longer attending Kent State, and the threat of possible ongoing harassment or assault was nonexistent.

According to Linder, the only thing she did not do was report the assault, as she was required to do under the terms of Kent State's sexual harassment policy, and that a failure to follow a university policy cannot serve to establish deliberate indifference. Further, she notes that she asked Kesterson if she wanted to press criminal charges against Tucker, and when Kesterson responded in the negative, she took that to mean that she did not want Linder to report the matter to the university. (Linder Dep. at 104, 107.) She highlights the fact that even Chloe, her sister and best friend, believed Kesterson did not want to report the assault. (Doc. No. 145 (Deposition of Chloe Kesterson ["Chloe Dep."]) at 107 ["Lauren did tell me that she didn't—

yes, she didn't want to report it."]; *see* Kesterson Dep. at 15.) Accordingly, Linder argues that she was merely respecting Kesterson's privacy by not referring the matter to the Title IX office. (Linder Dep. at 287-88.)

It is true that a university and its officials are not deliberately indifferent to a claim of sexual assault when they delay in taking action on a complaint out of respect for a complainant's request for confidentiality. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) In *Roe*, a female student athlete advised the university's NCAA compliance officer that she had been raped by a fellow student. When the official explained the process for filing a complaint, the student declined to report her rape or her assailant and indicated that she did not want the university to inform her parents. Citing the student's "expressed desire for confidentiality," the court found that the university was not deliberately indifferent in failing to investigate until after the student's father reported the rape to the university's public safety office. *Id.*; *see Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 968 (N.D. Okla. 2016) (finding university's failure to investigate female student's rape allegation was not deliberately indifferent where student indicated that she did not want to report the rape to the police or bring a student conduct complaint against her attacker); *see also Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997) (finding supervisor did not unreasonably respond to employee's claims of sexual harassment by waiting several months to investigate where the employee asked that the supervisor keep the matter confidential until the two spoke again on the matter); *Sims v. Med. Ctr. of Baton Rouge, Inc.*, No. CIV. A. 96-3371, 1997 WL 436258, at *4 (E.D. La. Aug. 1, 1997) (finding employer appropriately responded to employee's Title VII claim of sexual harassment by "respecting [the employee's] requests for confidentiality").

Unlike the clear expression of a desire for confidentiality in *Roe*, the record here is less clear. While Kesterson admits that she told Linder she did not want to press criminal charges, she emphatically states that she was never asked, and never indicated, that she did not want to file a report with the Title IX office. (Kesterson Dep. at 123.) Moreover, while Kesterson waited seventeen months to mention the assault, and only told Linder after Linder probed in a routine exit meeting, Kesterson suggested to Linder that her hesitation in coming forward was grounded in the fact that Tucker was Linder's son. (Linder Dep. at 93.) In fact, Kesterson testified that she told Linder that she did not want to press criminal charges against Tucker because she "didn't see how [she] could continue to play softball pursuing a rape case against [her] coach's son." (Kesterson Dep. at 124.)

Other facts, if believed, would lend support for a finding that Linder acted, not out of concern for Kesterson's privacy, but out of her own desire to keep the assault from coming to the attention of the university. It is true that Linder's policy violation, itself, cannot satisfy the deliberate indifference standard, but Kesterson claims that Linder's failure to report the assault was part of her overall plan to "deep six" her complaint so that Linder could protect her son at the expense of Kesterson's rights. Concerted effort designed to forestall any investigation into Kesterson's complaint would certainly qualify as deliberate indifference, as it would amount to a decision to ignore the alleged misconduct by ensuring that it was never investigated. Linder admitted that she was concerned about how the "fallout" from Kesterson's allegations and a possible rape investigation would affect Tucker. (Linder Dep. at 120.) Given this concern, a jury could view Linder's remark that she thought it was best if Kesterson not discuss the attack with anyone who did not already know as a subtle form of suppression and coercion by the person

who had substantial control over Kesterson and her future as a softball player and scholarship recipient. This is especially true if a jury were to find, as Kesterson has testified, that Linder did more than merely make a suggestion, but, instead, actually ordered Kesterson not to speak about the incident. (Kesterson Dep. at 198.) Under these circumstances, where there are material factual disputes, the Court cannot find, as a matter of law, that Linder was not deliberately indifferent.

### 2.    Class-of-One

For many of the same reasons, Linder is not entitled to summary judgment on Kesterson's class-of-one equal protection claim. To present a "class-of-one" equal protection claim, a plaintiff must demonstrate "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000). "Where a plaintiff succeeds in identifying similarly-situated individuals, plaintiff must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will." *Benjamin v. Brachman*, 246 F. App'x 905, 927 (6th Cir. 2007) (citing *Klimik v. Kent Cty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004)).

As her similarly situated comparable, Kesterson points to her fellow softball teammate who, like Kesterson, reported to Linder that she had been raped by another student. Linder insists that Kesterson's claims fails because she "did not treat [these women] differently in responding to their allegations of sexual misconduct. For each woman, Linder gave her the opportunity to decide what she wanted to do and abided by her choices." (Linder MSJ at 4933.) While

Kesterson's teammate was amenable to filing a report with the university, Linder notes that she "asked Kesterson if she wanted to press criminal charges and Kesterson said no. Linder took this to mean that Kesterson did not want to report her allegation of sexual misconduct." (*Id.*, record cites omitted). Even if the Court were to find the treatment of the women different, Linder argues that the facts surrounding Kesterson's report, including the substantial delay in coming forward and her unwillingness to bring criminal charges, demonstrate a rational basis for treating the two differently, and prevent Kesterson from refuting a conceivable basis to support the different treatment. Again, the Court finds that there is a question of fact as to whether Linder was motivated by a desire to respect Kesterson's privacy in electing not to report the alleged sexual attack, and this factual dispute precludes a ruling on summary judgment.

      B.      **First Amendment Claims**

Kesterson claims that Linder violated her right to free speech, as protected by the First Amendment, in two separate ways: (1) by means of a prior restraint, and (2) by means of retaliation for the exercise of free speech. The Court begins with Kesterson's prior restraint claim.

      1.      <u>Prior Restraint</u>

In Claim 3 of the amended complaint, Kesterson alleged that Linder placed upon her an unconstitutional prior restraint of her right to free speech when she asked her not to speak to anyone about Tucker's assault. (Doc. No. 20 (First Amended and Supplemental Complaint ["FAC"]) ¶¶ 68-69, 318.) As the Court has already noted, there are questions of fact as to whether this remark was part of a subtle form of coercion designed to discourage Kesterson from reporting the assault. The question the Court must now answer is whether it also would be

sufficient to establish a prior restraint. The Court finds that it is not.

As the Supreme Court uses that term, a law constitutes a prior restraint when: (1) one who seeks to exercise First Amendment rights is required to apply to the government for permission; (2) the government is empowered to determine whether the applicant should be granted permission on the basis of a review of the content of the proposed expression; (3) approval is dependent upon the government's affirmative action; and (4) approval is not a routine matter, but involves an examination of the facts, an exercise of judgment, and the formation of an opinion. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975).

Applying these benchmarks to define the boundaries of the term, courts have held that "[t]he term 'prior restraint' describes administrative and judicial orders that block expressive activity before it can occur." *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 125 L. Ed. 2d 441 (1993)). "Under a system of prior restraint, the lawfulness of speech turns on the advance approval of government officials." *Id.*; *see McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) ("Because an unaffiliated speaker's exercise of a First Amendment right depends on the prior approval of a public official, the policy imposes a prior restraint."); *Déjà Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials."); *Guadalupe Police Officer's Ass'n v. City of Guadalupe*, No. CV 10-8061 GAF (FFMx), 2011 WL 13217672, at *7 (C.D. Cal. June 8, 2011) ("A policy or law qualifies as a prior restraint if it requires speakers to obtain advance permission to speak."); *see*

*also Connection Distrib. Co. v. Reno*. 154 F.3d 281, 294-95 (6th Cir. 1998) ("Typically, '[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when used in advance of the time that such communications are to occur.'" (quoting *Alexander*, 509 U.S. at 550)).

In *Alexander*, the Court emphasized that it was necessary to be precise in the identification of prior restraints, inasmuch as it had "interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments." 509 U.S. at 554 (citing *Se. Promotions, Ltd.*, 420 U.S. at 558-59.) Accordingly, the Court in *Alexander* drew the distinction between prior restraints and laws, policies, and directives that leveled subsequent punishments for certain types of speech. *Id.* at 553-54 ("While we may have given a broader definition to the term 'prior restraint' than was given to it in English common law, our decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments." (footnote omitted)).

Despite Supreme Court case law addressing this type of First Amendment claim, courts continue to grapple with the contours of a prior restraint. Some courts have held that *any* policy or directive that has the effect of discouraging future speech amounts to a prior restraint, even if prior approval or screening is not required. *See Dirks v. Bd. of Cty. Comm'r*s, No. 15-CV-7997-JAR, 2016 WL 2989240, at *8 (D. Kan. May 24, 2016) (a suggestion not to speak on a topic, combined with a threat of reprisal constituted a prior restraint). Other courts have refused to find a prior restraint in the absence of the elements and considerations identified by the Supreme Court. *See Westbrook v. Teton Cty. Sch. Dist. No. 1*, 918 F. Supp. 1475, 1481 (D. Wy. 1996) ("[T]he phrase 'prior restraint' is a legal term of art that is shorthand for laws which do more

than simply punish a person, after the fact, for saying certain things."). In *Westbrook*, the court found that a county policy that did not require employees to apply for permission before they offered public criticism of a colleague or superior, did not permit the county to screen the content in advance of publication, and did not require pre-speech approval, was not a prior restraint. *Id.* at 1482 ("Teton County's policy simply does not give Teton County officials the power to deny the use of a forum in advance of actual expression. Teton County's policy is not, therefore, a constitutionally suspect 'prior restraint.'").

Similarly here, several of the key requirements for a prior restraint are missing. Linder did not require Kesterson to seek her permission before she commented on the assault, she did not reserve a right to screen or censor any statements, and she did not require Kesterson to wait for approval before she would be permitted to speak on the topic. Rather, viewing the evidence in a light most favorable to Kesterson, the evidence reveals a directive not to speak to anyone who already did not know about the assault and an unspoken consequence based entirely upon Linder's role over Kesterson as her coach. Not only would such a directive fail to the meet the elements identified by the Supreme Court, it would also fall more comfortably in the camp of a restriction that imposes subsequent punishment (although the threat of punishment was implied), rather than prior governmental screening. *See Alexander*, 509 U.S. at 553-54. The evidence, if believed, would not support the finding of a prior restraint, and Linder is entitled to summary judgment on this claim.

### 2.    Retaliation

A [First Amendment] retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and

two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (per curiam). Linder argues that Kesterson's retaliation claim fails, as a matter of law, because she cannot establish any of the essential elements.

The Court can dispense quickly with Linder's suggestion that Kesterson did not engage in protected activity because she did not "affirmatively speak about her allegation of sexual misconduct. Instead, . . . [she] merely responded to a question; she did not 'lodge a Title IX complaint' or 'make a report.'" (Linder MSJ at 4938 [record cites omitted].) Regardless of the setting, or the impetus for the speech, the Court finds it beyond dispute that reporting a sexual assault constitutes protected speech. *See, e.g., Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 300 (D. Mass. 2017) ("There is no question that [the student] and his family engaged in constitutionally protected conduct by reporting [a sexual assault] to the school and to the police . . . ."); *S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 808 (W.D. Pa. 2016) (finding a female student's complaints concerning the failure to eradicate discrimination in the school were entitled to First Amendment protection) (citing *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282-83 (3d Cir. 2004 ("We begin with the proposition that, except for certain narrow categories deemed unworthy of full First Amendment protection—such as obscenity, fighting words and libel—all speech is protected by the First Amendment.") (quotation marks omitted)))).

Notwithstanding the existence of protected activity, Kesterson's First Amendment retaliation claim fails because she cannot satisfy the remaining factors. As to the second factor, an action will be deemed "adverse only if it could deter a person of ordinary firmness from the exercise of the right at stake." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (quotation

marks omitted). "Although the [effect on freedom of speech] need not be great in order to be actionable, . . . it would trivialize the First Amendment to allow [a plaintiff] to bring First Amendment retaliation claims for *any* adverse action no matter how minor." *Id*. (quotation marks omitted); *see Thaddeus-X*, 175 F.3d at 386 (some adverse actions are so minor they do not give rise to constitutional injuries); *Thompson v. Ohio State Univ*., 92 F. Supp. 3d 719, 733 (S.D. Ohio 2015) ("The adverse action . . . must cause the plaintiff to suffer more than a *de minimis* injury.") While the question of whether an adverse action is sufficiently severe is ordinarily a question of fact "when a plaintiff's alleged adverse action is 'inconsequential,' resulting in nothing more than a '*de minimis injury*,' the claim is properly dismissed as a matter of law." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (quoting *Bell v. Johnson*, 308 F.3d 594, 603, 606 (6th Cir. 2002)).

Kesterson identifies the following actions: (1) Linder generally acted with extreme indifference toward her when Kesterson used to be one of her favorites, (2) Linder changed her approach to coaching Kesterson, (3) she temporarily benched Kesterson, (4) she did not address Kesterson by her nickname, (5) she did not spend as much time talking to Kesterson as she had in the past, (6) she moved Kesterson from her favorite position (short stop) to second base, (7) she made Kesterson attend team events at her home where pictures of Tucker were displayed, and (8) she told Kesterson she could not be emotional on the field during practice. Most of the perceived slights and indecencies Kesterson cites are either conclusory in nature or simply do not rise to the level of a cognizable adverse action.

Arguably Linder's decision to temporarily remove Kesterson from the lineup qualifies as an adverse action, though even that may not be enough as Kesterson concedes that she still

played in almost all of the games in the seasons that followed her report to Linder (Kesterson Dep. at 202-03). *See Seamons v. Snow*, 84 F.3d 1226, 1236-37 (10th Cir. 1996) (high school football player who was denied the right to play in retaliation for his protected speech could maintain a claim for First Amendment retaliation). Putting the temporary nature of the injury aside, however, this cited action fails because Kesterson cannot establish a link between the adverse action and the protected activity. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) ("The third element of a First Amendment retaliation claim requires the plaintiff to prove 'a causal connection between the protected conduct and the adverse action.'" (quoting *Thaddeux-X*, 175 F.3d at 399)). "The Sixth Circuit has interpreted this inquiry to mean that a substantial or motivating factor is 'essentially but-for cause—without which the action being challenged simply would not have been taken.'" *Benison v. Ross*, 983 F. Supp. 2d 891, 900 (E.D. Mich. 2013) (quoting *Vereecke*, 609 F.3d at 400), *rev'd, in part, on other grounds*, 765 F.3d 649 (6th Cir. 2014).

In her deposition, Kesterson admitted that she had been struggling with her performance in softball, and that there were other players who were performing better than she was at the time.[14] (Kesterson Dep. at 199; Oakley Dep. at 98-101, 384, 387-88.)[15] Because Kesterson cannot demonstrate that she would not have been temporarily removed from the lineup in the absence of her protected speech, she cannot make out a prima facie case of First Amendment retaliation. *See Heike v. Guevara*, 519 F. App'x 911, 922 (6th Cir. 2013) (per curiam) (finding

---

[14] Kesterson suggests that her softball performance suffered because of Linder's indifference to her report and her directive that she not speak of her assault. (Kesterson Dep. at 199.) However, for purposes of First Amendment retaliation, the focus is on Linder's motivation for taking the asserted adverse action.

[15] Kesterson also conceded that the statistics of Holly Speers, the teammate who replaced her at short stop, "were a bit better" in "all areas measured." (Kesterson Dep. at 137.)

that decisions involving which players to play and the allotment of playing time fall with the "broad discretion that typically characterizes the coach-player relationship" (quotation marks omitted)).

### C.    Qualified Immunity

Linder renews her request for qualified immunity, suggesting that, even if the Court refuses to summarily dismiss the constitutional claims against her, the Court should find that qualified immunity insulates her from liability. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "Qualified immunity provides [officials] 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013) (per curiam)). Qualified immunity will apply "'if [officials] of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an official's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right

was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first.[16] *See Pearson*, 555 U.S. at 236.

The Supreme Court has recently reiterated earlier admonitions that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 563 U.S. at 639).

According to this directive, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to [officials]' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *Pauly*, 137 S. Ct. at 552). Throughout the qualified immunity analysis, "[t]he 'dispositive inquiry . . .

---

[16] On some occasions, it may be necessary to employ a third step, which is whether the plaintiff "'offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Thacker v. Lawrence Cty.*, 182 F. App'x 464, 468 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)).

[remains] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).

In determining whether a law is clearly established, this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). If controlling authority does not establish the law, this Court may consider other circuit authority. *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson*, 483 U.S. at 639. Again, the right must be clearly established in a particularized sense, and not at a general abstract sense. *Id.* at 640. "'This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]' and 'on a fact-specific, case-by-case basis[.]'" *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (alterations in original) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997)).

With respect to the first prong, the Court has already determined that there are unresolved questions of fact as to whether Linder violated Kesterson's right to equal protection. Nonetheless, Linder is still entitled to qualified immunity for this claim if the constitutional rights implicated were not clearly established.

It is true that, by 1999, the Supreme Court had determined that a school's deliberate indifference to claims of student-on-student sexual harassment violates Title IX. *See Davis*, 526 U.S. at 648. As such, after the decision in *Davis*, school districts were on notice that their

deliberate indifference could lead to liability under Title IX. Kesterson argues that it is also true that, prior to her report to Linder in 2014, it was clearly established that an individual school official could be held liable under the Equal Protection Clause for her own deliberate indifference. In support, she cites to two Sixth Circuit cases, one reported and the other unreported, that would have put Linder on notice that her alleged conduct would violate Kesterson's constitutional right to equal protection. Both cases are distinguishable on the facts and law.

In *Patterson v. Hudson Area Schools*, 551 F.3d 438, 448 (6th Cir. 2009), the court found that genuine issues of material fact precluded summary judgment in favor of a school district on the question of whether it was deliberately indifferent under Title IX. While *Patterson* is distinguished on the ground it involved a funding recipient's liability under Title IX, it is further distinguished by the fact that it involved a persistent pattern of sexual harassment that continued over a period of several years. *Id.* at 448 ("We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student.").

In *Shively*, a decision issued several months *after* the May 2014 exit interview between Kesterson and Linder, the court found that school officials violated a student's equal protection rights by their deliberate indifference to reports of a female student's subjection to religious and gender-based harassment. The court also found that it was well established by 2011, the time of the reports lodged with school officials by the student's parents, that this right was clearly established, resulting in a determination that the school official defendants were not entitled to

qualified immunity. *Shively*, 579 F. App'x at 358. Like *Patterson*, however, the situation presented in *Shively* involved persistent harassment over a period of several years and to which the parents lodged numerous complaints. *Id.* ("It is difficult to imagine how any school administrator could think he would not be liable for allowing unregulated religious and gender-based persecution that spanned a four-year period.").

In contrast, Kesterson did not allege, and she has not shown, that she was subjected to ongoing and unregulated sexual harassment that lasted for years. Instead, she reported one instance (albeit one very serious instance) of sexual assault, occurring more than seventeen months before she made the report. Moreover, Kesterson does not deny that Linder shared with Kesterson her belief that Tucker would not be returning to campus, and, indeed, he did not return and the two had no further contact. Under these circumstances, the Court cannot find that the ruling in *Patterson* would have put Linder on notice that her failure to report one past act of sexual assault that was unlikely to repeat itself would have amounted to deliberate indifference. Moreover, it is unclear whether the court in *Shively*, presented with these facts, would have found the contours of the right clearly established in 2014. *See, e.g., Doe v. Hamilton Cty. Bd. of Educ.*, No. 1:16-CV-373, No. 1:16-cv-497, 2018 WL 3751612, at *17 (E.D. Tenn. Aug. 6, 2018) (distinguishing *Shively* and granting qualified immunity to school coach for known but unreported harassment lasting only a few days, finding that it would not have been "sufficiently clear" that inaction would amount to deliberate indifference); *but see Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 298 F. Supp. 3d 1089, 1109 (W.D. Mich. 2017) (relying, in part, on *Shively* to find that a university administrator was not entitled to qualified immunity, on a motion to dismiss, for a claim of equal protection violation relating to female students' reports of sexual

assault).

Other factual distinctions support this conclusion. In finding the right clearly established, the court in *Shively* relied, in part, upon the Sixth Circuit's decision in *Williams, supra*. There, the court held that individual government officials could be deliberately indifferent, under the Equal Protection Clause, for claims of peer harassment. *Williams*, 455 F. App'x at 618. However, the court found that the principal was not deliberately indifferent to a student's complaints about racial harassment because he took steps to remedy it, including removing racial slurs from the locker and setting up video surveillance in locations where the harassment had occurred. *Id.* at 619-20. Like the administrator in *Williams*, Linder took action. Linder attempted to connect Kesterson with counseling and assured her that Tucker was unlikely to return to campus. She also called Kesterson's mother to apologize and continued to check in on Kesterson over the summer. Given these facts, the ruling in *Williams* would not have necessarily placed Linder on notice that her failure to report the assault and initiate university corrective measures for a completed incident, occurring more than seventeen months earlier and unlikely to repeat itself would have amounted to deliberate indifference.[17]

Under these circumstances, Linder is entitled to the protections of qualified immunity on Kesterson's equal protection claim.

---

[17] A similar result is warranted under Kesterson's alternative theory of class-of-one liability. Kesterson cites *Olech, supra*, for the proposition that Linder should have known as early as 2000 that "singling out individuals for no good reason creates class-of-one liability under the equal-protection clause." (Linder MSJ Opp'n at 5573.) However, this is the type of generalized, broad level analysis that the Supreme Court warns against because it avoids the crucial question of whether an official acts reasonably in light of the particular circumstances that she faced. *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014). A defendant cannot be said to have violated a clearly established right where the right arises out of a zoning case, a completely different context than the one faced by Linder as a coach in an educational setting. Kesterson has pointed to no case authority from which the Court can find that would have put Linder on notice that her actions in handling the two sexual harassment complaints could have exposed her to liability under the Equal Protection Clause.

**V. OAKLEY'S SUMMARY JUDGMENT MOTION**

As previously noted, the only remaining claims against Oakley are made in his official capacity as the interim coach of the women's softball team. "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 68, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)). The Eleventh Amendment bars § 1983 actions against officials sued in their official capacity for money damages. *Ky. v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). Kent State is a public university, and, therefore, qualifies as a governmental entity as an arm of the state, making Oakley a state official. *See McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000)).

Kesterson concedes that she cannot recover money damages against Oakley in his official capacity, adding that she is properly seeking prospective injunctive and declaratory relief against Oakley (and by extension Kent State). The Supreme Court has carved out a narrow exception to sovereign immunity for suits against state officials in their official capacities where the plaintiff is seeking prospective injunctive and declaratory relief. *Ex parte Young*, 209 U.S. 123, 150-56, 28 S. Ct. 441, 52 L. Ed. 714 (1908); *see McKay v. Thompson*, 226 F.3d 752, 757 (6th Cir. 2000) (citing *Will*, 491 U.S. at 70-71). Kesterson claims that she is properly seeking injunctive relief in the form of halting Oakley's continued efforts to "deny [her] the benefits of her alumni status." (Oakley MSJ Opp'n at 5183.) She also requests that Oakley "acknowledge that his actions and his words played a role in [her] not being able to continue playing softball." (Kesterson Dep. at 281.)

45

An apology for past wrongdoing is not prospective injunctive relief and is not the type of relief that is cognizable in a § 1983 action against a state official in his official capacity. *See, e.g., Woodruff v. Ohman*, 29 F. App'x 337, 346 (6th Cir. 2002) (district court exceeded its equitable power when it ordered defendant to apologize); *Burkes v. Tranquilli*, No. 08-474, 2008 WL 2682606, at *4 (W.D. Pa. July 2, 2008) ("To the extent that [p]laintiff's requested relief regarding an apology can be construed as a request for injunctive relief against [d]efendants, such a claim for injunctive relief fails to state a claim as a matter of law.") While Kesterson insists that her deposition testimony cannot be characterized as a request for an apology, the Court finds that an acknowledgment of past wrongdoing is, indeed, tantamount to an apology for that wrongdoing, something this Court is without authority to order.[18] *See, e.g., Adams v. Ohio Univ.*, 300 F. Supp. 3d 983, 1004 (S.D. Ohio 2018) ("Because all allegations in the [c]omplaint are predicated on past conduct, this Court finds that the § 1983 claims against Professor McLaughlin in his official capacity for injunctive relief cannot proceed.")

Kesterson also claims that she is properly seeking prospective relief to stop Oakley's ongoing denial of her status as an alumna. The Court cannot impose injunctive relief based on conclusory allegations of ongoing discrimination. *See Adams*, 300 F. Supp. 3d at 1003. The only "ongoing discrimination" she cites to, however, is the fact that she was left off an email chain in

---

[18] The Court notes that Kesterson's deposition testimony was offered in response to the question "What do you want from Mr. Oakley in this lawsuit?" (Kesterson Dep. at 281.) Kesterson offers no support for her position that she should not be held to her response to a direct question inquiring into the nature of the relief requested in the amended complaint.

the fall of 2016. (Doc. No. 171-2 (Kesterson's Interrogatory Responses) at 5199.)[19] Yet, in his deposition, Oakley testified that Kesterson did not receive this particular email because she was still a student at Kent State (she did not graduate until December 2016), and still had eligibility to play for Kent State (as Oakley had advised her in the fall 2016); therefore, she was not yet an alumna of the Kent State softball team. Her sister, Chloe, who had graduated in May, was already an alumna and received the email, a fact that Kesterson concedes. (Oakley Dep. at 360-63.) Oakley's testimony is unrebutted, and the record is devoid of evidence that Kesterson is still not receiving Kent State softball alumni emails, or is otherwise being denied the benefits of being an alumna of the softball team. *See also Newhouse v. Probert*, 608 F. Supp. 978, 984 (W.D. Mich. 1985) (Permanent injunctive relief "is not available to prevent hypothetical injuries feared as liable to occur at some indefinite time in the future." (citing *Conn. v. Mass.*, 282 U.S. 660, 674, 51 S. Ct. 286, 75 L. Ed. 602 (1930)). Moreover, in the absence of any evidence of ongoing discrimination, the omission from an email chain in 2016 hardly establishes an entitlement to such an extraordinary remedy. *See Ghandi v. Police Dep't*, 747 F.2d 338, 343 (6th Cir. 1984) ("Permanent injunctive relief is an extraordinary remedy which should be granted only sparingly and for compelling reasons." (citing *Wong v. Nelson*, 549 F. Supp. 895, 896 (D. Colo. 1982)); *see, e.g.*, *Kulling v. Grinders for Indus., Inc.*, 185 F. Supp. 2d 800, 822 (E.D. Mich. 2002) (declining to award injunctive relief based on a single violation of federal law).

---

[19] In her unverified response to Oakley's interrogatories, Kesterson stated that Oakley "intentionally excluded Ms. Kesterson from softball alumni emails in the fall of 2015 because of her Title IX reports. Her sister Chloe, who left the team at the same time as Ms. Kesterson, received these emails even though Ms. Kesterson did not." (*Id.*)

Accordingly, Oakley is entitled to summary dismissal of the claims brought against him in his official capacity, and his motion for summary judgment is **GRANTED**.

**VI. CONCLUSION**

For all of the foregoing reasons, the summary judgment motions of Kent State and Oakley are **GRANTED**. Linder's motion for summary judgment is **GRANTED in part** and **DENIED in part**, and Linder's request for qualified immunity on the remaining equal protection claim is **GRANTED**. This case is closed.

**IT IS SO ORDERED.**

Dated: November 5, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**